**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

DOUGLAS RAMSEY,                          ) AU:21-CV-331-LY
                                         )
    Plaintiff/Counter-Defendant,         )
                                         )
v.                                       ) AUSTIN, TEXAS
                                         )
SHEET PILE LLC,                          )
                                         )
    Defendant/Counter-Plaintiff.         ) MAY 15, 2023

            ***********************************************
                  TRANSCRIPT OF JURY TRIAL TESTIMONY OF
                            DOUGLAS RAMSEY
                  BEFORE THE HONORABLE DUSTIN M. HOWELL
            ***********************************************

APPEARANCES:

FOR THE PLAINTIFF:    GERRIT SCHULZE
                      SHUMWAY VAN, LLC
                      13750 SAN PEDRO AVENUE, SUITE 810
                      SAN ANTONIO, TEXAS 78232

FOR THE DEFENDANT:    KEVIN JAMES TERRAZAS
                      ERIC A. HUDSON
                      TERRAZAS, PLLC
                      1001 S. CAPITAL OF TEXAS HIGHWAY
                      AUSTIN, TEXAS 78746

COURT REPORTER:       ARLINDA RODRIGUEZ, CSR
                      501 WEST 5TH STREET, SUITE 4152
                      AUSTIN, TEXAS 78701
                      (512) 391-8791

Proceedings recorded by computerized stenography, transcript

produced by computer.

**EXHIBIT INDEX**

| Plaintiff | OFFD | ADM |
|---|---|---|
| 3 | 92 | 93 |
| 4 | 87 | 87 |
| 5 | 68 | 69 |

(Open court, jury present)

**DOUGLAS RAMSEY,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**MR. SCHULZE:**

Q.   Mr. Ramsey, do you have a white binder to your right on the floor?

A.   There are three of them.

Q.   Okay.  Perfect.  We'll get into those in a moment. I just wanted to make sure they were there.

        Mr. Ramsey, would you please state your full name for the record?

A.   Sure.  Douglas Walter Ramsey.

Q.   Mr. Ramsey, what do you do for work?

A.   I run my own company.

Q.   What is that company?

A.   It's called Lone Star Global.

Q.   And what does Lone Star Global do?

A.   It's a small business management consulting firm.

Q.   Can you explain to the jury what business management consulting is.

A.   Sure.  It has different clients where it advises on different levels of business, depending on what that company may need.  There may be some startups that need kind of initial startup guidance.  Other companies are

smaller and can't necessarily afford full-time CFOs, COOs, VPs, and we step in and help them kind of on a part-time or contract basis.

Q.   And how did you get into that business?

A.   I decided after my last job that I would open my own company and go that route.

Q.   And that last job was Sheet Pile?

A.   That's correct.

Q.   We'll get into that in a moment, but can you tell us your educational background.

A.   Sure.  I have a Bachelor of Arts from Rice University in Houston.

Q.   Okay.  When did you get that degree?

A.   That was in 1998.

Q.   And have you worked in this -- this management type of position since then, or is this a new -- new career for you?

A.   Variations of business management, yes, my entire career.

Q.   Where did you start your career?

A.   I started my professional career actually with the Boy Scouts of America up in Minnesota, a high adventure camp called Northern Tier.

Q.   What did you do for them there?

A.   Well, after I was an expedition guide there for a

few summers in college, I went there and joined the team there as -- I believe the title was accounting specialist.  So I did accounting type work there for over four years.

Q.   And was that just books, or was there management work involved there, too?

A.   It was mostly books and some management as well.  I had a couple of, like, registrars, clerks, seasonal staff.

Q.   Okay.  Fast-forward with me, if you will, to your employment at City Lights.  Can you tell us what City Lights was?

A.   It was kind of a personnel company.  They would -- they played matchmaker with folks looking for professional careers and finding companies to match them up with.

Q.   When did you start working for City Lights Group?

A.   It was just a contract that I had while I was working for Rob.  They introduced me to Rob in January of 2013, and I stayed with them until, I believe it was, July 2013.

Q.   And just to clarify, Rob is Mr. Roberto Wendt?

A.   Yes.  Mr. Rob Wendt, yes.

Q.   Okay.  And that's the gentleman sitting over here on the left?

A.    That's correct.

Q.    Did you work as a contractor for City Lights Group for any other entities or anybody else?

A.    No.

Q.    So it was only for Mr. Wendt's entities?

A.    That's correct.

Q.    Did you have any sort of employment agreement with City Lights?

A.    No.

Q.    And so you were sitting here listening to my opening presentation.  You worked for City Lights, for Mr. Wendt, for couple of months.  What caused the transition from you as a contractor with City Lights Group to an employee of Mr. Wendt's?

A.    In discussions with Mr. Wendt in those first six months, we realized it would be a good professional match for me to join the team.  And so he made the offer for me to join the team full-time and without City Lights in the middle, and we went that route.

Q.    During your time as a contractor with City Lights, how many hours a week on average did you work for Mr. Wendt or his entities?

A.    It was full-time, but it would have been between 30 and 45 hours a week, I imagine.

Q.    Okay.  What were you doing during that time?  What

kind of work or how would you describe your work?

A.   Actually, from the very beginning, Rob brought me on basically as the interim CFO or CFO without the title of CFO.  The very first week I was introduced to all the bank accounts, all the banking, all the finance, all the employees, HR.  So really from the beginning, it was a CFO level role.

Q.   Okay.  Did you have an official title at that point in time?

A.   I think we bandied around CFO, which is chief financial officer, and I believe that may have even been on my email signatures very early on, within the first few weeks.

Q.   Okay.  Then couple of months later was it you that approached Rob and said, you know, I'd be a good fit for full-time employment, or was it Rob that approached you? How did you get there?

A.   We were mutually in agreement that it was a good match.  I enjoyed working with Mr. Wendt.  He seemed to appreciate my abilities and talents.  We seemed to mesh personally, professionally, and he made the offer do you want to come on full-time.  He made the impression that he didn't want to lose me to another group, and I was amenable to that.

Q.   Do you recall when it was that you started as an

employee?

A.   I believe that was July of 2013.  July or August of 2013.

Q.   Okay.  When you became an employee, what changed? Did you have new responsibilities?  Did you have new salary?  What changed?

A.   Really responsibilities didn't change so much. There were very few head count there within the companies, and so really the roles stayed essentially the same.  As far as how I was getting paid, yes, I was getting paid hourly through City Lights' contract work. And then when Mr. Wendt brought me on through Sempe, then that was a monthly -- monthly set amount.

Q.   And was that set based on the number of hours that you worked, or was that set based off of -- I mean, was it a salary, or how did that get set up?

A.   It was a salary.  It wasn't based on hours.  It was a salary set rate based on full-time work.

Q.   And what was that salary?

A.   That was $9,000 a month.

Q.   Okay.  And did they take out -- and when I say "they," I mean any of those entities that you were receiving the payroll from, did they take out your taxes, and things like that?  Or did they just pay you the $9,000 flat?

A.    No.  I was brought on through Sempe as a 1099 contractor, which basically puts the onus of paying taxes and deductions and all that on myself.  And so I would do that with my tax filings.  They just paid me the straight $9,000 a month.

Q.    And so at that point in time, you were working for Sempe Inc.  That was your official employer?

A.    That's correct.

Q.    Is that also who was paying payroll?  Your paycheck, would it say Sempe Inc. at the top?

A.    Yes.  It would say Sempe Inc. on the checks.

Q.    Okay.  You were working for other entities that Mr. Wendt owned at the same time, too, right?

A.    I was.

Q.    What were those entities, if you recall?

A.    Sure.  It was a variety.  It was PilePro Steel LP. That was basically the sales arm of a lot of his companies.  That was the one that actually made transactions with the customers, sold the steel. Sempe Inc., obviously.

      There was PilePro LLC, which was kind of his patent holding company, his litigation company.  It licensed out patents to some of his other companies.

      There was Origami Steel Corporation.  That was a startup company that he was trying to get a bunch of

funding for.  It wasn't a revenue-maker yet, but it was in the works, a very early startup.

I believe those are the main ones I can think of right now.

Q.    Okay.  What kind of work were you doing for those other entities?

A.    It was CFO level for all of them, or at least accounting level.  You know, like the extents -- the extent of it varied between company.  Like PilePro Steel was a very active company, so there was a lot of work there.  Origami Steel was a startup; there wasn't necessarily a lot of work there.

Q.    Let's talk a little bit about any one of those entities.  Pick one.  Let's talk about Origami Steel. Can you walk us through just what you were doing for Origami Steel?

A.    Sure.  As I mentioned, it was a startup company, and so there was a lot of marketing promotional materials. There were conferences that Rob and some of the other folks would go to.  So it was supporting that, making sure that those folks were paid and reimbursed for travel expenses.  Making sure that, you know, any promotional materials got where they needed to get or got revised from our marketing folks.  Make sure the bills paid, the taxes were paid, end-of-year reports sent off to the CPA

so the taxes could be filed by the CPA.

Q. Okay. And what about the PilePro partnership, the LP? What were you doing for that entity?

A. Okay. PilePro Steel LP I think is what you're asking about.

Q. Yes, sir.

A. That was the very busy one. So that's the one that had at the time a warehouse here in Austin, a warehouse up in New Hampshire. And so I was very busy with not just financial but also the operations of those. So I was working directly with the warehouse folks on ordering steel, selling steel, shipping steel, making sure customers were invoiced, making sure that customers were collected from when needed to be. And then also same kind of business management stuff, too, working with Rob to make sure we were going the right direction, cash flow, working with the CPA at the end of the year.

Q. Okay. So is it fair to say that if the business was -- if any one of those entities was doing more work, you were doing more work for those entities. And if they were doing less work, you were doing less work for those entities?

A. That's fair to say, yes.

Q. But at all times while you were employed in this period by Sempe Inc., you were still doing work for every

Q. single one of Rob's entities?

A. Yes.

Q. Would you -- did you have a different title for each of those entities? For example, you referenced earlier that your basic title was CFO. Was that for every entity, or did you have different titles?

A. It pretty much was that for every entity. I didn't necessarily have business cards or email signatures for each of the entities, but it was considered CFO for each of the companies.

Q. What qualified you for that title?

A. Well, Rob bestowed that title upon me, and I agree to it. But my financial background and abilities warranted that title.

Q. And you were comfortable doing that kind of work?

A. I was very comfortable, yes.

Q. Because you had done it in the past?

A. That's correct.

Q. After you became an employee, when you started working for Sempe Inc., what were your business hours? When did you start work and stop work?

A. It varied. I was -- it was partly remote work, partly at the warehouse in Texas, and some travel, of course, too. Generally speaking, I was on the computer, on the phone, around 7:30 or so in the morning and still

going at 5:30 or 6:00 in the evening, but still available evenings, weekends, phone, email.

Q.    Did you ever have a time clock or anything where you had to clock in and out?

A.    No.

Q.    So it was -- it was really more of a C-level position as CFO.  You did the work that was necessary?

A.    Yes.

Q.    Do you recall how long you were paid solely from Sempe Inc.?

A.    I believe that was about 14 months.  About August or so of 2013 to about September of 2014.

Q.    Okay.  What happened then?

A.    At that point, about September 2014, Rob and I discussed it.  He wanted to get me on the -- partly on the PilePro Steel payroll, partly because a lot of my hours were there.  But then if he did that, then I could be a W-2 employee on PilePro Steel and get some of the benefits there.  There were partial medical benefits, a basic package.  And then it would change my tax structure.

So at that point, split -- I went from 9,000- to 10,000-dollar-a-month salary and split that evenly, 5,000 each, between the two companies per month.

Q.    And why did your salary increase $10,000 a month?

A.    He offered me a $1,000 increase that month, and it also helped cover deductions and stuff that were now going to be coming out of my W-2 paycheck up front as opposed to 1099 at the end of the year.

Q.    Did you ever receive any bonus payments while you were an employee?

A.    No.

Q.    Did any employees ever receive any bonus payments?

A.    Not that I recall.  Certainly nothing significant or more than maybe a $100 at Christmas or something.

Q.    Okay.  Who benefited from the shift in the pay structure, revising the pay structure from $9,000 a month from Sempe Inc. to $10,000 a month split between Sheet Pile, I believe it was, and Sempe?  I'm sorry.  PilePro Steel LP and Sempe.

A.    Who benefited?  Well, I think both PilePro Steel and myself benefited.  Certainly I welcomed the extra $1,000 a month in salary increased.  And then it worked well for PilePro Steel, because then I was on their books as an employee as well.

Q.    Would you have done the work that you did for that $9,000 a month the whole time you were employed by strictly Sempe Inc. if you wouldn't have received $9,000 a month for that work?

A.    No.

Q.   And I realize that was a little bit of a commonsense question, but it's important to understand.

What if you were paid only half of that?  Would you have done the amount of work that you did over that year?

A.   No.

Q.   Okay.  So is it fair to say that your salary, the $9,000 a month that you were receiving for that period, was commensurate with the amount of work you were doing over that period of time?

A.   Yes.  I'd say it was.

Q.   You heard me say earlier that you were terminated in December of 2019, right?

A.   Correct.

Q.   From the time that -- and forgive me.  I'm -- there's too many entity names.  From the time that PilePro Steel LP and Sempe Inc. began collectively paying you $10,000 a month through the time you were terminated, did your job duties ever change substantially?

A.   Not substantially.  Minor tasks may have shifted around, but that was generally my same job role.

Q.   And can you explain for the jury what that would be, those minor tasks that may have changed?

A.   Minor tasks changed.  We closed up the Texas warehouse at one point, and so a lot of our operation

moved up to the northeast.  So it was managing just the northeast operation, managing it remotely, and travel back and forth.  That would have been the -- probably the biggest shift, I think, during those years.

Q.    Okay.  But in the grand scheme of things, the job duties that you described to us earlier remained the same throughout your entire tenure at one of these various entities?

A.    That's correct.  Yes, they did.

Q.    And as of 2014 you received $10,000 a month payroll?

A.    Correct.

Q.    And that means for an entire year you would have received $120,000?

A.    That's correct.

Q.    And that didn't change in 2015?

A.    It did not change, no.

Q.    Or in 2016?

A.    The amount did not change.  The payor changed in 2016.

Q.    Okay.  Can you explain that for us, please.

A.    Sure.  In twenty -- I'm pretty sure it was 2016, PilePro Steel LP, owned by Rob Wendt, sold all of its assets to a different company, iSheet Pile, LLC, also fully owned by Rob Wendt.  So it's a little bit of semantics, the change there, but the pay structure stayed

the same: 5,000 from Sempe and 5,000 from, then, iSheet Pile.

Q.   And your work or your duties and requirements, as you testified, didn't change?

A.   That's correct.

Q.   It was just the name of the company that differed?

A.   That's correct.

Q.   What about 2017?

A.   Stayed the same.

Q.   2018?

A.   Stayed the same.

Q.   2019?

A.   Stayed the same.

Q.   And the form of payment, as you just described, was identical in that period of time, right?

A.   It was, yes, until the end of 2018, I believe it was.  That 10,000 a month switched all over to iSheet Pile, LLC as full-time W-2.

Q.   Okay.  But the amount didn't change?

A.   The amount did not change.

Q.   Right.  Talk to me about payroll history at these various companies.  Did you always get paid on time?

A.   No.

Q.   Why not?

A.   It was a lean operation that a lot of times had cash

flow issues.  That was one -- as I recall now, one of the original reasons of moving part over to the W-2 and part to the 1099.  The W-2 was very consistently paid because all of the employees -- or most of the employees were on a W-2.  So they were consistently getting paid twice a month.  And then the 1099 payment, that often lagged quite a few months in many instances.

Q.    So before you started receiving the W-2 payments, were there periods of time where your entire $9,000 paycheck was late?

A.    Yes.

Q.    How often would that happen?

A.    Almost every time.  Almost every month.  It was always a catch-up game.

Q.    And what would change?  What would cause that to be -- what would cause it to where Sheet Pile could now -- or any of those entities could now pay you the $9,000?  What -- does that question make sense?

A.    It does make sense.  The company ebbed and flowed in cash flow.  It would live and die by sometimes very large purchase orders, maybe 200-, 300-, 400-thousand-dollar purchase orders.  But that might be a few months in between those.  All of a sudden we'd get one of those purchase orders, fulfill the purchase order, get paid on the purchase order, suddenly everyone's getting paid or

working to get caught up on payments.

THE COURT:  Why don't we take one of our stretch breaks.  We've been at it close to an hour now. So anybody that wants to stand up and just kind of move around a little bit.

We'll plan on taking our afternoon break at about 10 'til 3:00, okay?  So that will be pretty much right at the midway point of the afternoon.  And, again, we'll break for the day at 4:30.  And that will be how the afternoon will go.

MR. SCHULZE:  May we proceed?

THE COURT:  Whenever you're ready.

MR. SCHULZE:  Thank you, Judge.

Q.   Mr. Ramsey, the cash flow issues would cause 1099 payments to be late to you?

A.   Yes.

Q.   And then, from my understanding, the company would receive a big chunk of money, now have the money, and be able to pay you.  And so it would then pay you, and you would just be paid late?

A.   That's correct.

Q.   How did that impact your family, when you just didn't receive a paycheck for a month like you were supposed to?

A.   It was certainly stressful.  I had to discuss that

with the wife on more than one occasion. But that was one of the benefits of moving to getting paid from both companies, is at least the W-2 payment was fairly consistently on time.

Q. Would the companies prioritize certain payments over others, for example, prioritizing W-2 payments over contractor payments?

A. Yes. Absolutely.

Q. And who directed those prioritizations? Who was in charge of that?

A. Mr. Wendt and I would discuss those every time.

Q. And was it your decision or was it Mr. Wendt's decision?

A. Ultimately it was his decision. But I was there as a paid advisor, and so I would give my strong recommendations.

Q. Okay. During that period of time where, let's say, there was a month where you couldn't get paid because there wasn't enough money to pay you your $9,000, did you ever tell Mr. Wendt: You should pay me first. It's important?

A. I don't recall ever saying pay me first. It was usually more of discussion of let's pay the employees, let's pay the utility bill, let's pay a freight bill, and then maybe I can get half of my pay. That kind of

discussion.

Q.   What made you prioritize -- and when I say "you," what made you and Mr. Wendt prioritize certain payments over others?

A.   Some just made sense.  You know, paying your employees, no offense, was more important than paying the attorneys many times, at least timely.  And so we knew some groups could wait, some couldn't.  So, you know, things like child support or mortgages, those were obviously critical, whereas other payments could be a little bit late and still be acceptable.

Q.   Okay.  You were in charge of payroll for the company, right?

A.   How do you mean "in charge of"?

Q.   Well, you directed when 1099 contractors would get paid and when the W-2 employees would get paid and all that; is that correct?

A.   With discussion with Mr. Wendt, yes.

Q.   Okay.  Was Mr. Wendt also getting a 1099 each month, or how was he getting paid by the company?

A.   Most of the time he was also on a split system as well.  Some of it was W-2, and some of it was 1099.

Q.   Okay.  At the time that you were strictly a 1099 employee, do you recall ever paying Mr. Wendt a W-2?

A.   I don't recall that far back.

Q.   Okay.  Do you know if Mr. Wendt ever got paid late as well?

A.   He did.

Q.   So you and he were kind of the -- the upper-echelon employees of this company.  Is that fair?

A.   That's fair.

Q.   Were there any over C-level officers or employees?

A.   I wouldn't say quite C-level.  We had an operations manager in New Hampshire, which could be close but not quite C-level, necessarily.  But he was also a very strong confidant of Mr. Wendt's.

Q.   Was there ever a time that that operations manager didn't get paid payroll?

A.   Paid or paid on time?

Q.   Paid on time.

A.   Paid on time, yes.  There were multiple instances he didn't get paid on time.

Q.   For the same reason?

A.   Same reasons.

Q.   How was your compensation arrangement established back in 2014 when you switched from the $9,000 a month to the $10,000 a month from two companies?

A.   What do you mean by how was it established?

Q.   How was it established?  Was this a conversation between you and Rob, or did you have an employment

agreement?  Did you have a contract? an email chain?

A.   It started off as conversation with Mr. Wendt.  I believe we even had maybe a draft employment agreement at the time.  Never officially signed it or never signed it, but we had talked about a couple of options.  And it ended up being a handshake deal of let's do the split five and five and keep moving forward.

Q.   And so what changed as far as the way you ran your accounting end of this when that shift happened.  Describe that for us.

A.   Could you be more specific?

Q.   Sure.  So before, when you were still being paid by Sempe Inc., who was in charge of cutting the check from Sempe Inc. to you, Douglas Ramsey?

A.   I was.  With Rob's permission.

Q.   And who would sign that check?

A.   I usually signed that check.

Q.   And you had authority to sign it?

A.   We both had signing authority.  That's right.

Q.   Mr. Wendt gave you authority on the bank account to be able to sign checks on behalf of the company?

A.   That's correct.

Q.   Okay.  Did Mr. Wendt know that you were being paid $9,000 a month?

A.   He did.

Q.   And so each month for this whole period of time when you were cutting those checks, he knew that you were paying yourself $9,000 a month, sometimes late, sometimes on time?

A.   That's correct.  I almost want to say the were all late, but --

Q.   Okay.

A.   -- eventually.

Q.   So then in 2014 you split.  You become a W-2 employee, and you still get a 1099.  So now 5,000 is paid as an employee and 5,000 is paid on the 1099.

Did anything change as far as your responsibilities for making sure that you got paid?

A.   Well, my W-2, my regular employee pay from PilePro Steel, that was part of a payroll batch with all the other employees.  So it was processing a payroll batch with an outside payroll company twice a month.

Q.   And who was that outside payroll company?

A.   That was Hill Country Payroll.

Q.   Okay.

A.   And the other 5,000 would still be the 1099 type payment, where we would cut checks based on cash flow.

Q.   Okay.  You referenced that there may have been an employment agreement at some point in time that you-all discussed.  Did you ever sign an employment agreement at

that point in time?

A.    Not at that point.

Q.    From the time that you were hired at Sheet Pile through the August 2019 employment agreement that was referenced earlier, in that time period did you ever have an employment agreement with Sheet Pile?

A.    No.

Q.    Did you have any sort of an agreement that codified what your job responsibilities or duties or anything like that were?

A.    No.

Q.    Did you have any sort of, like, quarterly performance reviews or sit-downs with Mr. Wendt where he said, Doug, these are things you're doing great and these are things you need to improve on?

A.    Nothing formal like review.  But just we were in constant communication daily, many times a day.  We would meet when he was in town.  And if anything that was already coming up, we would discuss it, good, bad, or otherwise, just kind of on the fly.

Q.    Okay. How did you know whether you were doing a good job or a bad job or whether you were fulfilling what he wanted you to do as an employee?

A.    Well, I felt like I was doing a great job, and then Rob would tell me numerous times that I was doing a great

job.  And he seemed impressed with what I was doing, and that was more or less reinforced when he gave me the $1,000 raise and kept working with me for seven years.

Q.   Did you ever receive any complaints or reprimands or write-ups or anything like that as an employee?

A.   No.

Q.   Who else worked in the accounting department with you?

A.   Really it was strictly me in the accounting department.  We had some folks that would file papers and file invoices as well, but I don't know that I'd consider them in the accounting department.

Q.   So for all of these various companies, the accounting department really was just one guy, just you?

A.   Essentially me, yes.

Q.   And did anybody ever help you with these tasks that you had to get done?

A.   Which tasks?

Q.   Your job duties.

A.   Any of my job duties, sure.  You know, operationally, we were shipping, receiving, working with purchase orders.  We had guys in the warehouse who would process the purchase orders or communicate with me, communicate with customers.  We had folks keeping files, keeping records, archives, managing patents.  There were

a lot of employees helping, yes.

Q.   And you kind of worked with all the employees at Sheet Pile?

A.   Yes.  I worked with every one of them.

Q.   Every single one?

A.   Not so much the few in New Hampshire in the last couple of years, but certainly all the ones here in Texas and the operations manager in New Hampshire.

Q.   You said something earlier about, when Mr. Wendt would come down to Austin, you guys would get together. Was he not located here?

A.   For a while he was.  He had a house I believe here in Austin, and he was in and out.  He also traveled a lot, so sometimes even though he lived in Austin, he was traveling quite a bit.  And then at some point he sold the house here in Austin as well.

Q.   Who was in charge of the Austin operations of these companies?

A.   I was.

Q.   Tell me about what happened in August of 2019 when you signed the employment agreement.  What led to that?

A.   In the few weeks before that, maybe late July, early August, Rob was -- and I was more or less in agreement -- thinking that all of the employees needed to have an employment agreement.  It was something we had discussed

on and off numerous times through the years.  Sometimes we would have drafts and talk about it, and then it would fall apart again.

We had a stronger emphasis that summer of 2019 that we should get documentation and have all the employees sign employment agreements.  It's the right thing to do in a company, and we wanted to tighten that up.  And so we went back and forth a number of times on drafts, and then eventually there was a draft -- or a finalized employment agreement that Rob and I signed in August of 2019.

Q.   If you will do me a favor.  To your right there should be a white binder that says "Plaintiff's Exhibit Binder 1 of 2" on the bottom.

A.   Yes.

Q.   Will you pull that up for me, and will you flip to Tab Number 4.  That's Plaintiff's Exhibit 3.B.

MR. SCHULZE:  I believe this has been pre-admitted, and there are no objections to this, correct?  Since it's been pre-admitted, may I publish this to the jury?

THE COURT:  You may.

MR. SCHULZE:  Thank you.  The problem is it looks different on paper.

Q.   While this is loading, Mr. Ramsey, can you tell me

what this document is.

A.   It is titled the "confidential Employment and Noncompetition Agreement."

Q.   And this is that agreement that you and Sheet Pile signed for your employment?

A.   That's correct.

     (Technical difficulties)

          MR. SCHULZE:  Can everybody see that?

Q.   Mr. Ramsey, what is on the screen is the same as what you have in front of you on paper?

A.   It is.

Q.   Okay.  Perfect.  All right.  So this is the Confidential Employment and Noncompetition Agreement that you and Sheet Pile signed?

A.   Correct.

Q.   And when did you guys sign this agreement?

A.   August 27th, 2019.

Q.   Perfect.  Do me a favor and flip to the very last page of this document.  Is that your signature?

A.   It is.

Q.   And is that what you know to be Mr. Wendt's signature?

A.   It appears to be, yes.

Q.   And you see those squiggles in the bottom, left and bottom, right of this page 3?

A.    I do.

Q.    Are those you-all's initials?

A.    They are.

Q.    Perfect.  All right.  Mr. Ramsey, if you'll do me a favor, and we touched on this a couple of seconds ago, but what precipitated putting together these employment agreement -- or this employment agreement, I think you testified you were just trying to do the right thing for the business?

A.    That's correct.

Q.    And was Sheet Pile trying to sign an agreement like this with every one of its employees at the time?

A.    It -- that was the plan, yes.

Q.    Okay.  Prior to this agreement, you didn't have any sort of employment agreement in writing with Sheet Pile?

A.    That's correct.

Q.    Do you know if over the course of your employment at Sheet Pile, prior to this agreement -- so January of '13 through August of 2019 -- was it regular practice for Sheet Pile to have its employees sign confidential employment and noncompetition agreements?

A.    No, it wasn't.

Q.    Okay.  Was this -- would you say this was one of the first?

A.    I believe this was the first.

Q.   Okay.  Will you do me a favor, and will you read the paragraph for us that starts with the word "whereas."

A.   Sure.  "Whereas the employer desires to obtain the benefit of the services of the employee, and the employee desires to render such services on the terms and conditions set forth."

Q.   What were those services?

A.   Services from my end would be as chief financial officer or CFO.

Q.   Okay.  And that's what you described earlier what your job duties and responsibilities were?

A.   That's correct.

Q.   When you signed this agreement, were there any new services?

A.   No.

Q.   So when this says "Employer desires to obtain the benefit of the services of the employee," did the employer already have those, the benefit of those services?

A.   Yes.  For over six and a half years at that point.

Q.   Okay.  Why would you agree to give them the benefit of those services if you already were giving them the benefit of those services?

A.   Well, not that it was just boilerplate, but it was part of the agreement here.  And it made sense to me that

they still wanted the benefit of my services.

Q.   So as of August 27th, 2019, you had been working for Sheet Pile or one of the various entities for six and a half years, and they still wanted you to keep doing the same work?

A.   That's correct.

Q.   Do me a favor and read the first sentence under "Employment" for me, please.

A.   "The employee agrees that he will at all times faithfully, industriously, and to the best of his skill, ability, experience, and talents perform all of the duties required of his position."

Q.   "Faithfully, industrially, and to the best of his skill, ability, experience, and talents perform all of the duties."  What does that mean?

A.   Well, I guess you want me to go through it. "Employee agrees that he will at all times faithfully," so I guess with right intent, right purpose, non-nefariously.

Q.   Let me ask you this:  Before you signed this agreement, were you faithfully fulfilling your job obligations?

A.   I was.

Q.   So that didn't change.  You didn't start becoming faithful because of this agreement.  You were already

faithful?

A.   Correct.

Q.   Okay.  "Industriously, and to the best of his skill, ability, and experience and talents," what does that mean?

A.   I guess "industriously" would mean actually making good business sense and making good business progress. And "best of skill, ability, and experience and talents" would be, you know, all of the tools that are already possessed from education, life experience, and doing this 25 years now, put all of that into the work that I do for the company.

Q.   Prior to August of 2019, were you already industriously and to the best of your skill, ability, experience, and talents performing those duties?

A.   I was.

Q.   So that's nothing new either?

A.   Nothing new.

Q.   Do me a favor:  Read the second sentence where it starts with "It is also."

A.   "It is also understood and agreed to by the employee that his assignment, duties, and responsibilities and reporting arrangements may be changed by the employer in its sole discretion, without causing termination of this agreement."

Q.   What does that mean?

A.   Basically, that the company could change my job duties and title and role at any time, and it wouldn't terminate our agreement.

Q.   And it was like that before, too, right?

A.   It was.

Q.   And over the course of the last six and a half years, your job did change a little bit, right?

A.   A little bit from time to time, sure.

Q.   And so did you expect this to kind of be the same thing, that little things could change in your job duties without this agreement being invalidated?

          MR. TERRAZAS:  Objection: leading.

          THE COURT:  Sustain the leading objection.

Q.   (BY MR. SCHULZE) We'll skip that question.

A.   Okay.

Q.   Do you know if anything was going to change?

A.   I wasn't aware of any major changes upcoming, no.

Q.   So as of August of 2019 -- actually strike that.

          When you signed this agreement, was there anything in the works, any big plans, anything that was going to substantially impact you guys in the businesses that forced you to want to enter into this agreement?

A.   There were some minor product line changes but nothing earth-shattering, really.

Q.   Was it business as usual?

A.   More or less, because we were always developing different lines, yes.

Q.   Okay.  Do me a favor:  Go to paragraph 2 for me, and read for me where it starts with "As a chief."

A.   "As a chief financial officer, the employee is required to perform the following duties and undertake the following responsibilities in a professional manner."

Q.   You were already the chief financial officer, right?

A.   Yes.

Q.   So this also didn't change?  You didn't add a new title?

A.   That's correct.

Q.   Go ahead and continue on to those subparagraphs, please.

A.   "(a) Manage the financial operations of the employer;

     "(b) Manage human resources, tax, and accounting of the employer;

     "(c) Other duties as may arise from time to time and as may be assigned to the employee."

Q.   At the risk of beating a dead horse, you had already been managing the financial operation of the employer since January of 2013, right?

A.   Correct.

Q.    Who managed human resources?

A.    I managed human resources.

Q.    When did you start managing human resources?

A.    In January of 2013.

Q.    Who managed tax and accounting?

A.    I managed tax and accounting of the employer with the caveat, like I said, I didn't file the federal tax returns.  I sent those off to the CPA and worked with the CPA to get those filed.  But I managed the tax.

Q.    Okay.  Are there any new duties here that you didn't have before?

A.    No.

Q.    What is meant by subparagraph (c), "Other duties as may arise from time to time and may be assigned to the employee"?

A.    That's always a good open one for an employer.  Anything that may change, basically it's the employer's discretion to change your job duties.

Q.    So that kind of aligns with what we talked about earlier, your job changing piece by piece occasionally, right?

A.    That's correct.

Q.    All right.  Let's go down to paragraph 3, "Compensation."  Will you read 3(a) for me.

A.    "(a) As full compensation for all services provided,

the employee shall be paid at the rate of $120,000 per year," which is $10,000 per month.  "Such payment shall be subject to such normal statutory deductions by the employer."

Q.   What was changing in your payroll with this paragraph?

A.   Nothing.

Q.   At this point in time, were you already receiving $10,000 a month?

A.   I was.

Q.   And who was paying that $10,000 a month at that point?

A.   Sheet Pile.

Q.   How long at that point had you been receiving that $10,000 a month from Sheet Pile?

A.   It was for almost a year.  I want to say it was from December of 2018 I was getting that.

Q.   Okay.  And before that is when it was split between Sempe and one of the other entities?

A.   That's correct.

Q.   Okay.  Understood.  So part of negotiating this agreement with you was not giving you a raise?

A.   No, it wasn't.

Q.   Read paragraph (b) for me.

A.   "In the discretion of the employer and based on the

performance of employer's businesses, employee may be eligible for discretionary bonus."

Q.   What does that mean to you?

A.   Up to the employer, which in this case would be Sheet Pile and Rob Wendt, a discretionary bonus could be given at any time of the year for any or no reason.

Q.   Did you ever receive a discretionary bonus?

A.   No.

Q.   And I think you testified earlier already that, typically, nobody received a discretionary bonus?

A.   Correct.  Other than a very small possible cash, $100 or less, once a year.

Q.   So was this something new?  Did you believe that you were going to start receiving discretionary bonuses?

A.   It was a little bit new, but I wasn't really expecting that there would be any discretionary bonus, just not having seen one in the companies prior.

Q.   Okay.  Read paragraph (c) for me, please.

A.   "The salary mentioned in paragraph 3(a) shall be reviewed on an annual basis."

Q.   What did that mean to you?

A.   Rob and I had talked about that and basically discussed that, you know, in future years that, you know, depending on cash flow, business levels, performance, all of it, raises could be considered.

Q.   And is that because you wanted to be paid more than the $120,000 a year?

A.   I would be open it to, certainly.

Q.   In the past you also didn't have any sort of an agreement that gave you any monthly or annual raises, did you?

A.   That's correct.  I did not have that.

Q.   And, in fact, other than the change in payroll from when you worked for City Lights Group to when you became an employee, the only other raise you received was the $1,000 raise, from 9,000 to 10,000 a month?

A.   That's correct.

Q.   And so for a number of years you were working for same $120,000-a-year salary?

A.   That's correct.

Q.   Read paragraph (d) for me, please.

A.   "All reasonable expenses arising out of employment shall be reimbursed, assuming same have been authorized prior to being incurred and with the provision of appropriate receipts."

Q.   What does that mean?

A.   That means that any work-related expenses that incurred personally, whatever they may be, as long as I submitted my documentation on it, then I would be reimbursed for those.  You know, it may be travel to

New Hampshire or it may be purchasing supplies, whatever it may be.

Q.   Was it normal for you in your position to incur travel expenses?

A.   Very normal.

Q.   In the past had you incurred travel expenses?

A.   Yes.

Q.   And what would you do when you incurred those expenses?

A.   Keep the receipts and make a list in an Excel spreadsheet of what those were.  And then I would email those to Rob, we would discuss it, and then usually it was a cash flow conversation.  And then when it was time to pay, they would get reimbursed.

Q.   So prior to signing this agreement, you also received reimbursement for the expenses that you incurred on behalf of the company?

A.   Yes.

Q.   So nothing changed in (d) either?

A.   Correct.

Q.   Read paragraph (e) for me, please.

A.   "The employee also will be entitled to a one-time $44,000 bonus to be paid after the eight truckloads of products are delivered to Roll Form Group."

Q.   Why does this -- or what does this paragraph mean to

you?

A.   This -- we had gotten a very large purchase order for this customer Roll Form Group.  I forget the amount, but it was on the order of 1- to 1 1/2-million-dollars.  It was going to take a lot of extra work out of our team, a lot of extra management, a lot of effort, some changes in our lines.  And so as a performance bonus, once we got that first eight truckloads shipped out to the customer, then I was going to get a substantial bonus here.

Q.   Okay.  Did this require additional work on your behalf --

A.   A lot of extra work.

Q.   -- to get those shipments out?

A.   Yes, it did.

Q.   In what way?  Can you explain that for us?

A.   Figuring out what supplies we needed up in New Hampshire, what personnel we needed, managing the whole warehouse operations from freight and logistics to purchasing, and working with the customer.  It was -- it was quite a big deal.

Q.   And forgive me.  Is that typically a CFO's duty, to do that kind of work?

A.   In a lot of companies, absolutely not.  But we were a very small company of only a handful of employees, so all of us wore a whole bunch of different hats.

Q.   Okay.  And at this point in time, when you signed this agreement, you obviously knew that this large order was already coming?

A.   That's right.  In fact, I believe we already had the purchase order.  My timing may be off on that, but it was within a couple of weeks of actually getting that purchase order in hand.

Q.   And Sheet Pile was going to make upwards of a million dollars off of this deal?

A.   Yes.

Q.   And you had to do a whole bunch of extra work to effectuate that deal?

A.   That's correct.

        MR. TERRAZAS:  Objection: leading.

        THE COURT:  Overruled.

Q.   (BY MR. SCHULZE) Tell us a little bit about what this means, "$44,000 bonus to be paid after the eight truckloads of products are delivered to Roll Form Group." Was this sale only eight truckloads of products?

A.   It was unknown how much it was going to be truckload-wise, because truckloads vary.

Q.   And I guess this is probably a good time to get into a little bit of the business end of this.

        If I was to want to purchase sheet piling or products from Sheet Pile, do I order those by the

truckload?

A.    Typically, no.  Typically you order them by the linear foot.

Q.    Okay.  So I decide I need X-1000 feet, and then that X-1000 feet can be delivered to me by one truck or two smaller trucks or three tiny trucks or ...

A.    Could be whatever makes sense, and sometimes what your yard may be able to handle as well.

Q.    Okay.  When you signed this subparagraph (e) -- when you agreed to this subparagraph (e), had you guys discussed what size truckload of product was being delivered?

A.    No.  Because we -- we knew it was going to be varying sizes of truckloads.

Q.    Okay.  And so it was just each time you sent a truckload of product to Roll Form Group, you got to check off one.  And by the time you got to eight, that's when you were entitled to receive $44,000; is that right?

A.    That's correct.

Q.    Was that new?

A.    The bonus?

Q.    Uh-huh.

A.    It was very new, yes.

Q.    So this was not something that you-all had agreed to beforehand?

A.   Not before this agreement, no.

Q.   Did that paragraph, subparagraph (e), induce you into signing this agreement?

        MR. TERRAZAS:  Objection: leading.

        THE COURT:  Overruled.

A.   Absolutely.  I was very excited about that, and that helped me to sign this agreement.  That's -- that a large bonus in my world.

Q.   It is.  It's almost a third of your salary, right?

A.   Yes.

Q.   Let's move on to paragraph 4.  Can you read the language on paragraph 4 for us, please.

A.   Sure.  "Number 4.  Vacation.  The employee shall be entitled to vacations in the amount of two weeks per annum in which entirely unavailable, i.e., unable to contact by phone and email."

        How far did you want me to go?

Q.   Go ahead and keep going.

A.   "If employee will be unavailable for three days or longer, employee must notify employer at least two weeks in advance about this unavailability.  If employee will be unavailable for one or two days, employee must notify employer at least one week in advance about this unavailability.  If employee will be on vacation but will be available by email and phone, employee need not notify

employer prior to vacation, other that what would be customary for any professional in a business."

Q.   Was that new?

A.   It was.  We had already been doing that in practice, but this was new to more or less formalize it, yes.

Q.   So you just codified what you guys had been doing in the past?

A.   Correct.

Q.   Got it.  Move down to paragraph 5, "Termination," for me.  Do me a favor and read 5(a), please.

A.   5(a) under "Termination":  "The employee may at any time terminate this agreement and his employment by giving not less than two weeks written notice to the employer."

Q.   Is that new?

A.   I wouldn't say it's new.  It's more or less a standard practice, but it's the first time we had it written out.

Q.   Okay.  And you -- actually, strike that.

          Go ahead and move on to the second paragraph, (b), please.

A.   "(b) The employer may terminate this agreement and the employee's employment at any time, without notice or payment in lieu of notice, for sufficient cause."

Q.   What did that mean to you?

A.   That means if an employer has a reason to fire you, they can do it on the spot, without notice, without payment.

Q.   Okay.  Go ahead and read paragraph (c) for me, please.

A.   "(c) The employer may terminate the employment of the employee at any time without the requirement to show sufficient cause pursuant to (b) above, provided the employer pays to the employee an amount as required by the Employment Standards Act 2000 or other such legislation as may be in effect at the time of termination.  This payment shall constitute the employee's entire entitlement arising from said termination."

Q.   What did that mean to you?

A.   Basically, if there's not a reason to fire the employee, then they could terminate you and pay the final amount.

Q.   And at the time that you executed this, did you know what that final amount is or what that means?

A.   Not specifically.  But, customarily, it would be whatever pay that you've earned through -- through the -- past the termination.

Q.   Okay.  Read paragraph (d) for me, please.

A.   "(d) Employee agrees to return any property of

employer or any companies controlled, managed, owned, or affiliated with employer at time of termination."

Q. What did that mean to you?

A. Turn over anything you've got that's owned by the company, whether it's files, keys, cards, passwords, computers. Anything the employer owns of the company.

Q. When were you terminated by Sheet Pile, LLC?

A. Mr. Kevin Terrazas called me the evening of December 30th, 2019 to let me know I was terminated effective the following day, December 31st.

Q. Okay. Prior to that, your email access had been cut off, right?

A. That's correct.

Q. When did you stop working for Sheet Pile, LLC?

A. The night of December 30th, when Kevin Terrazas called me.

Q. How did you keep working after your email was cut off?

A. I still had bills to cover. You know, I was corresponding with a few employees that were left. I was trying to reach out to Mr. Terrazas to find out what the status was. I was trying to reach out to Mr. Wendt what the status was.

Q. After -- actually, what date was your email cut off?

A. I believe that was December 19th of 2019.

Q.    And did you know that you were going to be fired when that happened?

A.    I had no idea what was going on at that point.

Q.    When did you first find out that you were going to be fired?

A.    December 30th, when Mr. Terrazas told me I was being fired the next day.

Q.    What did you -- why did you think your email was cut off?

A.    I did not know.  It was a strange Rob Wendt tactic.

Q.    Okay.  So even after just randomly you couldn't log into your email anymore, you still continued working for Sheet Pile?

A.    That's right.

Q.    Why?

A.    I thought I was still an employee.  Rob Wendt and I had been having good conversations just that very week. He said I was doing a great job.  I had no reason to think otherwise.  I didn't know if it was a glitch or if Rob was ill or what the situation was.  It was a very confusing time.

Q.    When you were notified on December 30th that your -- you were fired as of December 31st, were you given a reason for that termination?

A.    No.  He just said -- well, he said that Rob has just

decided to part ways and that I was terminated effective the next day.

Q.   Was there any sort of sufficient cause?

A.   No.

Q.   Look back at paragraph 5(b) for me.  You read this earlier, and it says that the employer may terminate the employment at any time without notice, or payment in lieu of notice, for sufficient cause.

When you signed this agreement, did you know what sufficient cause would be?

A.   I did.

Q.   What was sufficient cause?

A.   Well, if you weren't doing your job or doing something nefarious or negligent or, you know, any -- anything really malicious, you know, you could assault someone at work, whatever it may be, you could be terminated for cause.

Q.   Okay.  Did any of those happenstances that you just listed happen in this case --

A.   No.

Q.   -- that caused you to be terminated for cause?

A.   No.

Q.   Did either Mr. Terrazas or Mr. Wendt ever tell you what their sufficient cause for terminating you was?

A.   No.  At time when Mr. Terrazas called me, and then I

had a follow-up meeting with Mr. Terrazas a few weeks later to turn over files and stuff, he never mentioned anything about sufficient cause.  Just that we were parting ways and going a different direction.

Q.   Okay.  And we'll get back into this here in a little bit, but I don't want to get too far down that rabbit hole.

Let's look at paragraph 6 for me.  What was this section about?

A.   Well it's titled "Noncompetition and Nondisclosure," so it's kind of been mentioned a little bit today about noncompetition, not working for a competitor and nondisclosure, not disclosing proprietary trade secrets from a company.

Q.   Will you read section 1 for us, please.

A.   Sure.  "Section (1) It is further acknowledged and agreed that the following termination of the employee's employment with employer for any reason, employee shall not hire or attempt to hire any current employees of employer or any companies controlled, managed, owned, or affiliated with employer at the time of termination for a period of two years."

Q.   What did that mean?

A.   Two years after termination, don't try to hire any of the employees of Sheet Pile or any of the affiliated

companies.

Q.   And so you were terminated December 31st of 2019. So is it fair to say that that two-year period would have ended December 31st of 2021?

A.   Yes.

Q.   In that period of time, December 31st, 2019 to 2021, did you hire or attempt to hire any current employees of Sheet Pile or any companies controlled, managed, or owned or affiliated with Sheet Pile?

A.   No.

Q.   No.   At this point do you or your entity employ any employees, or did they offer employment to any of those employees?

A.   No.

Q.   Let's look at paragraph (2).  Will you read that section for me.

A.   "(2) It is further acknowledged and agreed that for a period of two years following the termination of the employee's employment with employer for any reason, the employee shall not solicit business from current clients or clients who have retained employer, or any companies, controlled, managed, owned, or affiliated with employer at the time of termination, the six-month period immediately preceding employee's termination."

Q.   That was a mouthful.  What does that mean to you?

A.   Basically, within two years of termination, don't try to solicit business from any of the clients that Sheet Pile would have had.  There's a grammatical error in here, but I read it to be that the -- Sheet Pile would have had six months before I was terminated.

Q.   Okay.  And so because you were employed at Sheet Pile, you knew who those current clients and whatnot were in that six-month period prior, correct?

A.   I did.

Q.   And did you solicit business from any of those current clients in that two-year period?

A.   No.

Q.   In fact, have you solicited any clients since your departure from Sheet Pile that were also clients of Sheet Pile?

A.   No.

Q.   Let's look at paragraph (3) for me, please.  Go ahead and read that one.

A.   "(3) Employee agrees that he is being provided with highly confidential trade secret and proprietary information from employer and that access to such confidential, trade secret, and proprietary information would not be provided without this noncompetition agreement.  In addition, employee agrees that he could not do his job without access to this confidential, trade

secret, and proprietary information."

Q.   When you signed this agreement, were you given any new highly confidential, trade secret, and proprietary information?

A.   No.

Q.   Did anything change after this agreement that provided you access to new or, you know, previously unknown confidential information?

A.   No.

Q.   So the confidential information that's referred to in paragraph 6(3) here, that's all stuff you already knew?

A.   That's correct.

Q.   And you had been working the last six and a half years with that information?

A.   I had.

Q.   But you didn't have a noncompete in the six and a half years before this?

A.   That's correct.

Q.   You didn't have a nondisclosure in the six and a half years before this?

A.   That's correct.

Q.   In the six and a half years before this, did you ever disclose Sheet Pile's confidential trades and proprietary information?

A.    No.

Q.    Why not?

A.    That would be totally improper and just not something I would ever even consider doing.

Q.    But you didn't have an agreement that required you to not do it?

A.    I didn't.

Q.    But you elected not to anyway?

A.    Correct.

        THE COURT:  We're at the point when I said we'd take an afternoon break.  It's 2:50.  Why don't we break until three o'clock.  If everyone would please rise for the jury.

    (Jury recessed)

        THE COURT:  Okay.  See you-all in 10 minutes.

    (Recess)

    (Open court, no jury)

        THE COURT:  Anything to discuss before we bring the jury in?

        MR. SCHULZE:  No, Your Honor.

        MR. HUDSON:  No.

        THE COURT:  All right.  Please remain standing for the jury.

    (Open court, jury present)

        THE COURT:  Mr. Schulze, whenever you're ready.

Actually, I should have done this before you broke, and I won't remember to instruct you every time we take a break. But I do want to remind you that, as we take our breaks, until the trial is over, you're not to discuss this case with anyone, including your fellow jurors. If anyone approaches you and tries to talk to you about the case, please tell me immediately or somebody from my team. Do not read or listen to any news reports of the trial or use any technology tools to do any independent research.

Remember to keep an open mind until all the evidence has been received and do not speak with anyone in or around the courthouse other than your fellow jurors or court personnel. To give you an idea of how strict this rule is, once you are released and are deliberating in the jury room, if one of you has to step out to use the restroom or something, you've got to stop deliberating even then. So you really can only discuss the case once the case -- the evidence is closed and you are all seven sitting around the table together deliberating at the end of the case.

So, with that, Mr. Schulze, it is your return to direct examination.

MR. SCHULZE: Thank you, Your Honor.

Q.   Okay, Mr. Ramsey. Before we left off, we had just

started talking about confidential, trade secret, and proprietary information.  And I know that this is long and monotonous to go through this entire contract, so I apologize for that right off the bat.

But tell me real quick, what is paragraph 3 prohibiting you from doing?

A.   Basically, it's saying that I couldn't do my job without access to all of this proprietary trade secret information, and that access to it wouldn't be provided without some form of non -- nondisclosure clause.

Q.   And I believe we had just touched on the fact that access was however provided without this nondisclosure clause?

A.   Yes, it was.

Q.   And even though you had this information before, you didn't disclose it even without a nondisclosure agreement, right?

A.   That's correct.

Q.   Since your termination, have you disclosed any confidential trade secrets or proprietary information about Sheet Pile?

A.   I have not.

Q.   Let's move on to paragraph (4).  Read paragraph (4) for me, please.

A.   "(4) Employee agrees that a violation of any of

these noncompetition provisions would result in immediate and irreparable harm to which monetary compensation would not provide adequate relief.  Employee further agrees that injunctive relief would be appropriate for any violation of these noncompetition provisions."

Q.    What does that paragraph mean to you?

A.    To violate that and share proprietary trade secrets with a third party would cause a lot of harm to Sheet Pile.

Q.    Okay.

A.    Or could cause a lot of harm.

Q.    So play along with me for a second.  Sheet Pile at this point you claim owes you $100,000, owes you $44,000, owes you interest, owes your attorneys' fees.  Sheet Pile owes you a bunch of money, right?

A.    Correct.

Q.    But even at that, you're still not disclosing Sheet Pile's confidential trade secrets?

A.    That's correct.

Q.    Why not?

A.    One, it's improper, with or without this agreement. Two, I've signed this agreement not to do it.  Three, it doesn't help me if Sheet Pile is hurting financially, because I need them to have the resources to pay me my money back.

Q.    Understood.  Move onto paragraph (5) for me.  Read that paragraph for me.

A.    "(5) Employee agrees to notify Kevin Terrazas at kterrazas@clevelandterrazas.com and/or," there's a phone number, "if employee receives any job offer or if anyone attempts to communicate with him about Roberto Wendt, iSheet Pile LLC, Sheet Pile LLC, PilePro GmBH, PilePro LLC, or Solid LLC outside of contact involving normal business operations."

Q.    What did this paragraph mean to you?

A.    It means that if -- while I was working at Sheet Pile, if anyone tried to -- to talk to me about any of these entities or about Rob, I was supposed to notify the Sheet Pile attorney, Kevin Terrazas.

Q.    Okay.  While you were working at Sheet Pile, did anybody attempt to communicate with you about Rob or any of these entities?

A.    Not outside of normal business.

Q.    Okay.  And what did that mean, outside of normal business?  What would that be?

A.    Well, normal business would be normal operations of orders, customers, marketing, et cetera.  Outside of that would be something possibly more nefarious, you know, trying to find out about any of these -- about Rob personally or maybe proprietary information about any of

these companies.  That would be outside of business operations.

Q.   So if somebody called you and said, I want to order some sheet pile, you wouldn't have to email Kevin Terrazas.  But if somebody called you and said, Give me all of Sheet Pile's trade secrets, that's something you'd have to tell him about?

A.   Correct.

Q.   Read paragraph 6 for me, please.

A.   "(6) Employee agrees that, while he is employed, he will not accept employment from another company in the same industry or business as employer that is not controlled, managed, owned, or affiliated with employer without written approval from Roberto Wendt."

Q.   What did that paragraph mean to you?

A.   While you're working at Sheet Pile, you're not going to work for a competitor.

Q.   Okay.  That means you weren't allowed to moonlight on the side?

A.   With a competitor in the same industry, correct.

Q.   While you were employed at Sheet Pile, did you perform any work for a competitor of Sheet Pile?

A.   No.

Q.   And you didn't accept any employment from another company in the same industry while you were employed at

Sheet Pile, right?

A.    That's correct.

Q.    All right.  We're going to move on through this agreement.  Were going to skip past 7 and 8.  Actually, let's touch on 8 real quick.  Can you tell me what paragraph 8 says.

A.    Read it or give you my summary?

Q.    Read it for us, please?

A.    "8.   Independent Legal Advice.  The employee acknowledges that the employer has provided the employee with a reasonable opportunity to obtain independent legal advice with respect to this agreement and that either: (a) the employee has had such independent legal advice prior to executing this agreement; or (b) the employee has willingly chosen not to obtain such advice and to execute this agreement without having obtained such advice."

Q.    Did you seek independent legal advice before signing this agreement?

A.    Not independent legal advice, no.

Q.    So did you elect paragraph (b), you willingly chose not to obtain such advice?

A.    Essentially (b), yes.

Q.    Okay.  Will you read paragraph 9 for me, please.

A.    "9.   Confidentiality.  Employee agrees to hold this

agreement in strict confidence and to not disclose the terms of this agreement to any person or entity other than attorneys or tax advisors, and only as necessary, except as otherwise ordered by a court of law."

Q.   What did that paragraph mean to you?

A.   Don't talk about this agreement with anyone outside what's listed: attorneys, tax advisors.

Q.   Okay.  Prior to this court of law or this trial, did you ever discuss this agreement with anybody outside?

A.   Yes.  My wife.

Q.   Okay.  Anybody else?

A.   Which I can guess you could consider her my tax advisor as well, if that works.  Outside of that, no.

Q.   Okay.  And when you communicated with your wife about it, what did you and your wife talk about?

A.   I shared about all the clauses in here, all the specifics.  So discussed it with her, yes.

Q.   Honey, I'm going to do this work and get $44,000 for it; is that right?

A.   That was a part of it, yes.

Q.   Read paragraph 10 for me, please.

A.   "10.  Entire Agreement.  This agreement contains the entire agreement between the parties, superseding in all respects any and all prior oral and written agreements or understandings pertaining to the employment of the

employee by the employer, and shall be amended or modified only by written instrument, signed by both of the parties hereto."

Q.   What did this agreement mean to you or this section mean to you?

A.   This is everything -- everything in the agreement is in this agreement.  There is nothing outstanding.  There's no addendums, no previous drafts.  This is it.

Q.   And it -- there's a section in here that says, "superseding in all respects any and all prior oral and written agreements."  What did that relate to?

A.   It wasn't referring to anything specifically.  As far as I know, there weren't any prior written agreements, and any prior oral agreements went away with this agreement here, this written agreement.

Q.   So as of this employment agreement, there was no other previous employment agreement, because this superseded it.  Is that a fair understanding?

A.   This would supersede any of it, yes.

Q.   Do me a favor.  The second paragraph 10 -- and I realize that's a numbering issue -- is there anything in that paragraph that changed or that's relevant to what's going on?

A.   Just a moment.  (Reviews document).

         That didn't seem to change anything, no.

Q.   I was trying to ask that in a way to avoid you having to read it, and you still read it.

A.   I appreciate it.

Q.   All right.  Let's go into the Roll Form Group truckloads a little bit more, because we looked at this agreement a little earlier and we talked briefly about the $44,000 that you were entitled to a one-time bonus for.

Is this $44,000 bonus something that you came up with and said I would like a $44,000 bonus, or was that something that was presented to you by Rob or by somebody else?

A.   This was presented to me by Rob.

Q.   Can you tell us the circumstances of how this was presented to you?  What brought this about?  How did you begin having the discussion about a $44,000 bonus payment?

A.   I'm not sure what the math was on it, if you will.  Rob came forward, and, you know, we had been talking about these agreements for all of the employees.  And he said he wanted to make it sweet for me, and so he knew that this major job was coming up that was requiring a lot of work, a lot of travel, a lot of extra effort on several people to make it happen.  And he said I want to get a clause in there that will basically sweeten the

deal.  And so he offered that up, and I didn't turn it down.  It seemed very reasonable for all the effort that was coming up.

Q.   Is there a way for you to quantify the extra effort that you had to put into place for this Roll Form Group work?

A.   Possibly at the time I could have quantified how many extra hours or travel or trips.  But off the top of my head, I don't know.  I don't know how to quantify that sitting right here.

Q.   When you say travel and trips, what does that mean?

A.   Mainly, going back and forth up to New Hampshire. Obviously, I live here in Austin.  Going back and forth to New Hampshire, because that's where we were processing the steel, that's where we're going to ship it out of. So working directly with everybody up there to make sure this was a successful order, because obviously it was big for the whole company.

Q.   Related to this Roll Form Group order, did you travel to New Hampshire?

A.   I did.

Q.   More than once?

A.   Yes.

Q.   And then you did work up there in New Hampshire?

A.   Yes.

Q.   Were they long trips or ...

A.   Usually under a week.  A lot of times they would be go up on a Monday, come back on a Friday, sometimes come back over the weekend.  Usually about a week or so.

Q.   And all that happened between this -- between signing this agreement and asking for that bonus in December, right?

A.   I had traveled back and forth to New Hampshire a number of the years, but specifically in that time period, August to December, there were numerous trips specifically for that purchase order.

Q.   So was it customary for you to travel up to New Hampshire?

A.   It was.

Q.   How often did you travel up to New Hampshire?

A.   Possibly every four to six months.

Q.   Okay.  So three -- well, two to three times a year?

A.   That's right.  Two to three times a year.

Q.   And related to this Roll Form Group order, how many times did you travel to New Hampshire?

A.   I'm trying to remember how many times.  It was at least three or four times in those three months or so.

Q.   So it added extra trips?

A.   It did.  And a lot of extra effort at this end and that end.

Q.   What does that mean, that extra effort?  Can you explain that for us?

A.   On top of all the regular duties, this was a massive order, so it was a matter of orchestrating a bunch of trucks coming in to pick up, it was ordering material, making sure material came in at the right time, making sure we had the right labor on the right shifts.  It was count of an orchestration of a thousand moving parts to come together to make sure that this all worked timely.

Q.   Do you know why Rob Wendt wasn't doing that orchestrating?

A.   He was part of it as well, but he was also busy doing his normal CEO duties, which was, you know, outside funding, meeting with potential partners, potential vendors.  He was certainly busy with that as well.  He did attend in New Hampshire at least once or twice during that period, too.

Q.   But all this work that you were doing related to the Roll Form Group order was outside of the scope of a chief financial officer, right?

A.   Normally, yes.  But within this organization, it was right up the alley.  The CFO did a lot of COO duties as well.

Q.   Okay.  If you wouldn't have done that extra work, would Sheet Pile have had to hire somebody to do that

work?

A.   Most likely.

Q.   Will you do me a favor and flip to tab 6 for me, please.  This is Plaintiff's Exhibit 5.  Do you recognize this document or this set of documents?

A.   Set of documents, yes.

Q.   What are these documents?

A.   Those are all bills of lading from a couple of different providers transporting the steel for that specific purchase order, it looks like.

Q.   And are these documents that are kept in the ordinary course of Sheet Pile's business?

A.   Yes.

Q.   And who was in charge of keeping these documents for Sheet Pile?

A.   Either the warehouse or myself.  I always had a copy of them, and the warehouse typically had a physical copy of them as well.

Q.   How were these records put together?  Who makes them?  Who creates them?

A.   It varies.  The ones that say ArcBest, which is also known as ABF in some arenas, that was usually a bill of lading that I would create in coordination with the warehouse of whatever the specifics are.  Bill of lading is basically showing what products are going where and

how much of the quantity so it can be tracked.

And so I would create the ones for ArcBest. And then the others that are labeled "short-form bill of lading," that was a blank form that we had up in New Hampshire that the New Hampshire folks would fill out on-site and also send me a copy.

Q.   So you were in charge of keeping them and organizing them and having them on behalf of Sheet Pile?

A.   That's correct.

Q.   And making and keeping these records was a regular practice for you?

A.   Yes, it was.

MR. SCHULZE:  Your Honor, I move to admit Plaintiff's Exhibit 5 and publish to the jury?

THE COURT:  Any objection?

MR. TERRAZAS:  Hearsay, Your Honor.

THE COURT:  And your response to the hearsay objection?

MR. SCHULZE:  Your Honor, those are business records.  As Mr. Ramsey testified, they're kept in the ordinary course of business.  They're an exception.

THE COURT:  Hearsay -- well, Mr. Terrazas?

MR. TERRAZAS:  I'm sorry, Your Honor.  Most of these documents were not created by Sheet Pile.  There's no evidence they were created by Sheet Pile.  They're

signed by others.  They can't be a Sheet Pile business record if they're not created by Sheet Pile.

MR. SCHULZE:  That's not correct.  They were kept by Sheet Pile in the ordinary course of Sheet Pile's business.  They are Sheet Pile documents, as Mr. Ramsey just testified to.

THE COURT:  Overrule the objection and admit Defendant's Exhibit -- or this is Plaintiff's Exhibit 5, correct?

MR. SCHULZE:  Plaintiff's Exhibit 5, Your Honor, yes.

THE COURT:  Thank you.

MR. SCHULZE:  Thank you, Judge.

Q.   All right.  Mr. Ramsey, what you have in front of you in the binder, does that match what's in front of you on the screen as well?

A.   Yes.  It appears to.

Q.   Can you tell me what this first document is?

A.   This first one is a bill of lading ArcBest, also known as ABF many times.  This bill of lading shows that we were shipping some material from iSheet Pile there in Londonderry, New Hampshire, shipping to Samuel Roll Form Group there in Green Cove Springs, Florida.  And then down below it lists the specifics of what were being shipped.

Q.    And so is this document, what does this evidence? What does this show you?

A.    This is basically a receipt showing that we shipped certain items on certain dates with tracking so that we could -- everybody would know what was being shipped.

Q.    And what is ArcBest?

A.    It's a shipping company.  You see the ABF freight trucks all over the place.  It's the same company.

Q.    And so this -- you as Sheet Pile, when you say, okay, these items need to go to Roll Form Group, they get tossed on the truck.  And then does the driver put this together and hand you the bill of lading?

A.    I would have put this together already, so it's already with the load ready to go when the driver gets there.  Driver shows up, picks up the load, picks up usually a couple of copies of this bill of lading, and takes it with him.

Q.    Okay.  In the top, right corner there, do you see a date?

A.    I do.

Q.    What is the date of this shipment?

A.    Bill of lading date is September 5th, 2019.

Q.    What does that date represent?

A.    That would have been the date that this material was picked up from the New Hampshire address listed.

Q.   Okay.  I'm going to scroll down here a little bit.

Do you see in the top, left corner of my screen it says "ArcBest, time-critical," and it looks like it has another date there.  What is that date?

A.   So it's listed as time-critical, and so you could pay an extra fee with ArcBest and a lot of other carriers to basically get a guarantee of a delivery by a date. Picture using FedEx and paying the premium prices to get it delivered faster.  That was the date and time that ArcBest was committing to have it delivered.  So September 11th, 2019 by 5:00 p.m.

Q.   Okay.  And there on the right, contact name, phone number, email.  That's your information, right?

A.   The work phone number, yes.  The toll-free number.

Q.   Okay.  Why was your information on this sheet if this went out of New Hampshire?

A.   I created this.  And just a general principle with ArcBest, if they had any questions, they could call me any time and we'd straighten out whatever was going on.

Q.   Okay.  What do you see below that?  What is this "quote ID steel channels."  What does that information mean?

A.   That's all the specifics about what was actually getting shipped.  So setting up this bill of lading, we would have got a quote for that time-critical shipment,

and so that's just a reference number for the quote number or the quote ID.

And then below that is the steel channels PZ 90.  So Sheet Pile had all sorts of different formats of connectors.  PZ 90 was a very specific one that they sold.  So then it clearly lists that there were four pieces at 20 feet -- 20 feet long.

Q.   And those -- those four pieces at 20 feet long, was, part of the Samuel Roll Form order?

A.   That's correct.

Q.   And that part of the order needed to be delivered by September 11th, 2019?

A.   That's right.

Q.   And can you tell me based off this document alone, was this order delivered?

A.   Based off this document alone, no, I can't determine if this was delivered.

Q.   To your knowledge, was this order delivered?

A.   Yes, it was.

Q.   How do you know that?

A.   Because I tracked it later on through ArcBest's tracking system, and it got there.  And they would have a delivery receipt in their portal.

Q.   Perfect.  Thank you.  Flip to the next page.  You should have this on page 2 in your binder.  What is this

document?

A.    So this is another bill of lading.  So sometimes Sheet Pile would use ArcBest for shipments, and then sometimes we also contracted with outside hotshot drivers.  And those were found different methods.  And so we had our own basic bill of lading form here that we would -- or the New Hampshire warehouse would fill out for those hotshot drivers.  And those hotshot drivers would tow trailers, and they may be able to carry 8,000, or 10,000 or 12,000 pounds.  It varied.  So we would have different size loads, and they would bring in a hotshot that was appropriate for that truckload.

Q.    So is this a normal form for Sheet Pile to have used?

A.    This is absolutely a normal form.  In fact, the shipper on there, that first one, it says pickup date, 9-27-19.  That looks like the signature of Ann Kennison. She was an employee of iSheet Pile up in New Hampshire.

Q.    Let me -- since we're looking at the screen, not the binder like you --

A.    My apologies.

Q.    -- you're talking about this signature that's on your screen now?

A.    Yes.  That bottom left.

Q.    And who is that?

A.    It looks like Ann Kennison.  She worked in New Hampshire as a Sheet Pile employee.

Q.    An employee of Sheet Pile?

A.    Yes.

Q.    Okay.  And what is that date that you see on your screen right now?

A.    9-27-19.

Q.    So that's when this load was shipped?

A.    That's when this load should have been shipped. That's right.

Q.    Okay.  And can you tell what was shipped on this load?

A.    Sure.  So it's that same profile, that PC -- I'm sorry -- PZ 90.  And this says 50 pieces.  So this was 50 pieces, and it looks like at 30 feet.  Five bundles of 10 pieces each, because obviously it's pretty heavy.  So about 8500 pounds of steel on this one.

Q.    Oh.  And I'm going to scroll back up to the top here.

          Who is it that handled this shipment?

A.    It looks like Brother & Brother Trucking LLC, I believe.

Q.    That would have been a small hotshot carrier?

A.    That's right.

Q.    All right.  So the first one -- let me touch back on

this real quick.  This first one, ArcBest that's one of those big semi companies that we see driving down the highway that are making 35 traffic all slow --

A.    Correct.

Q.    -- is that right?

      And then this one, Brother & Brothers Trucking, this would be a hotshot company.  Would that also have been a semitruck with a big trailer like that or ...

A.    Most likely not.  It was probably a very heavy duty pickup truck with a very large flatbed trailer, most likely.

Q.    Is it common for Sheet Pile to use hotshot companies?

A.    Very common.  Very common.

Q.    I'm going to scroll down to page 3, and that would be page 3 in your binder.  This looks like an October 4th short-form bill of lading?

A.    Yes.

Q.    And that is the date on the top, right?

A.    Correct.

Q.    Who is the courier here?

A.    Kind of hard to read, but I believe it says Ground Pounder Trucking LLC.

Q.    Is that also a hotshot company like we just discussed?

A.   It would have been a hotshot company.  That's right.

Q.   Okay.  What did they pick up?

A.   They picked up more PZ 90.  There's going to be a theme there.  Six bundles of 10, so 60 pieces, and weighing a little over 10,000 pounds on that batch.

Q.   And when were those picked up?

A.   It looks like October 4th of '19.

Q.   So why wasn't everything that was being shipped to Roll Form Group being shipped at once?

A.   It was timing.  So it was a very large order, and these pieces were basically being manufactured, they were being welded together in New Hampshire.  And as soon as enough was put together to get on a truck, they tried to start doing a weekly truck.  I think you can see 9-27 and 10-4 are a week apart.  I forget the days of the week.

But they were trying to get a weekly load out, partly because once those got to the customer and the customer accepted them, then those were going to be payable.  The customer was going to need to pay Sheet Pile for those.  It was partly that.  Also partly just storage room.  These were massive pieces of steel.  The warehouse had limited space.  They needed to keep getting them out of the yard so they could keep receiving more raw material.

Q.   It was beneficial for Sheet Pile to send them out --

Q. send this entire order out piece by piece?

A. Yes. Absolutely. Well, in batches of pieces.

Q. In batches. Was it beneficial for Roll Form Group to receive them?

A. It was. It was actually preferred at their end as well, because that way they only had to receive a certain amount at a time and not hundreds and hundreds and hundreds of pieces all at once.

Q. Okay. So this was the third load, on October 4th, 2019?

A. Yes.

Q. And before that the other hotshot was the second load, and before that ArcBest was the first load?

A. Looks that way, yes.

Q. All right. I'm going to flip over to page 4. I'm going to scroll down to it. This is another short-form bill of lading like the last one we looked at. What's the date on this one?

A. October 17th of 2019.

Q. And who is the courier here?

A. Ironically it's Wendt Trucking, but I don't believe it was any relation to Rob Wendt.

Q. No relation?

A. I don't believe so.

Q. Okay. So Wendt Trucking, is that also a hotshot?

A.   Another hotshot.

Q.   Okay.  And what did they pick up?

A.   They picked up more PZ 90.  They picked up 10 bundles of 10, so 100 pieces at 20 feet each -- 20 feet long.  And so that was about 17,000 pounds.

Q.   Do you recognize that signature on the bottom, left?

A.   The shipper, yes.  That's Ann Kennison.

Q.   Same person we talked about earlier?

A.   Same person.  You got it.

Q.   An employee of Sheet Pile up in New Hampshire?

A.   That's correct, yes.

Q.   So that was our fourth pickup.  Forgive me for the weird highlighting that I'm doing with my mouse.
          All right.  I've scrolled down to page 5.  This should be page 5 in your notebook.

A.   Yes.

Q.   What are we looking at?

A.   Another short-form bill lading for another hotshot load of PZ 90.

Q.   Okay.  And real quick, the very first load was an actual trucking company --

A.   That's right.

Q.   -- ArcBest.  And the last ones have been hotshots.
          What is telling you on here that it's a hotshot business versus a trucking business?

A.   Easily it's the short-form bill of lading.  That's what we used for all hotshot drivers up in New Hampshire.  And then you can see the carriers, every one of them is different, because it was kind of, you know, who was in the area at the time that we could get hired to come pick up the load.

Q.   Whose responsibility was it to line all these shipments up?

A.   Most of these, the hotshots, actually, Ann Kennison was working directly up in New Hampshire to get these dispatched.

Q.   Okay.  So he got to choose who they were going to use to ship whatever was ready to Roll Form Group?

A.   She would try to find some, and then if there were multiple, she and I would discuss it and see if one had a better rate or speed or history.  And then she would make the call and set it up.

Q.   Okay.  So we're looking here at the fifth short-form bill of lading for the fifth bill of lading.  What's the date on this one?

A.   This one's November 1st, 2019.

Q.   Okay.  And this is another carrier, another hotshot business?

A.   That's right.  It looks like Carb Distribution, another one.

Q.    And what did they ship?

A.    More PZ 90, 10 bundles of 10.  So this was another 100 pieces, so another 17,000 pounds.

Q.    Okay.  And, again, that's Ann's signature in the bottom left?

A.    That looks to be Ann Kennison's signature, yes.

Q.    Perfect.  And flip to the next one, so this would be Number 6, I believe.  What are we looking at here?

A.    Another bill of lading for a hotshot driver on November 15 of 2019.

Q.    Okay.  And that looks like T.C. Hauling?

A.    T.C. Hauling.  That's what it looks like.

Q.    Okay.  And what did they ship?

A.    More PZ 90, 10 bundles of 10 another, so another 100 pieces, another 17,000 pounds.

Q.    Okay.  And, again, Ann's signature at the bottom?

A.    Yes.

Q.    Go to next one here.  It's number -- what is this, Number 8, I believe?

A.    Seven, maybe.

Q.    Lawyers are not good at math.

        Okay.  What am I looking at here?

A.    Another bill of lading.  So this was picked up November 22nd of 2019.  This one actually references that Roll Form purchase order under it, and this looks like

this was picked up by Bama Boyz Hotshot.  More PZ 90.
This was 20 pieces, so about 3400 pounds.

Q.   Okay.  This was on November 22nd, 2019?

A.   Yes, it was.

Q.   And again, Ann's signature at the bottom?

A.   Correct.

Q.   All right.  Flip to next page.  What is the date here?

A.   Another bill of lading, December 7th, 2019.  Picked up, looks like, Meg-Kay.  More PZ 90.  It looks like 75 pieces for almost 13,000 pounds.

Q.   Okay.  Meg-Kay another hotshot company?

A.   Yes.

Q.   And then again Ann's signature --

A.   Yes, it is.

Q.   -- sending that out?

     So that's been eight now, right?

A.   I believe you're right, yes.

Q.   Okay.  We're going to go on to the next one, Number 9.

A.   Okay.  This is another bill of lading shipped on December 18th, 2019.  Looks like by Wagner Brothers.  And different profile being put together up in New Hampshire.  This one is called Colt.

Q.   Okay.

A.   So this one was actually 250 pieces at 20 feet for a bigger load, 43,000 pounds.

Q.   Okay.  And Wagner Brothers picked this up and shipped it on over to -- for the Roll Form Group; is that right?

A.   That's correct.

Q.   And then again Ann's signature at the bottom?

A.   That's correct.

Q.   And Number 10, what am I looking at here?

A.   One more bill of lading.  This one was December 18th.  So same date as the previous one.  That's why it's mentioned Truck Number 2 on there on December 18th, 2019.  This one looks like Stallions EXP.  It was two different profiles, so it's got PZ 90.  It's got 66 pieces of that.  And 60 pieces of Joker, yet another profile.  So for about 29,000 pounds of steel.

Q.   Okay.  And that's also Ann's signature at the bottom?

A.   Also Ann's signature, correct.

Q.   An also sent to Roll Form Group?

A.   That's right.

Q.   Let me just -- so you had one shipment here on December 18th, Truck 1, with Wagner Brothers.  And then you had Truck 2 with Stallions EXP.  Why would you use two different trucks?

A.   Because it would have been probably too much weight for one truck.  These are some heavier ones and must have even been some bigger trucks to haul these.  But it was too much product to get on one truck.

Q.   Okay.  So that's the last page of our exhibit, but let me scroll back up.  So we look at -- I'm going to look back at page 2, if you don't mind?

     So this is the bill of lading with Brother & Brother Trucking LLC.

A.   Okay.

Q.   You testified earlier that the weight on this one was about 8,000 pounds?

A.   That's right.

Q.   Was that the maximum weight that that truck could hold, or how did that get determined that it would be 8,000 pounds of material?

A.   It was probably reversed determined.  That's probably what they produced in New Hampshire that week, and then Ann would have arranged for a truck to carry up to about 9,000 pounds.  So whatever was most efficient in that range would pick that up.

Q.   And so going to the next week October 4th, looks like that one was about a 10,000-pound load?

A.   Yes.

Q.   Why wouldn't you have waited to ship those two

together with one truckload instead of two truckloads?

MR. TERRAZAS:  Objection, Your Honor:  Calls for speculation and foundation.  He's saying that he wasn't there during the time this Ann Kennison who is --

THE COURT:  Overruled.  And please no speaking objections.

MR. TERRAZAS:  Yes, Your Honor.

A.   You mind repeating that, please?

Q.   Sure.  So we talked a couple of seconds ago about this September 27th, 2019 bill of lading.  It was 8,500 pounds, it looks like.  And then a week later you-all sent a 10,000-pound load on October 4th, correct?

A.   Correct.

Q.   Why wouldn't you have just waited with that September load and sent the September and October load together on one truck?

A.   Sure.  Well, most likely our truck was already being arranged for roughly 8,000 pounds and was on the way. And to get this out a week earlier meant that Sheet Pile was also going to get paid on this 8500 pounds a week earlier, in theory, than this load going out on October 4th.  And those hotshot drivers are pretty efficient dollar-wise, so to go ahead and ship it out 8500 pounds one week and 10,000 or so pounds the next week wasn't going to be a huge difference in

transportation costs.

Q.   Okay.  So we've looked at 10 individual short-from bills of lading now so far, right?

A.   Correct.

Q.   Is it fair to say that 10 loads as of this last page had been sent to Roll Form Group?

A.   That's correct.

Q.   With the last load having been picked up by the carrier on 12-18-2019?

A.   That's correct.

Q.   Okay.  Will you do me a favor and please skip to tab 5 in the binder.  This is Plaintiff's Exhibit 4.

Do you recognize this document?

A.   I do.

Q.   What is this document?

A.   So it's titled "iSheet Pile, LLC," which Sheet Pile and iSheet Pile, they changed names during 2019.  So you're going to see that in both places.

It's called "Sparky Production versus orders." So basically in New Hampshire we named the machine that was doing a lot of the welding, named it "Sparky."  It put off a lot of sparks.  It's not a big stretch.  So we called that machine Sparky.

So this was a list of tracking all of the orders that -- and I believe it looks like the -- the 10

purchase orders that we just went through.  It's got the number of pieces of each of those profiles on it.  It's got the lengths.  It's got feet.  It's got all the information on here, plus goals of what else still needed to be shipped after these 10 loads.

Q.   Who prepared this document?

A.   I did.

Q.   Why did you prepare this document?

A.   So that I could stay organized and track what had been shipped, what still needed to be shipped, and make sure we were shipping the right things.  And then also so I could keep track of invoicing to the customer of the right amounts.

Q.   Is this a document that you would ordinarily prepare in your position as a CFO?

A.   Yes, it is.

Q.   Is it normal for you in your position as CFO at Sheet Pile to keep documents like this or to create spreadsheets like this?

A.   It wasn't very common, because we didn't usually have a purchase order of such a magnitude where we had to do so much production on it.  If it was a smaller -- most purchase orders, no.  But if it was a purchase order that required multiple truckloads, then, yes, I would keep something like this.

Q.   Okay.  So when it was a bigger order, like this Roll Form Group, then you would have created a summary like this?

A.   That's correct.

Q.   Okay.  Were there other larger orders that you created summaries like this for?

A.   Yes, there were.

Q.   And you kept those as the CFO of Sheet Pile?

A.   That's right.

          MR. SCHULZE:  Your Honor, I'd like to move to admit Plaintiff's Exhibit Number 4 and publish to the jury.

          THE COURT:  Any objection to admitting Plaintiff's 4.

          MR. TERRAZAS:  No objection, Your Honor.

          THE COURT:  The court admits Plaintiff's Exhibit 4.  And you are free to publish as you see fit.

          MR. SCHULZE:  Thank you, Your Honor.

Q.   Now, Mr. Ramsey, for the benefit of the jury, what I'm showing on the screen is the same document that you just referenced and explained to us, correct?

A.   Yes, it is.  That's correct.

Q.   Okay.  I'm going to try to make this a little easier and zoom in a little bit here.

          So this -- what is the date of this document?

A.   The date of this document, December 18th of 2019.

Q.   Okay.  And what am I looking at here on my screen, if you'll look at my screen.

A.   Okay.  On your screen, sure, it's got those loads that we just discussed.  So it's loads 1 through 10 there.  It's got the ship date, and it starts with the columns of PZ 90, Joker, and then further on.  But it shows how many of those pieces of that profile shipped on that date.

Q.   Okay.  And this -- so this means that these 10 loads had already shipped, and what we see below it, what does that mean?

A.   Those are the units that still needed to be shipped.  So, you know, looking at the first column, that PZ 90, total shipped was 575 pieces.  Remaining to ship is blank, it's zero.  So everything's been shipped on that one.

Q.   So at that point in time, as of December 18th, completed all of the PZ 90 part of this order and shipped it?

A.   That's correct.

Q.   Okay.  And then next to that.

A.   Next to that column for Joker, it shows just that first batch being shipped on December 18th, the 60 pieces I believe that is.  Hard to see.  And then still 395 more

remaining to ship.  And so then the lines down below it had basically our goals that we were working on.

Q.  When you were planning on shipping those?

A.  Correct.

Q.  Okay.  But, as of December 18th, you had shipped 10 loads of material to Roll Form Group, correct?

A.  That's correct.

Q.  Okay.  If you will do me a favor and flip back over to, I believe it's tab 4, and this is Exhibit 3.B.  And look at me, if you will -- look with me, if you will, back at 3(e).  "Employee will also be entitled to a one-time $44,000 bonus to be paid after the eight truckloads of products are delivered to Roll Form Group."

As of December 18th, 10 truckloads of product had been delivered or sent to Roll Form Group, right?

A.  That's right.

Q.  And looking back at Plaintiff's Exhibit 4, and if I zoom into this, actually, as of December 6th, 2019, eight loads had been shipped to Roll Form Group, right?

A.  That's correct.

Q.  Do you know when that December 6th load would have arrived at Roll Form Group?

A.  Probably within a week.

Q.  So it's been taking about a week for those to get delivered?

A.   Three to six days, most likely.

Q.   Okay.  So as of December 18th, at the very least, all eight of those initial loads had been delivered to Roll Form Group?

A.   That's correct.

Q.   Okay.  What did you do after those loads had been delivered to Roll Form Group?

A.   Could you be more specific?

Q.   Related to this $44,000 bonus.

A.   Okay.  So on December 18th I had all the paperwork required for 10 loads.  So in addition to invoicing Roll Form Group for the ninth and tenth load, which both went out on the 18th, I also emailed Kevin Terrazas and Rob Wendt this same spreadsheet, all the bills of lading, and just reminding them that I was entitled to the $44,000 bonus.  I believe I even mentioned it doesn't need to be right away, but I just wanted to get this in the stack for payments.

Q.   Will you flip to tab 3 of your binder for me, please.

A.   Yes.

Q.   This is Plaintiff's Exhibit Number 3.  Do you recognize this document?

A.   I do.

Q.   What is this document?

A.   This is the email I was just starting to talk about, on Wednesday, December 18th at 6:10 p.m.

Q.   What email address sent that email?

A.   From doug@isheetpile.com.

Q.   And whose email address was that?

A.   That was my work email address at Sheet Pile.

Q.   Was that the email address we were talking about earlier that access was cut off of?

A.   It is.

Q.   Okay.  And who did you send that email to?

THE COURT:  You know, before we get into that, let's take our stretch break.  I made a note on my calendar that 3:45 would be a good time for it, so why don't we.

MR. SCHULZE:  Perfect.

Ready to proceed?

THE COURT:  Whenever you're ready.

MR. SCHULZE:  Thank you, Judge.

Q.   Mr. Ramsey, who did this email get sent to?

A.   It was to Rob Wendt, which is rob@isheetpile.com and Kevin Terrazas, kterrazas@clevelandterrazas.com.

Q.   And robatisheetpile.com, whose email address is that?

A.   That's Rob Wendt, the CEO of Sheet Pile.

Q.   And you're familiar with that email address?

A.   Yes.

Q.   You've emailed him there before?

A.   Many times.

Q.   Have you received responses from him at that email address?

A.   Many times.

Q.   What about the kterrazas@clevelandterrazas.com?

A.   I'm familiar with it.

Q.   Whose email address is that?

A.   That's Kevin Terrazas, counsel.

Q.   Okay.  And have you ever communicated with Mr. Terrazas through that email?

A.   Many times.

Q.   And so you've received responses from that email as well?

A.   Yes.

Q.   Do you know that to be his email?

A.   I do.

Q.   And you know rob@isheetpile.com to be Rob's email?

A.   That's correct.

Q.   And this Plaintiff's Exhibit 3 is a copy of an email that you sent?

A.   It is.

             MR. SCHULZE:  Your Honor I move to admit Plaintiff's Exhibit 3 and publish to the jury.

MR. TERRAZAS:  Hearsay, Your Honor.

THE COURT:  What's the hearsay response, Mr. Schulze?

MR. SCHULZE:  It's a -- it's not -- first of all, it's not being offered for the proof of what's in it.  But it is an email from Mr. Ramsey to Mr. Wendt and to Mr. Terrazas that evidences that the Roll Form Group bills of lading and summary were sent to Roll Form Group.

THE COURT:  Mr. Terrazas?

MR. TERRAZAS:  Yes, Your Honor.  It's absolutely being used for the truth of the matter asserted.

THE COURT:  Overruled.  The court admits Plaintiff's Exhibit 3.

MR. SCHULZE:  Thank you, Judge.

Q.   Just to confirm, Mr. Ramsey, this is -- what I'm showing on this screen is a copy of what you have in front of you as Exhibit 3?

A.   Yes, it is.

Q.   And this is that email?

A.   That's correct.

Q.   And why did you send this email to Mr. Terrazas and Mr. Wendt?

A.   To document that we had reached the minimum threshold of earning the bonus.  So I wanted it

documented and sent to Rob and Kevin.  And I sent it to Kevin not as attorney, but he was also kind of instrumental in getting me to sign my employment agreement, so he knew the ins and outs of that as well. So that's why I copied him.

Q.   Okay.  You were just letting him know I have met my obligations and I would like my $44,000 bonus?

A.   That's right.

Q.   Did you receive a response to this email?

A.   I did not.

Q.   Did you receive your $44,000 payment?

A.   I did not.

Q.   What happened after you sent this email?

A.   I believe I had dinner and went to bed and woke up, and my emails were cut off.

Q.   How did you find out that your emails were cut off?

A.   When I got up in the morning and tried to get on my email, none of my email worked.

Q.   What does that mean, "none of my email worked"?

A.   Well, I tried to get into my iSheet Pile email and it didn't work.  I believe I also still had a PilePro.com email, doug@pilepro.com, and it didn't work as well.

Q.   Okay.  Was this something that you tried to -- like you would go to a website to log in and you had to type your user name and password each time?  Or was this

something that was, for example, in Outlook that you just had access to?

A.    No.  I believe these were both Gmail-based.  And so you would go into Gmail, and usually it was either opened or sometimes you might have to refresh it and enter your password.  But I was locked out and the password would not work.

Q.    Okay.  So this time you tried to log in, and it said wrong password or you don't have access?

A.    It said wrong password.

Q.    Okay.  What did you do after you found out that your password was wrong?

A.    I believe I texted Rob, I tried to call Rob, and didn't get any answer.

Q.    Was it normal to not get an answer?

A.    Potentially.  He travels a lot, or at the time he traveled a lot, so he could have been on a flight.  He was also usually based in California, so it would have been early California time.  So I tried numerous times during the day.

Q.    What did you do next?

A.    I actually -- I believe I texted the -- there's a third-party IT company that Rob uses based here in Austin that handles email, websites, et cetera.  I texted the owner of that whom I'd worked with before to see what was

going on.  And he sent me just a quick message that Rob requested that I terminate your email or cut off your email.

Q.   What happened after that?

A.   I continued to try to reach Rob, unsuccessfully.  At some point I called Kevin because I didn't know who else to call.  We're a very small company.

Q.   And were you informed of your termination or anything like that at that point in time?

A.   Not at all, no.

Q.   What were you told?

A.   I believe once I finally got ahold of Kevin, that it was a kind of a nonanswer.  He was trying to get ahold of Rob or trying to figure it out or trying to see what was going on type answer.

MR. SCHULZE:  Your Honor, may I have two minutes to straighten my thoughts?

THE COURT:  You may.

MR. SCHULZE:  Thank you.

Thank you, Your Honor.

Q.   Mr. Ramsey, will you do me favor and flip over to tab 8 for me.  This is Plaintiff's Exhibit 7.

A.   Okay.

Q.   Do you recognize this document?

A.   I do.

Q.   What is this?

A.   This is an email -- an email string from myself to originally Kevin Terrazas on December 23rd of 2019.  And then I forward it to Rob's personal email later that same morning.

Q.   And who was -- who are both of those emails sent from?

A.   This is from my personal email address.

Q.   And what is that email address?

A.   thedougramsey@gmail.com.

Q.   And the bottom of these two emails, who was this sent to?  To the same Kevin Terrazas email, kterrazas@clevelandterrazas.com.

          MR. TERRAZAS:  Your Honor, may we approach?

          THE COURT:  You may.

     (At the bench)

          MR. TERRAZAS:  Your Honor, this is a hearsay email, and I object to the witness basically reading it and talking about it before it's attempted to be admitted.  He can ask him questions about the circumstances but not the, you know, email itself.

          THE COURT:  Until it's admitted.

          MR. TERRAZAS:  That's right.  That's right.  Yes, sir.

          THE COURT:  And so your objection is hearsay?

MR. TERRAZAS:  Yes, Your Honor.  It's hearsay, and he's starting to get into reading it.  And that's -- it's not technically hearsay yet, but this email is hearsay.  I don't want him to get into it before.

THE COURT:  That's fine.  Let's go ahead and take up the admissibility then.  What would be your response to a hearsay objection?

MR. SCHULZE:  It falls within one of the exceptions.  It's present sense impression under 803(1).

THE COURT:  I just feel like present sense impression is over-invoked.  "Describing or explaining an event or condition made after the declarant perceived -- while or immediately of the declarant perceived it.  So what is this?  "So talked to somebody this weekend." Tell me why that applies.

MR. SCHULZE:  So this applies because this was Mr. Ramsey trying to essentially get -- get paid.  And so he is explaining the work that he had done in order to get paid at that point in time.  So he's showing both Mr. Wendt and Mr. Terrazas that he has fulfilled his obligations; that he is -- it also shows that he's still even at this point, December 23rd, trying to help find an investor for the $250,000, and discussing ways that we can fix this and approach the miscommunication.

So it goes to the fact that Mr. Wendt stopped

responding to Mr. Ramsey. It goes to the fact that Mr. Ramsey had fulfilled his obligations and was asking Mr. Terrazas and Mr. Wendt for his payment. And then it goes to show that, not only did he communicate these requests to Mr. Terrazas, but he also communicated them to Mr. Wendt.

THE COURT: Well, I don't think 803(1) applies here, so I don't find that as a valid exception. So I sustain the hearsay objection on that basis. And it does seem like you are wanting to offer this to prove -- prove the truth of what Mr. Ramsey is saying here. So I don't see that -- it does still seem to be hearsay as opposed to outside the definition of hearsay.

Do you have anything else to say, or do you want to disabuse me of either of those notions?

MR. SCHULZE: No. I certainly think you're correct in that. I can have Mr. Ramsey discuss what he emailed and use the email as something to refresh his memory. But I think that creates the same problem that Mr. Terrazas is bringing up.

THE COURT: Well, that's -- hearsay is hearsay. And you can pursue this how you want. But, I mean, if it invokes an objection, I'll rule on it. But I sustain this objection to admitting this email or discussing its contents.

MR. SCHULZE:  Understood.  Thank you, Judge.

(In open court)

MR. SCHULZE:  Your Honor, may I have another couple of moments?

THE COURT:  You may.

MR. SCHULZE:  Thank you.

Thank you Your Honor.

Q.   All right, Mr. Ramsey.  At this point you had completed the eight shipments to Roll Form Group as per your agreement?

A.   Yes.

Q.   I think we left off a few moments ago that you testified that, even after you notified counsel, you didn't receive payment of that $44,000 bonus.  And you didn't -- in fact, your email was cut off, and you were then later told you were terminated?

A.   Correct.

Q.   Okay.  Did you ever receive a reason as to why the $44,000 bonus payment was not made?

A.   It was a vague answer of -- it had to be Kevin because Rob wasn't communicating.  But Kevin saying that Rob was thinking that those weren't full truckloads or that wasn't the full deal.  And so, therefore, I wasn't going to see any of that.

Q.   Was there ever any discussion when you negotiated

the employment agreement that we looked at earlier about those truckloads having to be full truckloads?

A.    No.

Q.    Is the term "full truckload" something that you used normally as an employee of Sheet Pile?

A.    No.

Q.    Do you know what a full truckload would be?

A.    It would be the full carrying weight of any -- of whatever truck was being used to transport something, I would think.

Q.    So it would vary depending on the truck?

A.    It could vary widely, yes.

Q.    Take a look back at Exhibit 3.B for me, and look at paragraph 3(e).  When you guys negotiated this paragraph, "Employee will be entitled to a one-time $44,000 bonus to be paid after the eight truckloads of products are delivered to Roll Form Group," did you ever discuss that each of those truckloads had to weigh a certain amount?

A.    No.

Q.    Did you discuss that each of those truckloads had to have a certain amount of product on it?

            MR. TERRAZAS:  Objection: leading.

            THE COURT:  Overruled.

A.    No.

Q.    Can you explain for the benefit of the jury what

your understanding of your obligations under paragraph 3(e) were.

A.    Well, it's basically what I had listed on that other spreadsheet.  If we shipped a load of steel to Roll Form Group, that was a truckload.

Q.    So if you shipped one truckload -- or one truck with one piece of steel on it to Roll Form, would that have counted as a truckload?

A.    It would have been pushing it, but that would have been a truckload, yes.

Q.    And so if you would have taken eight pieces of steel and shipped eight pieces of steel individually on eight trucks, would that have done what paragraph 3(e) here says?

A.    Technically, yes.  It would have been a little odd.  But, technically, that would have worked.

Q.    Perfect.  So I want to back up a little bit, and I want to talk to you about the $100,000 loan that we've already referenced.

You lent Sheet Pile, LLC $100,000, correct?

A.    I did.

Q.    When was that?

A.    In November of 2019.

Q.    Is that the first time you ever lent Sheet Pile money?

A.    No.

Q.    When did you lend Sheet Pile money before that?

A.    Several times.  One large one was $80,000.  I want to say it was a year or two before that.  I forget the date right now.

Q.    And where did you get that $80,000?

A.    From my line of credit.

Q.    So you pulled 80 grand from your line of credit and gave it to Sheet Pile?

A.    That's right.

Q.    Did you have an agreement with Sheet Pile related to that 80 grand?

A.    Yes.

Q.    And if you recall, what did that agreement require Sheet Pile to do?

A.    It was very similar terms to the current note. There was a promissory note and a security agreement, the promissory note promising me to pay me back that 80,000 principal, along with an 8,000 interest.  And it had the payment terms, et cetera, in there.  It also promised to pay whatever bank interest I was incurring from having it pulled out of my personal line of credit.

Q.    Will you do me a favor and in your binder flip to tab 1, please.  This is Plaintiff's Exhibit 1.

        I believe we've agreed to pre-admit Exhibit 1,

correct?

MR. HUDSON:  I believe that's right.

MR. SCHULZE:  Move to publish Exhibit -- Plaintiff's Exhibit 1 to the jury.

THE COURT:  If it's admitted, you can publish it.

MR. SCHULZE:  Thank you.

Q.   Looking at Plaintiff's Exhibit 1, Mr. Ramsey, do you recognize this document?

A.   I do.

Q.   And is this the promissory note that you were just referencing?

A.   Yes.  For the loan that we're talking about.  Not the original 80,000, but for the current 100,000.

Q.   Correct.  This is the $100,000 loan?

A.   Correct.

Q.   And you said that the previous $80,000 loan was substantially similar?

A.   Almost identical terms other than the amount and the date.

Q.   Okay.  Reflecting back on that $80,000, do you recall how much interest you earned from that note?

A.   I do.  8,000.

Q.   $8,000.  So 10 percent?

A.   Ten percent.  That's right.

Q.   And do you recall how long Sheet Pile borrowed that money?

A.   I don't remember, but it was a short-term loan.  It was something under six months.

Q.   Okay.  And were you paid back that entire $80,000?

A.   I was.

Q.   And were you paid back the entirety of the $8,000 in interest?

A.   I was.

Q.   And you referenced some additional interest a few moments ago?

A.   That's right.  So the 8,000 is what I earned off of it, and then Sheet Pile was also responsible for paying whatever the bank line of credit interest was charging me for having that 80 grand out for several months.  So whatever that interest amount was, then Sheet Pile reimbursed me for that.

Q.   For the benefit of somebody who doesn't know about this line of credit, what is the this line of credit that you have?

A.   Basically, it's like a second mortgage that I have -- that I've taken out on my house.  So my house is the collateral to have this line of credit that's sitting out there that I can pull from at any given time.

Q.   If you need the money?

A.    If I need the money or want the money.

Q.    And you have to pay interest on that?

A.    Yes.

Q.    And do you have to pay like a monthly mortgage payment then?

A.    It's not so much a mortgage payment, but then that interest becomes the minimum amount due each month.

Q.    Okay.  And so you pay back -- let's say you borrowed the $80,000.  As long as you paid back the interest each month, you didn't have to pay that $80,000 back?

A.    Correct.

Q.    Do you know what the rate of that interest is?

A.    I don't recall what that was.

Q.    Okay.  So Sheet Pile borrowed that $80,000 from you and paid you back everything?

A.    That's right.

Q.    Paid you back the interest as well?

A.    They did.

Q.    When you received that $80,000 back, did you pay off that loan?

A.    Put it right back, yes, within a day.

Q.    So it wasn't out of the ordinary for you in November when Sheet Pile approached you to borrow $100,000?

A.    That's correct.

Q.    Who was it at Sheet Pile that approached you to

borrow this $100,000?

A.    Rob Wendt.

Q.    Is that who had approached you about the $80,000?

A.    It is.

Q.    Let's take a look at this secured promissory note. And I won't make you go through every paragraph like I did the last contract.

A.    Thank you.

Q.    But can you do me a favor and just start at where it says "For value received" and read that first sentence.

A.    Sure.  "For value received, Sheet Pile, LLC, a New Hampshire Limited Liability Company and its successors and assigns, the borrower, hereby promises to pay to the order of Douglas Ramsey, an individual whose address is" -- there's my address -- "an its successors assigns, sometimes referred to the lender or holder according context, the principal sum of $100,000."

        The value received -- oh, just the first sentence.  There you go.

Q.    And so borrower here was defined as Sheet Pile, LLC?

A.    That's correct.

Q.    Did I read that right?

A.    That's right.

Q.    And you were the lender?

A.    That's correct.

Q.   Go ahead and keep reading "The value received"?

A.   "The value received is that lender will transfer $100,000 to the recipient account of the borrower's choosing no later than 25 November 2019."

Q.   Do you recall on what day you sent the $100,000?

A.   I don't remember the exact date, but it was between the 21st and 25th.

Q.   And did you give that money directly to Sheet Pile, or did you send that to somebody else on Sheet Pile's behalf?

A.   No.  I sent it to a bankruptcy trustee that Sheet Pile was having to work with for various reasons.

Q.   And that was at Sheet Pile's direction?

A.   That was at Sheet Pile's direction.

MR. SCHULZE:  Your Honor, may we approach briefly?

THE COURT:  You may.

(At the bench)

MR. SCHULZE:  Our motion in limine restricts us from discussing other lawsuits and things of that nature. There is a bankruptcy that a different entity, PilePro LLC, was involved in.  Sheet Pile purchased assets from that bankruptcy, and Mr. Ramsey was required to send that $100,000 to that bankruptcy trustee.

I'd like to -- I'd like to elicit some

testimony about what that $100,000 was used for and where he transferred it, but I can't do that very well without referencing the PilePro bankruptcy. And he's already said the word "bankruptcy trustee," and so I didn't want to get too deep into that without having discussed it first and having the Court's permission.

Specifically, that relates to our Exhibit 31, which is the actual order, tab 32.

THE COURT: Do you intend to offer that order?

MR. SCHULZE: I do.

THE COURT: And you want to ask questions related to that?

MR. SCHULZE: Correct. And, specifically, those questions relate to Sheet Pile was purchasing 100,000 -- purchasing from this bankruptcy trustee and needed to make that $100,000 payment to that bankruptcy trustee by a date that is set in this order.

THE COURT: Okay. Any objections to this line of questions or the exhibit?

MR. TERRAZAS: Yes and no, Your Honor. We don't object to him -- I think he can easily ask questions that say what was this payment used for without referencing any more about any bankruptcy or anything else. This order itself is not only hearsay, he doesn't have foundation on it. He would just be reading an

order.  He wasn't presented this order at the time.  He wasn't part of this order or anything to do with this order at that time.

And I think it would create very much undue prejudice if you're referencing a bankruptcy with PilePro.  He's already mentioned that's a company he used to work for and be affiliated with when we're talking about all this.  I just -- he doesn't need to talk about that bankruptcy at all.

THE COURT:  I agree.  Well, yeah.  I agree that the probative value of getting into the details of the order itself is just not necessary to get the level of context that's needed to understand that this was a legitimate transfer of money for that purpose.

MR. SCHULZE:  Understood.

THE COURT:  So I think if we can keep that at a high level, we can -- that purpose is communicated.

MR. SCHULZE:  And if Mr. Ramsey suggests that there was a deadline that he was aware of set by the bankruptcy court and transfer the funds by that deadline, is that permissible?  I don't want to get into the ...

MR. TERRAZAS:  Your Honor, if I may respond to that, the security agreement has a deadline.  That's the deadline he had to comply with.  Like anything related to the bankruptcy court didn't have anything to do -- any

additional obligation on the security agreement.

MR. SCHULZE:  It relates to the four-day timing, the four-day turnaround of him sending the funds and the due date.

MR. TERRAZAS:  Your Honor?

THE COURT:  Go ahead, Mr. Terrazas.

MR. TERRAZAS:  I'm sorry, Your Honor.  Just the timing of him sending it in four days or whatever I don't think has any relevance to the claims.  The question is whether or not Sheet Pile owes the money or not.

THE COURT:  So what's the relevance of the four-day turnaround?

MR. SCHULZE:  The relevance of the four-day turnaround is that Mr. Ramsey was doing everything that his employer was asking him to do on time, promptly, to save his employer.

THE COURT:  I overrule the objection to discussing the timing.  Basically, the four days -- this whole line of questioning I find to be permissible, so I overrule that objection.

I sustain the objection to your Exhibit 31.

MR. SCHULZE:  Understood.

MR. TERRAZAS:  And just to make clear, Your Honor, sorry, is he going to be able to reference the bankruptcy and those type of things?  I'm fine with

him saying there's a four-day deadline.  I'm worried about getting into bankruptcy and those types of things.

THE COURT:  What are you going to say?

MR. SCHULZE:  I was going to ask him what the need for that $100,000 was and why he had to get it from Doug Ramsey, why the company couldn't search for that money elsewhere, why the company couldn't take out its own loan.

And I suspect that he's going to testify that the company wouldn't be able to secure a loan that quickly and that there was a bankruptcy deadline that they had to comply with.

MR. TERRAZAS:  Your Honor.  May I offer that we have no idea what Mr. Ramsey might say or not say.  I don't think he's been advised about this, necessarily -- I don't know; maybe he has -- about this motion in limine, that he can't mention anything to do with the bankruptcy.  I worry about him not being instructed or knowledge of that he can't mention something like that, if he's asking these questions, that he'll go into it.

MR. SCHULZE:  And I can give him an instruction prior to this line of questioning.

THE COURT:  Well, I mean, one thing we can do, I guess, I feel like this is -- we've spent a lot of time already talking about this.  Clearly, it's a sensitive

subject.  We can send the jury out and do this on voir dire and make sure that everybody is on the same page and then bring them back in, if that's the cleanest way to do it to ensure that we're not getting too far.

I hope -- I mean, I realize this is a sensitive matter, but I'm not going to -- we're not going to do voir dires on every objection.

MR. SCHULZE:  No.

MR. TERRAZAS:  No, Your Honor.  Your Honor, may I also suggest -- and I don't know if you could do this, but if we can go to another line of questioning and get to 4:30 and then we can do this after the jury is recessed for the day --

THE COURT:  Yeah.  We're still 15 minutes.

MR. SCHULZE:  We're still planning on stopping at 4:30.

THE COURT:  Let's just do that.

MR. TERRAZAS:  Okay.  Thank you, Your Honor.

(In open court)

Q.  (BY MS. SCHULZE) Mr. Ramsey, you still with us?

A.  I'm here.

Q.  We just read that last sentence of the first paragraph there in the promissory note.  And I believe you read that the lender will transfer $100,000 to the recipient account of the borrower's choosing no later

than 25 November 2019.

Q.   Did you in fact transfer $100,000 to Sheet Pile or someone of their choosing by that deadline?

A.   I did.

Q.   Look down at number -- section 2 for me, please, talking about interest.  Can you read that first sentence for us, please.

A.   Sure.  "2.  Interest.  The principal amount of this note shall bear interest ('Interest') which shall be the sum of $10,000 as a one-time, flat-rate interest payment and (ii) the cost of all interest, costs, and fees associated with borrower's personally secured funds.  Interest will begin accruing on any unpaid principal balance of this note beginning on November 21, 2019."

Q.   So that $10,000 in interest, when did that become earned by you?

A.   Immediately, once I had sent the $100,000 wire.

Q.   Okay.  Can you explain to the jury what was meant by "the cost of all interest, costs, and fees associated with borrower's personally secured funds"?

A.   Sure.  Well, as I mentioned, the $100,000, I pulled that off of my personal line of credit with the bank.  And so the bank would charge me a monthly interest fee.  I believe it was $411 or so and change each month that was outstanding.  And so each month I would be required

to pay at least that $411 interest back to the bank. And then Sheet Pile was supposed to reimburse me for that.

Other costs and fees like, for instance, the wire cost I think was a $25 wire fee which Sheet Pile reimbursed as well. So any costs and fees associated with that line of credit there.

Q. Did you-all have the same arrangement for that $80,000 note?

A. We did.

Q. And I believe your testimony was earlier that Sheet Pile did pay those additional fees for that $80,000 note?

A. They did.

Q. Look down to paragraph 3 for me, "Payment of Principal." Please read that for me, at least the first sentence for now.

A. "Payment of Principal. All outstanding amounts shall be due and payable on demand on December 21, 2020 ('Maturity')."

Q. So the full outstanding payment, the $100,000, was due by December 21st, 2020; is that correct?

A. That's correct.

Q. When was the interest payment due?

A. It would begin accruing immediately. But it was a one-time deal, so it would also be due on December 21, 2020.

Q.   Your expectation was to be repaid the $100,000, plus the $10,000 in interest, plus the $411 fees that you were incurring, all on December 21st, 2020; is that accurate?

A.   On or before, yes.

Q.   Okay.  Read that next sentence for me, if you will?

A.   "Any unpaid principal or interest will continue accruing interest at an additional flat rate of $1,000 per month or portion of month after the maturity date."

Q.   What did that mean to you?

A.   So that means, after December of 2020, so about 13 months after this loan, if everything had not been paid back to me, then there was going to be an additional basically $1,000 flat-rate late fee, if you will, monthly or a portion of a month after that December date.

Q.   Okay.  Did you negotiate that, or where did that come from?

A.   I think that was already in there.  Sheet Pile or PilePro or Mr. Wendt had borrowed funds from several people over the years, and this was a promissory note that we had used -- revised, obviously, but used from prior loans.

Q.   So that $1,000 fee, what was the purpose of that?

A.   Basically, just as an obvious late penalty if everything wasn't resolved by the required maturity date on here.

Q.   After you weren't paid back this loan by December 21st of 2020, did you expect to receive the $1,000-per-month late fee?

A.   Yes, I did.

Q.   And you used the word "late fee."  This says any unpaid principal or interest will continue accruing interest on an additional flat rate of $1,000 per month.

Did that actually mean interest?

A.   I hate to use the word "interest" here.  Probably should have clarified it a little bit.  Interest to my mind was what the bank was charging me and I was having to pay the bank back each month.  And this interest, this accruing interest, is more or less a late fee that was payable to me for carrying this loan beyond the maturity date.

Q.   After December 21st of 2020, did you continue to -- incurring that $411 that you mentioned earlier to your lender?

A.   I did.

Q.   And that was just because that $100,000 note was still outstanding?

A.   That's right.

Q.   Go to the next section for me, "Prepayment."  Will you read that section for me.

A.   "Prepayment.  Principal and/or interest on this note

may be prepaid in whole or in part at any time, save and except in the event that borrower is the subject of a filing under any provision of Title 11 of the United States Code."

Q.    What does that mean to you?

A.    Basically, that it can be paid anytime early or at any time, really, unless the company goes bankrupt.

Q.    And why was that section included here?

A.    Just as a notice to Sheet Pile that they could pay it early.  They didn't have to wait until midnight on December 21st, 2020.

Q.    Was there any discussion about having it paid back early?

A.    There was.

Q.    Who was that discussion with?

A.    Both Rob Wendt and Kevin Terrazas.

Q.    Look to the next section paragraph 5,

        MR. SCHULZE:  And, Your Honor, just in the interest of the Court's time, it's 4:24, and this is a relatively long section.  It's a decent stopping point for me if the Court would prefer, or I can get into it.

        THE COURT:  I'm fine with our breaking for the day, if this is a logical spot.

        I expressed to the lawyers in our final pretrial conference which took place last week that it's

important to me that we make the best use of your time and that we may -- we go full days.  But sometimes there is a logical place like this, and we're only five minutes before we were going to break for the day anyway.  And so, yeah, that's fine.

I will remind you of my previous instruction to not discuss the case with anyone, including each other. If anyone approaches you to talk about the case, please let me know.  Don't listen to any news reports or use any other technology tools to do independent research.  Keep an open mind until all the evidence is closed, and don't speak to anyone in or around the courthouse other than your fellow jurors or court personnel.

With that, I will turn you loose and look forward to having you-all here at 8:45 tomorrow morning.

All rise for the jury, please.

(Jury recessed)

THE COURT:  Okay.  So, Mr. Ramsey, you can't step down just yet because were going to do a quick line of -- kind of a mock line of questioning here -- we also call this "voir dire" -- to figure out the scope of what we can get into with respect to Mr. Schulze's questions about the Sheet Pile bankruptcy that sort of prompted the need for your $100,000 loan.

So I guess how do you-all want to do this?

Mr. Schulze, do you want to just kind of start in on your questions, and then we'll take the objections as they arise?

MR. SCHULZE:  We can do that.  Absolutely.

If I may give Mr. Ramsey just a brief instruction?

THE COURT:  Yes.  That's fine.  And do we need this on the record?

MR. SCHULZE:  Not for me, Your Honor.

MR. TERRAZAS:  No, Your Honor.  I don't think so.

(End of requested transcription)

**UNITED STATES DISTRICT COURT      )**

**WESTERN DISTRICT OF TEXAS            )**

I, Arlinda Rodriguez, Official Court Reporter, United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

WITNESS MY OFFICIAL HAND this the 9th day of November 2023.

/S/ Arlinda Rodriguez
Arlinda Rodriguez, Texas CSR 7753
Expiration Date:  10/31/2025
Official Court Reporter
United States District Court
Austin Division
501 West 5th Street, Suite 4152
Austin, Texas 78701
(512) 391-8791