**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

DOUGLAS RAMSEY,                          ) AU:21-CV-331-LY
                                         )
    Plaintiff/Counter-Defendant,         )
                                         )
v.                                       ) AUSTIN, TEXAS
                                         )
SHEET PILE LLC,                          )
                                         )
    Defendant/Counter-Plaintiff.         ) MAY 16, 2023

        *********************************************
              TRANSCRIPT OF JURY TRIAL TESTIMONY OF
                        DOUGLAS RAMSEY
              BEFORE THE HONORABLE DUSTIN M. HOWELL
        *********************************************

APPEARANCES:

FOR THE PLAINTIFF:    GERRIT SCHULZE
                      SHUMWAY VAN, LLC
                      13750 SAN PEDRO AVENUE, SUITE 810
                      SAN ANTONIO, TEXAS 78232

FOR THE DEFENDANT:    KEVIN JAMES TERRAZAS
                      ERIC A. HUDSON
                      TERRAZAS, PLLC
                      1001 S. CAPITAL OF TEXAS HIGHWAY
                      AUSTIN, TEXAS 78746

COURT REPORTER:       ARLINDA RODRIGUEZ, CSR
                      501 WEST 5TH STREET, SUITE 4152
                      AUSTIN, TEXAS 78701
                      (512) 391-8791

Proceedings recorded by computerized stenography, transcript

produced by computer.

**EXHIBIT INDEX**

|  | | OFFD/ADM |
|---|---|---|
| Plaintiff | | |
| 8 | 11 | 11 |
| 9 | 94 | 94 |
| 10 | 30 | 31 |
| 11 | 128 | --- |
| 12 | 129 | 129 |
| 13 | 4 | 4 |
| 14 | 40 | 40 |
| 15 | 42 | 43 |
| 16 | 137 | 137 |
| 17 | 145 | 145 |
| 18 | 151 | 151 |
| 21 | 54 | 54 |
| 22 | 155 | 156 |
| 26 | 62 | 64 |

(Open court, jury present)

THE COURT:  Mr. Schulze, we left off with your direct examination of Mr. Ramsey.  Shall we continue there?

MR. SCHULZE:  Yes, Your Honor.  Please.

THE COURT:  All right.  Mr. Ramsey, you can come on back to the witness stand, and I'll remind you of the oath that you took yesterday.

MR. SCHULZE:  Good morning, Your Honor, ladies and gentlemen.  May it please the Court?

THE COURT:  Counsel.

**DOULGAS RAMSEY,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. SCHULZE:**

Q.   Mr. Ramsey, do you still have the white binder sitting there to your right, the Plaintiff's Exhibit Binder 1?

A.   Good morning.  Yes, I do.

Q.   Excellent.  Will you do me a favor, and in that binder flip to tab 14, please.  Should be a document labeled as Exhibit 13?

A.   Yes.

Q.   Do you recognize that document?

A.   Yes, I do.

Q.    What is that document?

A.    That is a form from the wire transfer of $100,000 that I --

Q.    And is that a document that you filled out and completed?

A.    Let me see.  Yes.  I filled it out with the bank, yes.

Q.    And is that something that you created in the furtherance of giving this loan that we talked about all day yesterday to Sheet Pile?

A.    Yes, it is.

        MR. SCHULZE:  Your Honor, I'd like to move to admit Plaintiff's Exhibit 13 and publish to the jury.

        THE COURT:  Any objection?

        MR. TERRAZAS:  Hearsay, Your Honor.

        THE COURT:  What is your response to the hearsay objection?

        MR. SCHULZE:  Your Honor, this is a document that was kept in the ordinary course of business.  This was a business transaction between Mr. Ramsey and Sheet Pile.  Mr. Ramsey just testified that he created and kept this document in the course of making that loan.

        THE COURT:  Overrule the objection and admit Plaintiff's Exhibit 13.

        MR. SCHULZE:  Thank you, Your Honor.

Q.   Mr. Ramsey, can you confirm for the jury that the document that is showing on the screen is the same one that you're looking at in the binder?

A.   Yes, it is.

Q.   And what is this document?  Why was it created?

A.   This was to actually perform the $100,000 transfer from my personal line of credit account using BBA -- excuse me -- BBVA Bank to the account directed by Sheet Pile.

Q.   And there's some information that's been redacted here such as your account number and whatnot, but can you tell me what -- what it shows here under "wire amount"?

A.   Sure.  Under the wire amount is $100,000 even.

Q.   And that is the exact amount that you transferred under this loan?

A.   Yes, it is.

Q.   Can you tell me what information is under "originator information"?

A.   Sure.  It is redacted because it did have my personal account information and my personal street address, but that is my last name, Ramsey.  That is my account.

Q.   But that's the information that would have been there, is your street address, your account information, and your full name?

A.    That's correct.

Q.    Okay.  Up here on the top, right "receiving, slash, beneficiary bank information," can you tell me where this loan was sent to?

A.    Yes.  It was sent to a Rabobank, NA in Santa Barbara, California.  It's got the bank ID.

Q.    And then under "beneficiary, slash, reference information" there, can you tell us what information is there?  And you don't need to read the account number to us.

A.    Sure.  It's got the account number on there and then also the name of PilePro LLC.

Q.    Okay.  So this is the document that you provided to your financial institution to initiate the wire transfer for PilePro 's benefit?

A.    That's correct.

Q.    I'm sorry for Sheet Pile?

A.    For Sheet Pile.  That's right.

Q.    Okay.  And PilePro LLC, as it's referenced here, is just another one of Mr. Wendt's entities; is that correct?

A.    That's correct, yes.

Q.    Do you know whose initial is there on the bottom left?

A.    I'm guessing, since it says Kate Fauth, that that's

her initials, and I would think that that is the bank employee there.

Q.   Okay.  Do me a favor.  In your binder flip backwards to tab 9, please.

A.   Okay.

Q.   Does it say Plaintiff's Exhibit 8 on the bottom?

A.   It does.

Q.   Do you recognize this document?

A.   I do.

Q.   What is this document?

A.   It is an email that I sent to -- to attorney Kevin Terrazas.  It's an email string that I sent to --

        MR. TERRAZAS:  Your Honor, may we approach?

        THE COURT:  You may.

     (At the bench)

        MR. TERRAZAS:  Your Honor, this is the same email we discussed before that was hearsay that couldn't get in.  I object to Mr. Schulze having a witness look at documents that haven't been admitted, that he hasn't established any foundation for or anything else, when he's not refreshing recollection or anything.  It's -- that's improper.  He can ask questions and if he needs to refresh recollection, refer to documents.  But that's the procedure to use.

        THE COURT:  How else is he going to lay the

foundation for a witness to admit an exhibit but for asking him questions?

MR. TERRAZAS:  Your Honor, if it's a hearsay exhibit such as this, then what he's supposed to do is to ask him, you know:  Did you correspond.  What was in that or correspondence?  He can answer all those questions, and there's no use of the exhibit itself.  If he can't remember what he wrote or something like that, then he can refresh his recollection but it still doesn't get published to the jury.  And that's in the rules of evidence in terms of the correct procedures on it, even as an exception to hearsay.

MR. SCHULZE:  In order to lay foundation for this exhibit, I need to establish who sent the email, who it was sent to, who it was sent from, who received it, the date, and that's what I'm doing at this point.

MR. TERRAZAS:  But, again, the proper procedure is to ask the witness to provide testimony, and then if he can't remember, then he can refresh the recollection with whatever emails.  But if it's a hearsay email, it's not supposed to come in.

MR. SCHULZE:  I'm not using this to refresh his recollection.  I intend to offer this as an exhibit.

MR. TERRAZAS:  And again --

THE COURT:  I overrule the objection.

MR. SCHULZE:  Thank you, Judge.  Just to be clear, overrule the objection as to the admissibility of the exhibit or as to --

THE COURT:  You may -- you may ask all the questions you were about to ask to lay a foundation to admit this exhibit.

MR. SCHULZE:  Thank you.

(In open court)

Q.  (BY MR. SCHULZE) Okay, Mr. Ramsey.  At the top you can see that this email was sent by somebody.  Who was it sent by?

A.  It was sent -- the top email was sent by Kevin Terrazas.

Q.  And what email was that sent from?

A.  Kterrazas@clevelandterrazas.com.

Q.  Do you recognize that email address?

A.  I do.

Q.  And whose email is that?

A.  That's counsel Kevin Terrazas', or it was at the time.

Q.  And is that an email address that you had previously corresponded with Mr. Terrazas to?

A.  Yes.

Q.  And from what email address did you send this email?

A.  From my personal email address.

Q.   And what is that personal email address?

A.   Thedougramsey@gmail.com.

Q.   And this is an email address that you use routinely?

A.   Yes.

Q.   And when was this email sent?

A.   Monday, December 23rd, 2019.

Q.   At what time?

A.   At 11:17 a.m.

Q.   And just to confirm, this is an email you received?

A.   Yes.

Q.   Did you save this email?

A.   I did.

Q.   Why did you save it?

A.   It was relating to the loan that I had made and request for payment, and so normally I keep emails that relate to anything important like that.

Q.   Important like that?  Important like the loan?

A.   Important like the loan, sure.

Q.   And is it fair to say you kept all the emails that you have related to that loan?

A.   I believe I did.

Q.   Does that include both emails you sent and emails you received?

A.   It would include any emails that I still had in my personal email.  A lot of the emails about loan were in

corporate email, which were shut off a few days before this.

MR. SCHULZE:  Okay.  Your Honor, I'd like to move to admit Plaintiff's Exhibit 8 and publish it to the jury.

THE COURT:  Any objection?

MR. TERRAZAS:  Yes, Your Honor.  If we may, I apologize, approach one more time.

THE COURT:  Is it a hearsay objection?

MR. TERRAZAS:  Yes, Your Honor.  To the second email.

THE COURT:  Overruled.  The court admits Plaintiff's Exhibit 8.

MR. SCHULZE:  Thank you, Your Honor.

Q.   And, Mr. Ramsey, can you confirm for the jury that the email that we're looking at here is the same one that you're looking at in the binder?

A.   Yes, it is.

Q.   And so this the email from Kevin Terrazas to you, Doug Ramsey, yes?

A.   Correct.

Q.   Can you read the email response that you received from Kevin Terrazas for us, please.

A.   Sure.  It says, "Thanks.  Looks like Rob has found the 250K, so should be good.  Not sure exactly what is

going on with everything else, as this was the fire everyone was working to put out.  I think we will have to address it after the holidays.  Hope you have very Merry Christmas."

Q.    And this was sent December 23rd of 2019?

A.    Correct.

Q.    That's after your email access had already been shut off?

A.    That's correct.

Q.    Is that why you were emailing from your personal email address?

A.    Yes, it is.

Q.    This was before you were terminated, though, correct?

A.    Yes.

Q.    So at this point in time, you were still employed by Sheet Pile, LLC?

A.    That's correct.

Q.    What was the $250,000 fire that he's referencing?

A.    There were several urgent payments that the company was needing to make basically in order to stay in business.  It was some IP asset purchases.  I won't go into all of the details.  My $100,000 loan was one of the urgent payments.  The next urgent payment I believe was the 250,000 that Kevin is referencing here.

Q.    Okay.  To your knowledge, after the $250,000, was -- were there more payments that needed to be made?

A.    There were more additional payments, yes.  There was a whole payment schedule.

Q.    And those were important payments?

A.    Extremely important.

Q.    What would have happened, to your knowledge, if those payments hadn't been made?

A.    Essentially, Sheet Pile would have gone out of business.

Q.    Okay.  So it was vital for the continued operation?

A.    Vital for the entire company.  That's right.

Q.    Looking down on that email, there's a section of that email that looks like it was something that was sent by you.

A.    Yes.

Q.    Can you tell us when that email was sent?

A.    Sure.  So this was sent less than two hours before the response.  It was on December 23rd, 2019 at 9:34 a.m.

Q.    Okay.  Looking at the second paragraph there that begins with "First I talked to."  Can you read us that paragraph -- can you read that paragraph for us, please?

A.    "First I talked to an oil investor this weekend who may be interested in loaning or investing the 250K, which may still be needed today."

Q.   Okay.  So that -- the company was in need of an additional $250,000?

A.   That's correct.

Q.   In addition to the $100,000 that you'd already loaned it?

A.   That's correct.

Q.   Why didn't you loan it the additional 250,000 that it needed?

A.   Well, at this point I didn't know where I was with the company, and I also didn't have $250,000 to loan.  My line of credit was already essentially tapped out.

Q.   Okay.  But you were still -- even though you lost access to your email, you were still trying to help them find this money that the company desperately needed?

A.   Absolutely, yes.

Q.   Start with the second paragraph for me that begins with "Second."

A.   "Second, I'd like to see how we can move forward productively."

Q.   What are you referring to there?

A.   Multiple emails and attempts -- or calls to Kevin trying to figure out what was going on since email had been cut off for four days.  Obviously at this point I realized something was amiss.

Q.   Okay.  Read the next sentence for me, please?

A.    "I understand Rob may be disappointed about the timing of my bonus request."

Q.    Had that been expressed to you, that Rob was disappointed, or where did that information come from? Why did you feel that way?

A.    I don't remember if Kevin said something specifically or made me think that it was odd.  But it was clearly odd that I put in my bonus request one night and then the next morning my email was cut off.

Q.    Okay.  All right.  Do me a favor.  Flip to the next page, tab 10, for me, please.

A.    Okay.

Q.    Is this another email?

A.    Yes.

Q.    And can you tell me between which email addresses this email was sent?

A.    Sure.  Starting at the top, it's from my personal email address, same one I referenced earlier, to the same Kevin Terrazas email.

Q.    And that's your personal email address and Mr. Terrazas's email address?

A.    That's right.

Q.    And is this another email that you're keeping -- that you kept and saved in the ordinary course of the business transaction that was this loan?

A.    Yes.

Q.    And this is an email that you sent to Mr. Terrazas in this transaction?

A.    Yes.  That's correct.

        MR. SCHULZE:  I would like to move to admit Plaintiff's Exhibit 9 and publish to the jury.

        THE COURT:  Any objection?

        MR. TERRAZAS:  Yes, Your Honor.  It's hearsay and there's --

        THE COURT:  Is it not a statement by a party opponent if it's a statement made on behalf of Sheet Pile?

        MR. TERRAZAS:  It's not a statement from Sheet Pile.  This is a Douglas Ramsey email.

        THE COURT:  Is the -- the emails -- I mean, obviously, there's a lot of communications back and forth here.  It seems like the emails from counsel here at least are -- count as statements by a party opponent, but we've got lots of statements -- this is a long chain of emails, Mr. Schulze.  What about all these statements by your client?  How do those not count as hearsay.

        MR. SCHULZE:  It's -- it's absolutely a back-and-forth communication, Your Honor.  But this is a document that Mr. Ramsey testified he kept in the ordinary course of business.  It was a business record.

THE COURT:  I'm not buying the business records exception on this.  I need to understand why a statement, even if he's on the stand ...

MR. SCHULZE:  It falls under Rule 807, Your Honor, the residual exception.

THE COURT:  I sustain the hearsay objection to any statements made by Mr. Ramsey in these email chains.

MR. SCHULZE:  Understood, Your Honor.

THE COURT:  So you may not publish anything that includes a statement by Mr. Ramsey.  Do you understand that?  You're going to need to redact your exhibit.  So Exhibit 9 is only admitted as to statements made by Mr. Terrazas on behalf of Sheet Pile, because that's a statement by a party opponent.

MR. SCHULZE:  Understood, Your Honor.  May we approach on that?

THE COURT:  You may.

     (At the bench)

MR. SCHULZE:  I apologize, Judge.  I don't want to become argumentative.

     (In open court)

THE COURT:  You know what?  Actually, I assume there are going to be multiple.  Why don't we send the jury out.  I'm going to send you-all out for just a few minutes; it won't be long.  There's a couple of things

that would just be easier than going back and forth.

(Jury recessed)

THE COURT:  All right.  Everyone can have a seat.  Before we jump into this, I want to reiterate my grave concerns about the lawyer as witness rule and referring -- we've got a lawyer here who's trial counsel but also enmeshed in the factual development of this case, and I think Rule 3.7 bears on this issue.

It's a concern that I had when I very first heard the preliminary injunction in this case, was that Mr. Terrazas's name was all over consultations on how to set up this plan to deal with this dispute with Mr. Ramsey, but no one else has seemed to express that concern.

At this point, I mean, there's an exception to 3.7 that says if it were to cause substantial harm on the client to disqualify a lawyer, I can tell you, if this had come up earlier, I don't -- all of the policy concerns underlying Rule 3.7 I think are present here.  I think this is going to be confusing to the jury.  In any other lawsuit in which we're -- in any other trial referring in which we're referring to lawyers, we're referring to each other by Mr. This and Mr. That or Mrs. This and Mrs. That.  Here we're talking about "Kevin," his emails between the client on the stand and

"Kevin."  This just makes me very uncomfortable.  This is an ethical morass if you ask me.  But here we are.

So I don't know if either side wishes to address this or can explain it or explain why nobody's objected or raised this as a concern.  I guess both sides feel like they stand to benefit from playing it out this way in front of a jury.  But I have to think that the confusion concerns that are expressed in the comments to Rule 3.7 are 100 percent present and muddying the waters in this case.

Anyone care to comment?  Mr. Schulze?

MR. SCHULZE:  Judge, we have no specific requirement or need as to why we didn't object to Mr. Terrazas.  As far as the plaintiff is concerned, we assumed that if Mr. Terrazas felt that he couldn't adequately stand in both shoes, that he would have not taken the case into trial.

For the longest time I was working directly with Mr. Hudson, so it was my understanding that Mr. Hudson would be trying this case and was essentially lead counsel on the matter, although Mr. Terrazas was involved throughout the entire proceeding.

THE COURT:  Mr. Terrazas, what do you have to say?

MR. TERRAZAS:  Your Honor, we made very clear

to Mr. Schulze from the very beginning that I was lead counsel on this case, so he knew about it.  The -- any sort of objection that he had we believe is waived and has been waived on it.

We believe that all these emails are not relevant to the claims or defenses in this case.  I'm not sure exactly what he's trying to prove with these at all. Just like that last email that we discussed when he first raised it, he said this is involving the loan.  Nothing in that email involved the loan at all.

THE COURT:  I don't think you can deny that you are in the middle of these discussions, and they are present.  Do you have anything -- and they are certainly a part of the case as it is.

Now, obviously, you have a different view of what relevance they have to the matter than what Mr. Schulze has.  But they're here, and -- and I would overrule a relevance objection.  And I'm pretty confident that evidentiary ruling will be upheld on appeal.

They -- they have their strategy in how they prove their case, and I think these -- this back and forth, when you're communicating on behalf of the person that they're suing sure seems relevant to me, at least for the fraud claim.  And so -- and the breach, for that matter.

Do you have anything to say about the confusion that this is causing for the jury in terms of having you as a lawyer representing the client but also being essentially a factual player in this?

MR. TERRAZAS: So, Your Honor, what I would say is -- and, again, I'm not --

THE COURT: Is this an issue you anticipated or thought about and said it's going to be okay? I mean, I'm curious to know because, again, this reflects -- just raises major, serious ethics concerns for me.

MR. TERRAZAS: Your Honor, that's what I want to talk about a little, in terms of the ethics concerns, I'm not as skilled and informed about Rule 3.7 in terms of the Texas equivalent of 3.08. There are several provisions in there that -- that talks about it. One is that, if it's going to cause confusion to the jury, the issue is more of -- with Mr. Schulze and whether or not he objects to that. The client has been fully informed on this and has agreed for me to participate in this, which is what is allowed under it. So it appears that both sides are not objecting to this.

And so -- and, again, I don't think that this -- respectfully, Your Honor, I don't see this as being a major issue. In terms of the fraud claim as I understand it, somehow there was representations made

before this $100,000 loan.  And I've looked at the complaint again on this to make sure, and there is no fraud claim associated with, or breach of contract associated with, any sort of correspondence or representation after.

And so that's why I don't believe any of this stuff is relevant.  I don't think it's going to confuse the jury in this, because I don't think it's a major issue in this case.

THE COURT:  So what was your -- you wanted -- so I had sustained the objection as to Ramsey's statements within this lengthy chain of emails, and that's when you had asked to approach and that's when I sent the jury out so we could talk about that quickly.  And I wanted to take this opportunity to reiterate my ethics concerns.

What is it you wanted to say about the Ramsey portions of these emails?

MR. SCHULZE:  I understand the Court's ruling, and I wanted to clarify just my own argument on the actual issues and reasons why I think that these emails are excepted from the hearsay objection.

THE COURT:  Were not getting -- no.  I've ruled on the business rules exception.  So if all you have to say is more on that, that I've heard all I need to hear

on that.

MR. SCHULZE:  No, Your Honor  I'd like to --

THE COURT:  Because here's the deal, right?  I get -- you know, you've got -- I'm not going to entertain 15 minutes worth of objections and arguments on -- you make your objection to hearsay, I'm going to rule.  Sometimes I'll ask for response.  This is not how this trial is going to go.  I just want to make that very abundantly clear.  Coming to the bench to argue every single objection is not how this trial is going to go.  And so is there anything more you have to say on your hearsay response?

MR. SCHULZE:  Just on Rule 807, Your Honor.

THE COURT:  The residual exception?

MR. SCHULZE:  Yes, Your Honor.

THE COURT:  No.  I don't buy that either.

MR. SCHULZE:  Understood.

THE COURT:  Anything else?

MR. SCHULZE:  No, Your Honor.

THE COURT:  All right.  Let's bring the jury back in.  All rise, please.

MR. SCHULZE:  Your Honor real briefly, I'll need a little bit of time to redact these exhibits, if I may?

THE COURT:  Well, you can't publish it now, so

you can do it during a break.  We're not going to take a break to allow you to redact exhibits.

MR. SCHULZE:  Understood.

THE COURT:  So you need to take it down if it's not been admitted.

MS. STEWART:  This one has been admitted.

THE COURT:  Okay.

(In open court)

THE COURT:  Mr. Schulze?

MR. SCHULZE:  Thank you, Your Honor.

Q.   Mr. Ramsey, I'm going to ask you to flip back over to tab 1, please.  This is Plaintiff's Exhibit 1 which was admitted yesterday.

A.   Okay.

MR. SCHULZE:  Are we able to pull that up on the screen?  I'm so sorry.  Thank you.

Q.   Mr. Ramsey, do you recall seeing and talking about this promissory note yesterday?

A.   Yes.

Q.   Perfect.  I want to jump into where we left off when we stopped on this note yesterday.  We had gone through the first four paragraphs, so we were just about to start paragraph 5.  Can you tell us what paragraph 5 was about?

A.   Default remedies.

Q.   And what does "default" mean to you?

A.    If -- if the terms of the agreement aren't met, then it's in default.

Q.    Okay.  Can you tell us what default condition (i) is there, please.

A.    "Borrower's failure to pay any payment of principal or interest as and within 10 days of when due in accordance with the term of this note."

Q.    And remind us when this note was due.

A.    This note was due on December 21st of 2020.

Q.    And where do you find that?

A.    That was in section 3, first page.

Q.    Okay.  I think we already established Sheet Pile didn't pay the principal and interest by December of 2020; is that correct?

A.    That is correct.

Q.    Did Sheet Pile pay it within 10 days?

A.    No.

Q.    Okay.  So was it your position at this point in time that Sheet Pile was in breach of this agreement?

A.    Yes.

Q.    Read subparagraph (b) for me, please.

A.    "The entire unpaid principal balance of this note and all accrued interest thereon shall immediately be due and payable at the option of the holder hereof upon the occurrence of any one or more of the events of default

and at any time thereafter."

Q. Was there a point in time that you declared the entire unpaid principal balance of this note due?

A. Yes.

Q. And when was that?

A. It would have been 10 days after it was due, so December 31st, 2020.

Q. And how would you have declared that note due?

A. You mean, how -- how physically or mentally or what?

Q. Would you have called somebody? Would you have emailed somebody? Would you have sent a letter?

A. Yes. I wrote letter. I believe it was separate letters to Rob and Kevin, a copied letter to both.

Q. Okay. Did you ever receive a response to either of those letters?

A. I don't believe I did.

Q. I want to flip over to tab 2 for me, if you will. This is Plaintiff's Exhibit 2.

MR. SCHULZE: And I believe this has been preadmitted; is that correct?

Move to publish Plaintiff's Exhibit 2 to the jury.

THE COURT: This has already been admitted?

MR. SCHULZE: It has, Your Honor.

THE COURT: Then, yes, you can publish it.

MR. SCHULZE:  Thank you.

Q.    Mr. Ramsey, do you recognize this document?

A.    I do.

Q.    What is this?

A.    This is the security agreement related to the promissory note.

Q.    And why did you have a security agreement related to the promissory note?

A.    So the security agreement basically secures the loan.  It lists out what the collateral would be for that loan.

Q.    If Sheet Pile was going to pay you the $100,000 back by December 20th of 2020, why did you need a security agreement?

A.    As reassurance that it was going to be paid back. So if it wasn't going to be paid back, then the collateral was listed in this security agreement.

Q.    Okay.  Will you read the first paragraph of this security agreement for us, please.

A.    "This Security Agreement (the agreement), made as of November 21st, 2019, by and among Sheet Pile, LLC, a New Hampshire Limited Liability Company (the borrower), with its primary place of business address at," and it's got an address in New Hampshire, "and secondary place of business," another address on New Hampshire, "on the one

hand, and Douglas Ramsey, an individual who holds the note as defined below, the secured party, on the other hand."

Q.   So the two parties to this agreement are Sheet Pile, LLC as the borrower and Douglas Ramsey as the secured party?

A.   Correct.

Q.   Looking down just a little bit, can you tell us what "collateral" means?

A.   Collateral is basically something that's available if somebody defaults on a note.  You know, like if you have a mortgage, your house is typically collateral.  So if you don't pay your mortgage, the bank can come take that collateral, which would be a house.  So in this instance it would list out specifically what that collateral would be if Sheet Pile didn't pay the loan back.

Q.   What was the collateral for this security agreement, if you'll tell us where you're looking.

A.    I'm looking at the very end of this note, Exhibit A.  It's got a description of the collateral.

Q.   And for the benefit of the jury, can you tell us what that collateral was?

A.    Sure.  It was any open receivables of the borrower as the date of this agreement.  Number 2, it's

specifically receivables due and open on that Roll Form Group PO 2PP004775.  That's the one that we discussed yesterday with all the production.  Additionally, all current inventory of the borrower, in stock or production.  That includes steel and a sealant.  And then also all equipment, tools, machinery, and supplies held by Sheet Pile.

Q.   And do you know what the value of all of this collateral was?

A.   I'm not sure of the value.

Q.   Was it over a $100,000?

A.   Yes.  It would be.

Q.   And so did you feel secure that if you had a security agreement that gave you an interest in these four individual pieces of collateral, that you would get your note repaid?

A.   I did.

Q.   Did you get your note repaid?

A.   No.

Q.   Do me a favor.  Flip to tab 11 for me, please.

Do you have Plaintiff's Exhibit 10 on the bottom, right?

A.   I do.

Q.   Do you recognize these documents?

A.   Yes, I do.

Q.   What are these documents?

A.   These are invoices related to that large purchase order to -- the Samuel, Son, and Co., also known as Samuel Roll Form Group.

Q.   And who created these invoices?

A.   I did.

Q.   And you created these while you were employed at Sheet Pile?

A.   I did.

Q.   And did you keep and save these invoices in the ordinary course of Sheet Pile's business?

A.   I did.

Q.   Is it normal for Sheet Pile to keep these kinds of invoices in its records?

A.   Yes, it is.

          MR. SCHULZE:  Your Honor, I'd like to move to admit Plaintiff's Exhibit 10 and publish to the jury.

          MR. TERRAZAS:  No objection, Your Honor.

          THE COURT:  Let's see.  This is ...

          MR. SCHULZE:  It will be tab 11 in the binder, Your Honor.

          THE COURT:  It's tab 11, Exhibit 10, right?

          MR. SCHULZE:  Correct.  Yes.

          THE COURT:  Overrule the hearsay objection and admit Plaintiff's Exhibit 10.

MR. TERRAZAS:  I apologize, Your Honor.  We didn't have an objection.

THE COURT:  Okay, okay.  Then admit Plaintiff's 10.

MR. SCHULZE:  Thank you, Your Honor.

Q.   Mr. Ramsey, can you confirm for the jury that the documents that you're looking at on the screen are the same documents that you have in the binder?

A.   Essentially.  Mine are black and white; that's in color.  But, yes, it's the same one.

Q.   And can you give us the PO number of this invoice here.

A.   Sure.  2PP004775.

Q.   Is that the same number that we just read on the previous exhibit?

A.   Yes, it is.

Q.   So you were given a security interest in the money that was given -- or that was paid for these invoices.  Is that fair?

A.   That is fair.

Q.   Let's look at these invoices real quick.  What is the date of this first one?

A.   The date of the first one is September 6th, 2019.

Q.   And how much is this invoice for?

A.   $1800.

Q.    And I'm going to do some math while we're talking?

So you said $1800?

A.    Correct.

Q.    Going to go to the next invoice, what's the date of this invoice?

A.    September 27th, 2019.

Q.    And is that the same PO number?

A.    It is.

Q.    And what's the amount of this invoice?

A.    22,500.

Q.    Okay.  Next invoice, what's the date of this invoice?

A.    October 4, 2019.

Q.    Same PO number?

A.    Yes, it is.

Q.    What's the amount of this invoice?

A.    $27,000.

Q.    Okay.  Going to the next page, what's the date of this invoice?

A.    October 17, 2019.

Q.    Same PO number?

A.    Yes.

Q.    And what's the amount of this invoice?

A.    $45,000.

Q.    Okay.  Next invoice.  What's the date of this one?

A.    November 1st, 2019.

Q.    And same PO number?

A.    Yes.

Q.    And what's the amount of this one?

A.    $45,000.

Q.    Almost there.  What's the date of the next invoice?

A.    November 15th, 2019.

Q.    Same PO number?

A.    Yes.

Q.    And what's the amount of this one?

A.    $45,000.

Q.    What's the date of the next invoice?

A.    November 22nd, 2019.

Q.    And same PO number?

A.    Yes.

Q.    What's the amount of this invoice?

A.    $9,000.

Q.    What's the date of the next invoice?

A.    December 6th, 2019.

Q.    Same PO number?

A.    Yes.

Q.    And the amount?

A.    $33,750.

Q.    What's the date of the next invoice?

A.    December 18th, 2019.

Q.   And what is the PO number?  Same?

A.   Same number.

Q.   Same PO number?

A.   Yes.

Q.   And what is the amount of this invoice?

A.   $112,500.

Q.   And the last one, what is the date of this invoice?

A.   December 18, 2019.

Q.   Same PO number?

A.   Yes.

Q.   And what's the amount of this one?

A.   $65,700.

Q.   So I was doing the math while we were talking, and I was adding all of those together.  Would you agree with me that all of these invoices are -- add up to $407,250?

A.   Sounds the right ballpark, yes.

Q.   That's way in excess of the $100,000 note or loan that you gave Sheet Pile?

A.   Yes, it is.

Q.   It's also in excess of the $44,000 bonus you were supposed to receive from Sheet Pile, right?

A.   Yes, it is.

Q.   These invoices that we looked at just now, there were 10 of them.  Yesterday we looked at Plaintiff's Exhibit 5, which had previously been published and

admitted.  And I'm going to flip over to it.  That's going to be tab, I believe, 6 in your binder.  Yes.

You read us some dates just now.  Do all of those dates correspond with these various bills of lading?

A.    I believe they do or within a couple of days, yes.

Q.    So is it fair to say that every time Sheet Pile sent a truckload of product to Samuel Roll Form, it also sent them an invoice?

A.    That's correct.

Q.    Do you know if Samuel Roll Form paid Sheet Pile these invoices?

A.    Based on the dates, I'm sure the first few at least were paid, because I was still employed there and they had terms of net 45 days and they usually paid within 45 and 60 days.  I don't remember there being a receivables issue with those, the first few.  I'm not sure exactly how many.

Q.    That was my next question.  Had Sheet Pile ever worked with Roll Form Group before?

A.    Many times.

Q.    And Roll Form Group had always paid its bills on time?

A.    They had.

Q.    Okay.

A.    May I add to that?

Q.    Yes.

A.    These invoices also, if you look on Exhibit 10 lower on the invoice, it says the invoice is payable to a funding group.  So I'm not sure if I can speak about that.

Q.    Absolutely.  Tell us a little bit about that.  Why would the invoice be payable to a funding group?

A.    Okay.  So Sheet Pile used a factoring group for its receivables.  Basically, it had a company that would buy out its receivables for a cash flow boost, if you will. So as soon as there was a valid packet of invoices, packing slips, documentation, that would go to this funding group.  Then the funding group would pay a certain percentage of that immediately or almost immediately to Sheet Pile to basically speed up cash flow.

So, for instance, this first packet, $1800 was small, but the subsequent ones were larger.  So when that packet would go to the funding group, they would send, I think it was, about 80 percent of that receivable immediately to Sheet Pile so that they could use that money to pay their bills, get more material, basically to keep the pump flowing -- the money pump flowing so they could buy more material and keep producing on this

purchase order, or other purchase orders as well.  This is standard operating procedure.

Q.   So even though Sheet Pile didn't require payment on this invoice for 45 days, it would get paid on this invoice much sooner because the money was coming from Flash Funding?

A.   It would get I believe about 80 percent up front, within a couple of business days, and then Samuel Son -- Samuel Roll Form Group would pay the funding company that invoice amount at 45 to 60 days.  So really they were getting -- Sheet Pile was getting paid on these much sooner.

Q.   Okay.  Perfect.  Flip back over to tab 2 in your binder, going back to the security agreement.

And remind us the date of this security agreement.

A.   November 21st, 2019.

Q.   And you were employed by Sheet Pile at that point in time?

A.   Yes.

Q.   You were familiar with Sheet Pile's operations, its inventory, its assets?

A.   Yes.

Q.   Number 3 says, "All current inventory of borrower, in stock or in production, including steel and Wadit

sealant."

Do you know the value of the inventory, including stock and production, steel and Wadit sealant at that time?

A.   At that time it was probably on the order of three quarter of a million dollars to maybe slightly over a million dollars.  I'm not sure exactly.

Q.   Okay.  And number 4, "All equipment, tools, machinery, and other supplies held by borrower."

And remind us again, who is borrower?

A.   The borrower is Sheet Pile.

Q.   And what was the equipment, tools, machinery, and other supplies?

A.   That would have been forklifts, material handling, tractors, anything else that was owned by Sheet Pile.

Q.   Okay.  So, collectively, it's safe to say that you had a lot of collateral for this $100,000 note?

A.   Oh, yes.

Q.   Was any of that collateral accessible to you or available to you to be able to satisfy the unpaid portion of this note?

A.   What do you mean "available to me"?

Q.   Were you able to get any of this collateral in order to make sure you got paid?

A.   No.

Q.    If you will do me a favor and flip to -- actually, let's do this little differently.  If you will go back to Exhibit 1, tab 1, we began talking about this yesterday, but the payment was the $100,000 that you lent them, you were going to get that principal amount back, right?

A.    Yes.

Q.    And then, according to paragraph 2, you were going to receive $10,000 as a one-time, flat-rate interest payment; is that right?

A.    Yes.

Q.    And then that subsection 2 there, the cost of all interest and costs and fees associated with borrower's personally secured funds.

         I think you referenced this yesterday, but can you tell what those costs, fees, and interest were?  Give us an example of what that could have been.

A.    Sure.  The main one is the monthly interest charge that the bank was charging me for the line of credit.  I believe that was 411 dollars and maybe 67 cents, give or take.  And that was monthly.

Q.    And that was a charge just for maintaining that loan?

A.    The charge on the interest of that loan, yes, every month.  That monthly payment was due every month.

Q.    Will you flip to tab 15 for us, please.  This should

be Plaintiff's Exhibit 14?

A.    Yes.

Q.    Do you recognize this document?

A.    I do.

Q.    What is this document?

A.    This is a check that iSheetPile wrote to me in December of 2019 for $290.72 for loan interest.

MR. SCHULZE:  Your Honor, I'd like to move to admit Plaintiff's Exhibit 14.

MR. TERRAZAS:  No objection, Your Honor.

THE COURT:  The court admits Plaintiff's Exhibit 14.

MR. SCHULZE:  May I publish to the jury?

THE COURT:  You may.

MR. SCHULZE:  Thank you.

Q.    Mr. Ramsey, what we're looking at the screen, is that a copy of what you're also looking at in Exhibit 14?

A.    It is.

Q.    What was this $290.72 check for?

A.    Sure.  That would have been the first prorated interest there at late November for the beginning of the loan.  Probably two weeks' worth or so.  And, as I recall, I believe that was 260.72, and then 30 of this was for the wire transfer fee for me sending the $100,000 at the beginning.

Q.   It cost you to send that $100,000.  They charge you the wire fee -- the bank did?

A.   Right.  It was 25 or 30 dollars, yes.

Q.   And so Sheet Pile, under the promissory note, had agreed to reimburse you for those expenses as well?

A.   That's correct.

Q.   Did you and Mr. Wendt have a discussion about reimbursing yourself this $290.72?

A.   Yes, we did.

Q.   Whose signature is on this check?

A.   That's my signature.  It's yours.

Q.   So you wrote yourself a check?

A.   I did write myself a check.

Q.   From Sheet Pile?

A.   Yes.

Q.   But Mr. Wendt was aware of the fact that you were going to write yourself this check.

A.   Yes.  Very.

Q.   And I think you established yesterday that you had the authority to write checks on behalf of Sheet Pile?

A.   Yes.  We both do.  Or both did.

Q.   When was this check written?

A.   December -- excuse me.  December 11, 2019.

Q.   Did Mr. Wendt or anybody ever bring up any problems with the fact that you wrote yourself this check?

A.   I don't believe so, no.

Q.   And what did you do with this check when you received the money?

A.   I deposited it into my account and paid the interest on the line of credit.

Q.   Will you flip over to tab 16 for me, please.  Do you recognize this document or set of documents?

A.   Yes, I do.

Q.   What are these documents?

A.   It's mostly statements from my bank showing the line of credit and the interest that was due.

Q.   So those are documents provided to you by your financial institution?

A.   That's correct.

Q.   And do these relate directly to the $100,000 loan --

A.   Yes, they do.

Q.   -- that you took out?

     And are these documents that you kept in relation to that loan?

A.   Yes.

     MR. SCHULZE:  Your Honor, I'd like to move to admit Plaintiff's Exhibit 15 and publish to the jury.

     MR. TERRAZAS:  Hearsay, Your Honor.

     THE COURT:  This is a business record, correct?

     MR. SCHULZE:  It is, Your Honor, yes.

THE COURT: Overruled and admit Plaintiff's 15.

MR. SCHULZE: Thank you, Your Honor.

Q.   Mr. Ramsey, can you confirm for the jury what we're looking at the screen here is the same as what you're looking at in your binder.

A.   Yes, it is.

Q.   Okay.  Looking at the top there, what period of time is this statement for?

A.   This is for November 11, 2019 through December 10, 2019.

Q.   And can you see there on the right-hand column there's a row that says "cash transactions"?

A.   Yes.

Q.   What was that cash transaction?

A.   That is $100,000.  That is the outgoing payment wire transfer that I sent on behalf of Sheet Pile.

Q.   Okay.  Is that -- is that cash that went in or cash that went out?

A.   That is cash that went out from my account.

Q.   Okay.  Flip to the third page for us, please.  And it actually says page 2 of 3 on the top.

A.   Understood, yes.

Q.   Looking at the transaction history here, can you tell us what we're looking at, starting with the November 21st, transaction?

A.   Sure.   That is -- so this is a checking account here.   And so on November 21st, there was a deposit from my line of credit for $100,000 into my checking account here, because you can't just send out money from a line of credit.   You've got to put it in a checking account and move it.   So that was the transfer from my line of credit into my checking account.

And then on November 22nd, next business day, it's got the outgoing wire referencing PilePro, LLC, one of Mr. Wendt's Companies for the $100,000.   And then after that, on the same day, November 22nd is the wire fee of $30 that I mentioned.   And then on December 13th is the mobile deposit of the 290.72 reimbursement that I had from iSheetPile that we discussed.

Q.   Okay.   Go ahead and flip to the next page for us.

What are we looking at here?

A.   This is another statement of my account here.

Q.   Which account?

A.   The checking account, it looks like.

Q.   Okay.   So previous balance there, it says -- or let's actually start on the left side.

What is the revolving payment under "payment summary"?   What does that mean?

A.   That would have been the monthly interest charge that the bank was charging me for that line of credit.

Q.    And that's the same as that minimum payment?

A.    That's right.

Q.    And so you had a total payment due each month?

A.    That's correct.

Q.    And is that the $411.67 that we're looking at?

A.    That's correct.

Q.    What is the period for this statement?

A.    This is January 11 of 2020 through February 10 of 2020.

Q.    Okay.  And about halfway down the page there on the right, it gives us a finance charge.  Is that the same as that payment we were just discussing?

A.    Yes.  That's correct.

Q.    All right.  So the charge for this loan, $411.67.

Look at the next page for me.  What's the date of this statement?

A.    February 11 through March 10 of 2020.

Q.    And if you'll look about halfway down, we've got a finance charge.  Is that the same, 411.67?

A.    Yes.  That's correct.

Q.    And just above that we have "payments."  Do you see that, "payments and credits"?

A.    Yes.

Q.    What is that payment?

A.    That is the 411.67 again, the same monthly finance

charge, the interest charge.

Q. The bank charged you the 411.67, and you paid the 411.67?

A. Yes. That's correct.

Q. Other than $290 check -- 290.72 check that we looked at a few moments ago, did Sheet Pile ever pay any of these finance charges?

A. No.

Q. So when we see this statement here and it says that there was a payment of 411.67, is it you that made that payment?

A. Yes.

Q. And we'll look at one more. The next statement here, what is the period date?

A. That is March 11 through April 10, of 2020.

Q. So we're looking at the same thing here, a finance charge of 411.67?

A. That's correct.

Q. And a payment by you for 411.67?

A. Yes. That's correct.

Q. Over the life of this note, did you always make that 411.67 payment?

A. I did.

Q. Every month?

A. I did.

Q.   You never missed one?

A.   Never missed one.

Q.   And that payment, did you always make it out of your own pocket?

A.   Yes.

Q.   And as of today, Sheet Pile hasn't repaid you any of that monthly fee?

A.   Other than that 290 check that we discussed, yes, that's correct.  No payments.

Q.   I'm going to switch gears a little bit and I want to talk a little bit about your payroll.

How did Sheet Pile handle payroll while you were employed there?

A.   What do you mean, how did it handle the payroll?

Q.   Who handled the payroll?

A.   I handled the payroll with the outside payroll provider.

Q.   Okay.  What did that mean, you handled it with the outside payroll provider?  What part did you do, and what part did Sheet Pile do?

A.   Sure.  So any 1099 contractors that we had, I would cut the checks in discussion with Rob and made sure we paid all of them, their checks.  And then any W-2 employees, those were all through Hill Country Payroll. We made them twice a month.  And so before the deadline,

twice a month I would contact Hill Country Payroll with the list of employees confirming who is getting paid what.  Some were hourly, some were at a set salary.  So each batch would get confirmed.  I would send it to Hill Country Payroll.

Q.   So you were actively involved with making sure the W-2 employees were getting paid each month?

A.   Yes.

Q.   And were you the one that was cutting the 1099 checks?

A.   Yes.

Q.   And you said that you were corresponding with Mr. Wendt on that?

A.   That's right.  Yes.

Q.   What does that mean?

A.   That means going through the list twice a month of all of our employees, making sure, you know, the W-2 employees were getting paid priority.  And then as we discussed yesterday, some of the 1099 employees would have to get paid a little bit late, usually just Mr. Wendt, myself, or the New Hampshire operations manager.  But, generally, everyone else was getting paid on time.

Q.   Okay.  And so when you would cut checks like the $290 check we looked at a few moments ago, would you have

Mr. Wendt's approval on those 1099 checks as well?

A.   Yes.

Q.   Did you ever cut any checks on behalf of Sheet Pile that you didn't have his approval on?

A.   Very few, but I would send a list of what those were.  Those were generally standing utilities, mortgage payment, stuff that's monthly, recurring, it's pretty obvious.  And I would still share all of those with him, either during or after the fact.

Q.   And if you didn't pay those, power would have gotten cut off or something like that?

A.   Correct.

Q.   So you had the unilateral authority to make those payments on behalf of the entity because you were looking out for the entity's best interests?

A.   Yes.

Q.   The 10 -- excuse me.  The W-2 employees, how often were they paid by Sheet Pile?

A.   They were paid twice a month.

Q.   And on what date were they paid?

A.   I believe it was generally around the 10th and 25th of each month.

Q.   Okay.  So the check that would be received on the 25th of each month, what period of time in a month did that check cover?

A.    It would be paid in arrears, meaning they were paid after they worked.  So that would cover 1st and 15th of -- or 1st through 15th of that month, they would get paid 10 days later, on the 25th.

Q.    Okay.  And then what about the 16th through the end of the month?

A.    Sixteenth through the end of the month would get paid on the 10th of the following month, so 10 days later.

Q.    At the time that you were terminated from Sheet Pile, you were making 10,000 gross a month, right?

A.    Correct.

Q.    And you were a W-2 employee at that point in time?

A.    At that point, yes.

Q.    So that means on the 20th or 25th, you received payment for the 1st through the 15th of the month?

A.    That's correct.

Q.    And then the following month, on I think you said the 10th, you would have received payment for the 16th through the end of the month?

A.    That's correct.

Q.    Think back to December of 2019, the month that you were terminated.  Did you receive payment for the work you completed on January 1st through January 15th?  Excuse me.  December 1st through December 15th?

A.   December 1st through 15th, yes, I did get paid.

Q.   And when did you receive that payment?

A.   Since the 25th was Christmas, I imagine it was the business day before that, whatever that would have been, the 23rd or 24th.

Q.   And how did you receive that payment?  Does that come in a check or --

A.   Direct deposit.

Q.   Direct deposit.  And that payment came through?

A.   Yes.

Q.   Even though your email address had been cut off?

A.   Yes.

Q.   And then on -- I believe you testified yesterday that on the 30th Mr. Terrazas told you you were fired effective as of the 31st, right?

A.   Correct.

Q.   But you had worked from the 16th through the end of the month?

A.   That's right.

Q.   Did you receive payment for your work from the 16th through the end of the month --

A.   No.

Q.   -- the following January?

A.   No, I didn't.

Q.   Do you know why you did not receive that payment?

A.    I did not know why.

Q.    Did you look into why you didn't receive that payment at all?

A.    I asked, I requested, I emailed Mr. Terrazas.  I didn't get a straight answer on why I didn't get paid for that period.

Q.    Okay.  Did you file any reports or complaints about -- like with the State of Texas or anything for unpaid salary?

A.    No, I didn't.

          THE COURT:  And before we jump in, I do want to revise one of my rulings on one of the exhibits earlier and instruct the jury.  So if you'll indulge me, Plaintiff's Exhibit 8 -- no.  Tab 9, Plaintiff's Exhibit 8, is one that we admitted earlier, correct?

          MR. SCHULZE:  Yes.

          THE COURT:  Over the hearsay objection of Defendant.  That's right, Mr. Terrazas?

          MR. TERRAZAS:  Yes, Your Honor.  I believe so.

          THE COURT:  And there are two emails in there, the email from Mr. Terrazas to Mr. Ramsey, which is at the top of that thread.  And I said that's a statement by a party opponent.  And then Mr. Terrazas objected to the email that Mr. Ramsey had sent to him that's at the bottom of that email.  You-all ended up reviewing the

text of that email, and I admitted it in its entirety.

You know, after thinking about that some more, and to be consistent with my ruling with respect to the other chain of emails, I do sustain the objection to Plaintiff's Exhibit 8 to the extent that it includes the Ramsey email sent on December 23rd, 2019.  So you would need to redact that before it's published to the jury.

And just a quick instruction.  I had told you-all at the beginning that when I sustain an objection to evidence that you're not to consider it or think about what it might have been.  So, anyway, I'm reminding you of that instruction.  This is an instance where you did review something that I've now determined is not admissible.

And so I can't unring the bell, but I have determined that the portion of this part -- and you'll get a redacted version of the exhibit when you go back. But I would just say that I instruct you to disregard any testimony that was related to the redacted portion.

So with that, Mr. Schulze, you can resume your direct examination.

MR. SCHULZE:  Thank you, Your Honor.

Q.   Mr. Ramsey, will you flip to tab 7 in your binder, please.  Excuse me.  Actually, skip that one.  Flip to tab 22 for me, please.

MR. SCHULZE:  And I believe Defendants have agreed to withdraw their objection to this exhibit, Plaintiff's Exhibit 21?

MR. TERRAZAS:  That's correct.

THE COURT:  So the court admits Exhibit 21?

MR. SCHULZE:  Thank you, Your Honor.  May I publish this to the jury?

THE COURT:  You may.

Q.   (BY MR. SCHULZE) Mr. Ramsey, is what we're showing on the screen here the same as what you're looking at in your binder?

A.   Yes, it is.

Q.   Can you tell me what it is that we're looking at?

A.   So this a listing, basically a reconciliation, of all of the W-2 and 1099 payments made to me from the different Rob Wendt companies.

Q.   Okay.  So this summarizes your payroll from the time that you started at Sheet Pile through the time that your employment ended?

A.   That's right.

Q.   Okay.  And on the left-hand side we see "year." That just shows the year of the payment.  Is that accurate?

A.   That shows the year of the period, not necessarily when the payment was made, but when the year of the

employment was, if you will.

Q.   Why don't you walk us through the headers up there, the various columns starting with year period, and explain for the benefit of the jury what each of those columns mean.

A.   Sure.  Okay.  So "year" is pretty obvious.  It's 2013 through 2019, the years of my employment.  And then the "period" is fairly obvious, too.  It's either monthly or then it gets down into semimonthly after that.

Q.   What does that mean?  Is that for the period of the work that you did --

A.   Period of the work that I did.

Q.   -- or the period you were being paid for?

A.   Period of the work that I did that I was to get paid for.  For instance, the first one is 2013 January, the month of January that I worked.

Q.   Okay.

A.   So that leads into next column of when the payment for that period would have been due.  As we discussed, a lot of those were 10th or 25th of each month.  Then whatever the monthly rate would have been after that, what company it was getting paid from or company that I was doing the work for.  How -- how that was getting paid, the method, if you will.  The actual paid amount, which paid amount should match the monthly rate, of

course.

Q.   And real quick, let me back up to the method real quick?

A.   Sure.

Q.   Method would have been -- looks like looking down this list real quickly, there's either 1099 or W-2 or a third party.  What do those three mean?

A.   So third party, first six, seven months, I was working through an outside group.  They were the ones actually paying me, the City Lights Group.  And then after that it would have been either 1099 or W-2 from each of the groups.

Q.   Okay.

A.   As we've kind of discussed.

Q.   Okay.  Moving on to "paid amount"?

A.   Sure then the paid amount, obviously that should match the monthly rate, in theory.  I imagine we'll get into that deeper here in a minute.  Then the paid date, that was the date I was actually paid for each of those periods.  And then a column shows how late those payments may have been.

And then there are several repeating columns. So the company, method, paid amount, paid date, and days late repeat three times because, for any given month, I may have been paid from one or two or three companies.

Q.   Okay.  So let's look at these.  Let's actually start with the very first one.  This would have been for the January of 2013 period, correct?

A.   Correct.

Q.   That payment was, by my read on this, due February 10th of 2013?

A.   Correct.

Q.   And what was the monthly rate?

A.   Monthly rate was 7,400.

Q.   How was that amount determined?

A.   That was a contract hourly rate that I had through City Lights Group with PilePro Steel I believe at the time.  So it was based on hours worked in that month of January 2013.

Q.   So did you turn in a -- a time sheet or something like that?

A.   I did.

Q.   At the City Lights Group?

A.   I turned in a time sheet to Rob Wendt and City Lights Group.

Q.   Okay.  And then did this check come from Mr. Wendt or one of his entities to City Lights Group and then to you, or did it come directly to you?

A.   The first one you explained.  So PilePro Steel, I believe it was, paid City Lights Group, and then City

Lights Group would pay me.

Q.    Okay.  The $7,400 rate, that is the amount that you had charged to PilePro or any of the entities through City Lights Group?

A.    That's correct.

Q.    Do you know if that's also the amount that one of Mr. Wendt's entities paid to City Lights Group, or was there a surcharge by City Lights Group?

A.    There was no surcharge on those checks.  They paid -- PilePro paid that exact amount to City Lights, and City Lights paid that exact amount to me.

Q.    And when was that first check for the work that you did in January paid?

A.    That was, looks like, March 29 of 2013.

Q.    And at that point were you already in charge of making those payments, or did somebody else make that payment?

A.    I was in charge of it at that point.

Q.    Okay.  Why was that paid 47 days late?

A.    It was a cash flow issue that PilePro Steel had. City Lights was happy to pay me, but they wanted to make sure that they got paid from PilePro Steel before I got paid.  So anytime PilePro Steel would pay City Lights Group, then the next day I would get paid from City Lights Group.

Q.   So is it fair to say that you were paid on March 29th, 2013 or that any of the PilePro entities paid on that date?

A.   I would have been paid on March 29th, 2013.

Q.   Okay.  And so when would you have cut the check to City Lights Group to pay for that January work?

A.   Either March 28 or March 29th.  It would have been within 24 hours of that check.

Q.   Okay.  So there was never any delay from City Lights Group paying you?

A.   Never more than one day.

Q.   Okay.  It looks like, going through June of 2013, City Lights Group was paid late every time?

A.   Every time, yes.

Q.   So as of June of -- June 10th of 2013, that was the due date for the June 13th period, correct?

     Forgive me.  I made that more confusing than it needed to be.

A.   Right.

Q.   The June 2013 period, it looks like date due was July 10th of 2013?

A.   Correct.

Q.   So I'm looking at the very last City Lights Group payment here.

A.   Yes.

Q.   That was for $6,680?

A.   Yes.

Q.   And it looks like that wasn't paid until November 15th of 2013.

A.   That's correct.

Q.   But starting in July you began working, it looks like, for Sempe Inc., or at least getting paid by Sempe Inc.  Is that fair?

A.   That's correct.

Q.   But you hadn't been paid, it looks like, for June or May or April.  In fact, it looks like you had only been paid for January and February.

A.   That's accurate.

Q.   Is that correct?

A.   That's accurate.

Q.   Why would you keep working for the company if you were so far behind on getting paid?

A.   It's a good question.  For whatever reason I had a comfort level.  I could see that there were -- it was a very viable business.  Purchase orders were incoming.  I was working directly with Rob to help improve efficiency. I knew that, given enough time, we could improve that cash flow dramatically.  And we did over time.  So I had a comfort level of -- of doing that.

Q.   What were you brought into these entities to do?

What was the main goal when you started?

A.   Off the bat, there was a need for everything finance and accounting.  So I was essentially brought in as acting chief financial officer from the very beginning, which also included a lot of operational duties.  Like I mentioned, it's a very small company by head count, so that covered operational as well.

Q.   Did you ever create a proposal for Sheet Pile on what you were intending to do?

A.   I did.  I believe the very first day, the first week or so, I was putting together -- well, well beyond the first week.  But the first week I was starting off some very strong triage lists of what I was finding in books and operational processes that were issues and making a triage list of how we were going to tackle those and resolve those.

Q.   And did that triage list become part of your job duties and responsibilities?

A.   It did.

Q.   And did that become a working plan of action for what you were going to do for Sheet Pile?

A.   It did.  Very much so.

Q.   Will you flip to tab 27 for me.  Is that a copy of the plan that you had put together?

A.   It is.

Q.   And is this a document you would have put together in the ordinary course of your employment at Sheet Pile?

A.   Yes, it is.

Q.   Is this a document that was handed over to Mr. Wendt?

A.   Yes -- well, emailed, I imagine.

Q.   Emailed.  And what's the date of this document?

A.   This one is January 14 of 2013.

Q.   And on the bottom, right corner we've got some -- some numbers that start with "Sheet Pile."  Is this a document that was produced to us in discovery by Sheet Pile?

A.   Yes, it is.

MR. SCHULZE:  Your Honor, I'd like to move to admit Plaintiff's Exhibit 26.

THE COURT:  Any objection?

MR. TERRAZAS:  Yes, Your Honor.  Hearsay and relevance.

THE COURT:  What is the hearsay response?

MR. SCHULZE:  Judge, this document is self-authenticated be Sheet Pile's production.  This is a document that they produced in response to a discovery request.

THE COURT:  That's -- it's a hearsay, not an authentication objection.  What is the hearsay objection?

MR. SCHULZE:  It's also a business record. It's something that Mr. Ramsey testified he created in the course of his business.  It was relied on by him and Mr. Wendt, and it is -- it defines his job role in this entity.

THE COURT:  I didn't hear testimony that this is the sort of record that's regularly kept in the course of the business.  And, frankly, it doesn't look like it. It seems sort of *ad hoc*.

MR. SCHULZE:  Forgive me, Your Honor.  I believe that Mr. Ramsey testified that he regularly created these, and there's actually several of them in here with several dates, starting with Sheet Pile 000008. You can see that that's a revised version of it with a new date.

THE COURT:  What is the -- what's the response to the relevance objection?

MR. SCHULZE:  Your Honor, this is relevant to show what Mr. Ramsey was hired to do, what he was being compensated to do.  And because part of Sheet Pile's argument in this case is that Mr. Ramsey paid himself double what he should have been paid, this goes to show that Mr. Ramsey was actually performing the work that he was being paid for and that the compensation relates to the -- the scope of work that he was doing for

Sheet Pile.

THE COURT:  Overrule the objections and admit Plaintiff's Exhibit 26.

MR. SCHULZE:  Thank you, Your Honor.  May I publish to the jury?

THE COURT:  You may.

Q.    (BY MR. SCHULZE) Mr. Ramsey, can you confirm that what's on the screen here is what you're looking at under tab 27, Plaintiff's Exhibit 26?

A.    Yes, it is.

Q.    And this was the document we were talking about that you created?

A.    It is.

Q.    Tell me about that first section.  And you don't need to read it for us unless you need to to refresh your memory.  But what was the urgent triage that you needed to get done for the company?

A.    Sure.  So I was coming into this company mainly cold.  You know, I had just meant Rob a day or two prior to this, and so I needed to get my hands in deep and figure out what the issues were.  He had kind of laid them out for me.

So I needed to see it for myself, so the urgent triage was basically picking through what was most critical, you know, things like payroll, cash flow,

things that we needed to address immediately that day or within a few days, before we could get to some of the other larger issues.

Q.   When you came into the company, did you immediately identify some problems?

A.   Absolutely.  Yes.

Q.   And was this document your way of explaining how to hopefully solve those problems?

A.   It was a combination making my notes of figuring out what was critical so I could discuss it with Rob in an organized fashion of where we needed to go and what we needed to tackle first, second, third.

Q.   Tell me about paragraph 2.  It says, "I am starting a quick audit."  What was that?

A.   That was a basically a quick glance of all the financials in -- in PilePro Steel originally, because that was the operating company, the one that was selling steel, receiving funds, paying payroll, et cetera.  And so I was starting a very fast audit of that.  I didn't have time to drill down into all of it yet, but trying to drill down to understand the basic cash flow forecast, payroll issues, tax issues.

Q.   So you were giving Mr. Wendt essentially a plan of what you were planning to do to benefit the company?

A.   A very early plan, yes, that was going to continue

evolving.  But, yes, the very early draft.

Q.   Flip back over to Exhibit 21 for me, please, back to the payroll schedule here.

     For the month of January 2013, you were paid $7,400; is that accurate?

A.   Correct.

Q.   Was that a fair amount for the work that you were doing for the company?

A.   It was.

Q.   It looks like for February you were paid $10,740?

A.   That's right.

Q.   Why was that amount so much greater?

A.   Partly because I had started partway into January. You see my first triage notice from January 14th.  I think I had just started maybe the 12th or 13th, a day or two before that.  I forget the exact date.  So January wasn't a full month with PilePro Steel.  It was comparable hours once I got in there, but it was only a part month for January.

Q.   Okay.  And February, March -- March was $11,400. You did another full month for them?

A.   That's right.

Q.   It looks like April was 8,240.  Why did it go down again?

A.   I don't recall why it may have gone down.  I may

have had some preexisting commitments during then.  I know I did during May and June.

Q.   Okay.  During this time period, while you were employed by City Lights Group doing work for Sheet Pile or any of those other entities, were you also doing work for other clients?

A.   I don't believe I was doing any other work for any other clients at that time.

Q.   What were the preexisting commitments you were referencing?

A.   Personal family matters.

Q.   Okay.  So you took some time off or something like that?

A.   Basically, yes.

Q.   Tell me what happened as of July 2013.

A.   Okay.  Late June Mr. Wendt and I were discussing, you know, we had a good partnership, we had good working rapport.  He liked my plans of actions, and the outcomes that were coming from those by then, we were getting more efficient.  We seemed to enjoy working together, and so he asked if I wanted to come onto the Sempe payroll full-time.  And I agreed.

Q.   So it was your decision -- he offered it, but you ultimately accepted that offer?

A.   He offered, I accepted.  That's right.

Q.   And the Sempe payroll, was that payroll, or was that contract work?

A.   That was contract work at that point.

Q.   Did any of your job duties change from June of 2013 to July of 2013?

A.   No.  It was seamless as far as job duties.

Q.   What we looked at here a few moments ago as Plaintiff's Exhibit 24, this plan of action, so to speak, that work that you were doing under that plan, is that work that you continued doing even after switching to Sempe Inc.?

A.   I think you mean Plaintiff's Exhibit 26?  Is that the one you're referring to.

Q.   Yes.  I apologize.  Exhibit 26.

A.   Just to be clear.  Yes.  That's some of the duties. That was early on in January, but those would have evolved into job duties later on.

Q.   Let's look back at 26, if you don't mind.

     Paragraph 3 talks about a payroll issue.  Do you remember what that payroll issue was?

A.   I do.  When I came in, again, January 13 or 14, one of the first things I learned is that there was not enough cash for payroll at that point on the 15th.  And I was a bit in shock.  In 20 years of doing this, I'd not gone -- we'd never missed a payroll.  So that was kind of

the number one priority, is to get the employees paid that week.  So there was a cash flow issue, so we're trying to resolve that as kind of a top priority that week.

Q.   And did you resolve that issue for them?

A.   We did.

Q.   I'm going to scroll to this third page here.  It looks like this is an update and the current audit status.  Can you tell us why you put together an update?

A.   Sure.  It was obviously early on triage, getting to know the company.  It was ever-evolving, mainly as I was learning more and more details and trying to propose more and more solutions.  So it looks like this was the very next day, an update on what we had been working on with quite a bit more detailed notes.

Q.   Okay.  And there are certain things that are listed in red here.  Can you tell us what those are or why they're in red?

A.   Sure.  It looks like they were listed in red because it was information I didn't have yet.  So these first few examples are "need current bank statements, may be in pile of mail."  So I was struggling to kind of learn what was going on in the different bank accounts, because there were numerous different bank accounts, and trying to understand the correlation between all of them.

Q.    Where is it that you were working from when you were doing this work.  Was it a physical location?

A.    It was a physical location.  At that point PilePro Steel had an office at 100 Congress here in Austin.

Q.    Okay.  And so you traveled to that office?

A.    I would go to that office.  That's right.

Q.    Was Mr. Wendt in that office as well?

A.    He was, yes.

Q.    Take a look back at Exhibit 21.  So it looks like for July, August, September, October, November, and December of 2013, your monthly rate was $9,000 each month; is that accurate?

A.    That is accurate.

Q.    And that's the amount that you and Mr. Wendt had agreed to pay you?

A.    That's right.

Q.    And scrolling over to "paid amount" for those months, it looks like you were ultimately paid that $9,000 for each of those months?

A.    Yes.

Q.    Looking at the December 2013 charge, it would have been due January 10th, 2014?

A.    Correct.

Q.    And when was that paid?

A.   November 26th of 2014.

Q.   So over 11 months late --

A.   Yes.

Q.   -- or 10 months late?

A.   Yes.

Q.   Look back at the previous month, November of 2013. That wasn't paid until November of 2014?

A.   Correct.

Q.   October of 2013, that wasn't paid until November of 2014?

A.   Correct.

Q.   Why were all three of those paid in November?  Do you recall?

A.   I imagine there was a good cash flow situation by November that helped improve that and get those paid in November.

Q.   Okay.  Switching over to 2014, it looks like January through August you were also charging $9,000 a month, and that was to Sempe Inc.; is that correct?

A.   That's correct.

Q.   Now, starting with January of 2014, it looks like $9,000 was charged.  $5,000 was paid on February 5th, 2014.  So it looks like they paid that one early?

A.   That's right.

Q.   But that was only a partial payment?

A.    Correct.

Q.    Why was it only a partial payment?

A.    You'll see those first three months actually, January, February, March, all had a $5,000 payment paid February 5th together in 2014.  Rob came to me and said he wanted to start get things paid to me more timely.  And so even though a bunch of 2013 was still past due, he wanted to make a down payment on those first three months of 2014 to start the year off right.

Q.    And he paid all three of those on February 5th, 2014?

A.    Correct.

Q.    If you charged $9,000 for February 10th of 2014 -- or excuse me.  Let me rephrase that.

      If you charged $9,000 for January of 2014, and then on February 5th, five days before the due date, it looks like you received $15,000, right?

A.    Correct.

Q.    Why wouldn't that have been applied to the $9,000 that you charged and then have the next two months be lower?

A.    Me personally, I would have paid it to whatever was past due in 2013 to clear up the oldest first, but I also understood what Rob was wanting to do of let's start fresh, start making payments on this fresh year.  So that

was more Rob decision.  And I was getting paid, so I didn't have a serious problem with it and nothing inappropriate about it either, where it's posted.

Q.   At that point you, on February 5th, 2014, would have received, I assume, a $15,000 check?

A.   That's correct.

Q.   From Sempe Inc.?

A.   Correct.

Q.   And it was normal and customary at that point in time for you to receive chunk payments like that --

A.   It was.

Q.   -- is that right?

A.   That's right.

Q.   Were you concerned at all at that point that you were getting paid essentially in advance for February and March work when you were still owed money from the previous year?

A.   It wasn't the best scenario, but I wasn't too concerned about it because, again, I could see the inside workings.  I saw that we were making great progress on efficiencies and cash flow.  And so I knew things were going to improve at some point.

Q.   The money wasn't there yet, but you knew it was coming?

A.   Correct.

Q.    It looks like all the way through August of 2014 you had the same situation, where 5,000 or 4,000 dollars was paid, and then later another payment came from also Sempe Inc. for the remainder that was due?

A.    That's correct.

Q.    Can you explain why that occurred?

A.    Similar situation.  Rob wanted to stay current on at least some portion of the monthly payments in 2014.  So there were several payments semi-timely of 4,000, 5,000 towards those $9,000 payments.  And then we got caught up on the remainders of them in 2014 and 2015.

Q.    Were you charging any sort of a late fee or an interest or anything like that on outstanding amounts?

A.    No, I wasn't.

Q.    What value was Rob receiving by paying current partial payments instead of paying off what was owed in the past?

A.    I don't know about -- I don't know about that, but he was keeping me, the employee, fairly content and comfortable while also maintaining the cash flow of the company.

Q.    Okay.  Let's look at September of 2014.  Can you tell me what we're looking at here.

A.    Sure.  So September of 2014 we switched payment from Sempe over to full -- let me see.  It's broken out here.

Full W-2 employee with PilePro Steel for a number of months, until about, it looks like, January of 2015.

THE COURT:  I thought we'd take our morning break at 10:30.  It's about 10:25 now.  So whenever you reach a logical spot, we'll do that.

MR. SCHULZE:  Absolutely.  I'll get through my questions on this transition, and then that will be a good stopping spot.

THE COURT:  Okay.

Q.   (BY MR. SCHULZE) So, Mr. Ramsey, it looks like you were previously charging $9,000 a month, and now you were only charging $5,000?

A.   No.  Rob actually offered me the $1,000 raise at that point, so I went from 9,000 to 10,000 a month.  If you look on the left, the periods change from a monthly to a semimonthly.  So half monthly, 5,000 each half-month.

Q.   So for the period of September 1st through 15th, you were to receive $5,000.  And then for the period of September 16th through 30th, you were also to receive $5,000?

A.   That's correct.

Q.   And looking here at the due date for September 1st through 15th, that would have been due September 25th, 2014?

A.    I'm sorry.  Repeat that, please.

Q.    For the period of September 1st through the 15th, you would have been paid September 25th, 2014?

A.    That's correct, yes.

Q.    And scrolling over to the right, it looks like the amount that you were paid on September 25th, 2014 was only $2500?

A.    It was.  And, actually, I misspoke.  I was misreading this.  So this is where we did the split from PilePro Steel and Sempe.  So it would have been 5,000 a month from PilePro Steel, 5,000 a month from Sempe and split out.  There's some payments over on the -- the second batch of paid amounts that are 5,000 each month, and it should say "Sempe Inc." next to each of those and unfortunately says N/A.  So there's a mistake on here.

Q.    But if there's data on that right-hand column under the paid amount, where it's, for example on July 5th, 2015 of $5,000 payment, that was a payment that came from Sempe Inc.?

A.    That would have been from Sempe Inc.  There's four $5,000 payments there that should be highlighted as Sempe Inc.

Q.    Okay.  And those four payments would have corresponded to the individual months September, October, November, and December?

A.    That's correct.

Q.    Okay.  So, staying on the left-hand "paid amount" column, it looks like for each set of payroll, PilePro Steel LP paid you $2,500?

A.    That's correct.

Q.    So, in total, PilePro Steel LP paid you $5,000 per month?

A.    Each month.  That's correct.

Q.    And then Sempe Inc. paid you the other 5,000?

A.    The other 5,000.  That's correct.

Q.    Why was it split between the two entities?

A.    It was -- I had different job duties, so PilePro Steel I was running CFO of PilePro Steel, relatively straightforward.  It was the operating company bought and sold steel, had employees, had warehouses.

Sempe Inc. was a management company that, through that, I managed a lot of the other companies that we mentioned that Rob Wendt had that were necessarily startups or didn't have their own revenue, like Origami Steel, PilePro LLC, Solid LLC.  I also managed a lot of Rob's personal matters through Sempe Inc.

So that was the reason for the split at that point.  It made the logical sense, business duties and payment-wise as well.

Q.    Understood.

MR. SCHULZE:  I think this is a good point to stop.

THE COURT:  Okay.  It's just at 10:30.  We'll come back at 10:40.  Thank you.

(Recess)

(Open court, no jury)

THE COURT:  Anything to address before we bring the jury in?

MR. SCHULZE:  Very briefly about the redacted exhibits, I took the break and redacted various of these exhibits.  I can't redact the binders that you-all have in front of you quickly.  Is it all right for Mr. Ramsey to review the documents, and he'll have the unredacted portion to refresh his recollection, but what's published to the jury and what I can show on the screen will have big black boxes?

THE COURT:  Yeah.  I mean, what I'm worried about and what I want to be sure of is that whatever is published to the jury is what goes back.  And so if he's got unredacted versions there, as long as he's not reading from them, then I think that answers that issue.

Any comment from you, Mr. Terrazas, on that?

MR. TERRAZAS:  No, Your Honor.  I think that's fine.

THE COURT:  Okay.  And, you know, in terms of

bench conferences and sending the jury out, as I said before, I got the sense that we were going -- we were going down a path of having a bench conference on every objection, which just becomes unmanageable, unwieldy. And so I'm going to kind of play it by ear in terms of what I -- every other trial I've done we just get an objection, maybe I'll ask for a brief response.

If I need to entertain more argument at the bench, I'll ask you to. If it's something that's particularly sensitive, that is, if it's a subject of a motion in limine that I granted, that I think is appropriate to assume that you're going to do that at the bench. But if it's just we want to make -- you know, we're just not going to approach on every objection. It's just not tenable. And so we'll -- but we'll just kind of have to play it by ear on that.

Anything else for us to address before we bring the jury in?

MR. SCHULZE: One very brief question. I have an exhibit. It's an email chain between Mr. Ramsey and Mr. Terrazas. I have redacted all of the messages from Mr. Ramsey directly. But what occurred in that email chain is Mr. Ramsey sent Mr. Terrazas a whole bunch of questions and information, and Mr. Terrazas' reply was to essentially answer each section in Doug's email, and so

Doug's email has become part of Mr. Terrazas' reply.

And so I can't -- I can't redact the entirety of that. I know this makes it frustrating and confusing. But at the end of the day, that text from Mr. Ramsey is part of the response from Mr. Terrazas. So I would ask the Court's permission to allow me to not redact that portion as well, because it would render the -- the exhibit far more confusing and useless. And the actual text, even though Doug wrote it initially, was utilized in the response by Mr. Terrazas.

THE COURT: I understand that. Mr. Terrazas, briefly?

MR. TERRAZAS: Your Honor, I don't know the specifics of that email. This is something that -- I'm assuming Mr. Ramsey is going to continue his testimony past lunch -- I would like to take a look at and confer with Mr. Schulze during lunch about so that we can address it accordingly. But I -- again, I don't have this specific email that we're talking about right here to be able to address.

THE COURT: I'll take up the objection as it arises, and I'll rule on it when it -- if there is an objection when it comes in. I don't -- based on what you're describing, I don't see any need for any protracted discussion or anything like that. You can

offer it, you can object, I'll rule on it, we'll move on to the next thing.  How does that sound?

MR. SCHULZE:  Do we want to look at it right now real quick?

THE COURT:  No.

MR. TERRAZAS:  And, Your Honor, just in terms of the bench conferences, completely understand and agree we don't what want to have too many bench conferences.  The only issue -- and I'm trying to be very respectful of your -- your ruling and guidance on this and just saying you know "objection: hearsay."

Some of them have, like that one that we had an Exhibit 8, it -- it required me to talk about the hearsay, what the objection was.  And I don't want to have speaking objections, which is why sometimes we do bench conferences.  And so that's -- that's the only issue.  I'm trying to not do anything other than "objection: hearsay," but sometimes it takes a little bit more, and I don't want to violate any of the Court's pronouncements.

THE COURT:  Well, when you make your objection, I'll look at the document.  If I want more from you, more clarity on what you're objecting to, I'll ask for it.  Otherwise, I'll rule on it, and your record will have been made.  Okay?

MR. TERRAZAS: Understood, Your Honor.

THE COURT: Anything else for us to address before we bring the jury in?

MR. SCHULZE: One last question just for me to plan the rest of this testimony this morning. What time would the Court like me to wrap up testimony for the next break.

THE COURT: Noon.

MR. SCHULZE: At noon? Okay.

THE COURT: Thank you. We can bring the jury in. All rise, please.

(Open court, jury present)

THE COURT: Mr. Schulze, whenever you're ready.

MR. SCHULZE: Thank you, Your Honor.

Q. All right, Mr. Ramsey. When we left off, we were just looking at September of 2014, and we had concluded that you were paid $2500 twice by PilePro Steel LP and then $5,000 by Sempe Inc. And I want to just clarify a little bit.

Prior to September 2014, you were being paid $9,000 officially by Sempe Inc. even though those were broken into individual payments. Is that accurate?

A. Yes. That's correct.

Q. Who was writing those checks from Sempe Inc. to you?

A. I was writing those checks.

Q.   Because you were in charge of payroll for everybody?

A.   That's right.

Q.   And throughout this entire period that you were charging $9,000 to Sempe Inc. for your monthly work, did Mr. Wendt ever express to you that he wasn't paying you $9,000 a month or that you weren't worth $9,000 a month or that you salary was only $5,000 a month or anything like that?

A.   No.  Not at all.

Q.   Starting September of 2014, when you were paid $5,000 from PilePro Steel LP and $5,000 from Sempe Inc., did Mr. Wendt ever express to you that you weren't worth the $10,000 a month or that the salary was not $10,000 a month?

A.   No.

Q.   So looking back at Exhibit 21, it looks like from -- excuse me -- September 1st, 2014 through December 31st, 2014, you were on that same structure, $5,000 to PilePro Steel and the other $5,000 came from Sempe Inc., which we see in the right in that second "paid amount" column; is that accurate?

A.   Yes.  That's correct.

Q.   And it looks like the payments from Sempe Inc. came late as well; is that accurate?

A.   Yes, they did.

Q.   That $5,000 payment on July 5th, 2015 was applied to money that was owed for September of 2014?

A.   Yes.  That's correct.

Q.   And the next one down, same thing.  That one was applied to October, and then the next $5,000 down was applied to November.

A.   Yes.  That's correct.

Q.   Is that accurate?

A.   Yes.

Q.   So looking at the right-hand "paid date" column, it's fair to say that was another $15,000 check from Sempe Inc. to you?

A.   Yes.  It was the same date, yes.

Q.   And you kept records of all of the money that you were owed and all of the money that you were paid, much like this spreadsheet that we're looking at right now, right?

A.   Yes, I did.

Q.   And so that allowed you to keep track of what you were owed, what you were paid, when you needed to pay yourself again when money was available?

A.   That's right.

Q.   In a period of like July 5th, 2015 where you paid yourself $15,000, would that have come after a discussion with Mr. Wendt?

A.   The July 5th, yes.  July 5th, '15, yes.  All of these Sempe payments would have been a discussion with Rob.

Q.   Did you ever pay yourself a big chunk, like $15,000, without having a discussion with Mr. Wendt?

A.   Never.

Q.   Why not?

A.   We always discussed cash flow issues, we always discussed payroll Sempe payments, 1099 payments, and specifically my payments.

Q.   So it was just usual and customary for you, even back into 2014, to have a discussion with Mr. Wendt and then decide who was going to get paid, and then you would cut those checks?

A.   Yes.

MR. TERRAZAS:  Objection: leading.

THE COURT:  Sustained.

Q.   (BY MR. SCHULZE) I want to move on to --

MR. TERRAZAS:  Your Honor, I move to strike the witness's answer to that.

THE COURT:  Sustained.  Please be careful about testifying, counsel.

MR. SCHULZE:  Yes, Your Honor.

Q.   Look at January of 2015 for me.  And it looks like it's actually broken off all of 2015 on the chart, right?

There's little lines?

A.    Yes.

Q.    Did anything change over the year 2015 with regard to your payments?

A.    No.  The structure was the same.  Sempe payments varied, as they're listed here.

Q.    But you would get paid payroll under your W-2 each month?

A.    Yes.  Twice a month.

Q.    Looking down at the first part of the 2016 year, did anything change January through March of 2016?

A.    No.  Still the same structure.

Q.    Go ahead and flip over to the second page.  That's going to show us April through December of 2016.  Did anything change here?

A.    I'm sorry.  April through December --

Q.    Yes.

A.    -- you said?

         The only change was in November.  So at some point in late 2016, PilePro Steel LP, fully owned by Rob Wendt, sold to iSheetPile, LLC, also fully owned by Rob Wendt.  So the W-2 was issued then by iSheetPile, LLC not only to me but all employees of formerly PilePro Steel, then iSheetPile, LLC.  That's the only change.  The structure, the payment amounts, everything else stayed

the same.

Q.    So after October 16th -- excuse me.

After October 31st of 2016, did PilePro Steel LP continue to pay anybody's salary?

A.    No.

Q.    So everything was swapped over to iSheetPile, LLC at that point?

A.    All the normal payroll was switched from PilePro Steel to iSheetPile, yes.

Q.    November 1st of 2016 through December 31st of 2016, nothing else changed --

A.    Nothing else changed.

Q.    -- is that correct?

A.    That's correct?

Q.    What about January 1st, 2017 through December 31st, 2017?

A.    Exact same structure.

Q.    And let me ask you this just because we didn't touch on it earlier:  From 2013 to 2014, you were paid by City Lights Group initially, and then you were later paid by Sempe.  All through that while, all through it looks like September 1st, 2014, did your job duties change?

A.    No.

Q.    They were generally the same?

A.    Same job duties.  That's right.

Q.   And then starting in September of 2014, you were paid $10,000 a month.  Did any of your job duties change then?

A.   No.

Q.   So that was a raise that you received?

A.   That was a $1,000-a-month raise, yes, offered by Rob.

Q.   So for the entire 2014 year, your job duties didn't really change?

A.   That's correct.

Q.   Now, I believe you testified earlier that there were -- yesterday that there were some small changes that occurred?

A.   Sure.  Like most jobs, a little bit of shifting depending what's going on.  But vast majority of the job duties stayed the same.

Q.   Okay.  2015 job duties remained the same?

A.   Remained the same.

Q.   2016?

A.   Yes.

Q.   And then 2017, January through December 31st, you were paid the same?

A.   That's correct.

Q.   And your job duties, were they any different?

A.   Stayed the same.

Q.    Let's look at January 1st of 2018 through October 15th of 2018.  Any of your payroll change there?

A.    Stayed the same.

Q.    And did any of your job duties change?

A.    No.

Q.    Going to next page, 2018, did any of your payroll change?

A.    Yes, it did.

Q.    And October 16 of 2018 through December 31st of 2018, that first section up top?

A.    Yes, it did change.

Q.    What changed?

A.    Starting December 1st all of my payroll, instead of being split 50-50 between iSheetPile and Sempe, it all moved into iSheetPile, LLC.

Q.    Okay.  And so let's look at that December 1st, 2015.  That would have been for the period of December 1 through the 15th?

A.    Correct.

Q.    And when was that payment due?

A.    That payment was due December 25th of 2018.

Q.    And how much was that?

A.    That would have been 5,000 for the half-month.

Q.    Okay.  And when were you paid?

A.    I would have been paid right about the 25th.

Probably the business day before that.

Q.   According to this sheet, what day were you paid?

A.   According to this sheet, December 25th, 2018.

Q.   Okay.  Which was the payroll date?

A.   That's right.

Q.   And how much were you paid?

A.   I was paid $5,000.

Q.   Okay.  And then the second week or the second set of weeks in December, the 16th through 31st, when would that have -- when was that paid?

A.   That would have been payday January 10th of 2019.

Q.   And did that payday occur?

A.   It did.

Q.   And how much did you get paid?

A.   5,000.

Q.   Okay.  So the Sempe payments ended in that month?

A.   That's correct.

Q.   Did any of your job duties change to cause that Sempe payment to end?

A.   No, they didn't.

Q.   Why did that structure change?

A.   It was kind of a tiding up.  I think we were talking about winding down Sempe Inc.  Sempe Inc. had several contractors within it, including Rob Wendt, and we were just trying to tidy things up and make things a lot more

streamlined.

Q.   Okay.  And then let's look at the January year --
excuse me -- the 2019 year, starting in January.  Did
anything change in 2019?

A.   No.

Q.   So your agreement was still the 5K a month?  Sorry.
10K a month?

A.   Still 10K a month.

Q.   5K for every two weeks?

A.   For every half-month, yes.

Q.   Looking at the very bottom of this document,
December 1st through the 15th, when was the payment date
for that check?

A.   It would have been a paid date of December 25th,
2019.

Q.   And you testified earlier that you received that
check?

A.   I did.

Q.   And then for the period of December 16th through
31st, when was that due?

A.   That was due January 10th of 2020.

Q.   Why is that row highlighted?

A.   Because I did not get paid that $5,000 for that
period.

Q.   So that amount remains outstanding and owing to you?

A.   Still remains unpaid.

Q.   Okay.  Will you do me a favor and flip to tab 9 in your binder.  I'll represent to you this is an email exchange that was produced.  If you will look at the second email down, it starts at -- on Tuesday, January 9th.  Excuse me.  On Tuesday, January 7th.  Do you see that?

A.   I'm sorry.  Tab 9?

Q.   Tab 9 -- tab 10, Exhibit 9.

A.   Tab 9, Exhibit 9.  Okay.  I'm sorry.  On Tuesday, January 7th, yes.

Q.   We're never going to get these tabs and exhibit numbers straight.  I apologize for that.

Can you tell me who sent that email on Tuesday, January 7th?

A.   Yes.  Kevin Terrazas.

Q.   And who was that email sent to?

A.   That was sent to me.

Q.   And what email address was it sent to?

A.   It was sent to my personal one, thedougramsey@gmail.

Q.   And we established earlier that that is an email that you used for communication?

A.   It is.

Q.   And we established earlier that Kevin Terrazas, kterrazas@clevelandterrazas.com, was an email address

that you used to communicate with Mr. Terrazas?

A.   It was.

Q.   Flip to the second page for me, please.  And about a quarter of the way down, on Tuesday, January 7th, do you see that section?

A.   I do.

Q.   What is that?

A.   That is an email from Kevin Terrazas to myself.

Q.   Okay.  And are those the same email addresses that would have been used in that?

A.   Yes.

Q.   Do me a favor.  Go down to the next -- well, actually, to the next page.  It should say "Ramsey 0504" at the top.

A.   Yes, it does.

Q.   And it says, "On Tuesday, December 31st."  Do you see that?

A.   Yes.

Q.   What is that?

A.   An email from Kevin to myself.

Q.   And the same email addresses?

A.   It is.

          MR. SCHULZE:  Your Honor, I have a redacted version of Plaintiff's Exhibit 9 that has the individual emails that we've skipped over at this point redacted

out.  I'd like to move to admit Plaintiff's Exhibit 9, the redacted version, and publish to the jury.

THE COURT:  Provided that any emails that are written by -- authored by Doug Ramsey in the "from" have been redacted out and that it only contains emails that were written by Kevin Terrazas or anybody else -- it looks like these are only between Doug and Mr. Terrazas -- I do admit the Plaintiff's Exhibit 9 with those redactions, with full understanding that some of the Terrazas emails copy language from emails that Mr. Ramsey sent and then respond to them within the body of the email.  And I find those to be admissible for the same reason I find the rest of the Terrazas emails to be admissible as a statement of a party opponent.

So I admit Plaintiff's Exhibit 9 subject to those objections and authorize publication of the redacted exhibit subject to those redactions.  And I authorize production of the redaction -- redacted exhibit to the jury.

MR. SCHULZE:  Thank you, Your Honor.

Q.   Mr. Ramsey, I've pulled up the redacted version of the exhibit on the screen.  Are you able to see that?

A.   I see that, yes.

Q.   And looking at the top here, is this at the top, right Ramsey 0502, is that the same document you're

looking at?

A.   Yes, it is.

Q.   Okay.  And we started referencing on Tuesday, January 7th, this email from Mr. Terrazas.  Can you tell us what that email says?

A.   Sure.  You want me to read it to you?

Q.   Please.

A.   "Doug, I am in trial right now, which should end tomorrow evening.  Please understand that I am not going with any 'lies.'  I don't know who is right or wrong, and it's not my decision on any of this.  I can only represent clients.  I will try to get you a draft agreement by Friday.  Thanks for your patience."

          THE COURT:  You might slow down just a little bit so the court reporter can keep up with you.

          THE WITNESS:  Yes, Your Honor.  Sorry.

Q.   (BY MR. SCHULZE) And for us, too.  We can't listen that quickly.

          What was this email about?

A.   We'd had numerous emails going back and forth, trying to end things amicably, trying to get my loan payment back, trying to get the bonus resolved, a variety of things.  And it -- from this he was going to get some kind of draft agreement written up that would come to terms with everything.

Q.   And he's responding to an email that you sent him; is that correct?

A.   At least one.  It may be several.

Q.   What is he referring to, "Going with any lies"?

A.   I was getting frustrated that Mr. Wendt was telling Mr. Terrazas some very untrue things, and I was getting concerned that that was slowing down my loan repayment and bonus.

Q.   Had you emailed Mr. Terrazas about those lies?

A.   I believe I had.

Q.   And can you recall specifically what lies you were concerned about or what lies you were referencing?

A.   It may have had to do with the original loan agreement.  When we had originally set the loan agreement, we were going to make it due or payable within just a couple of months.  Then when we revised it, we inadvertently put over a year for it to be due.  Rob knew that it was due quickly.  Kevin knew that it was due quickly.  And Rob was trying to persuade Kevin that was not the case.

Q.   If you'll flip to page 2 of the exhibit.  And don't read this aloud, but is the email at the top, does that refresh your recollection of what lies you were discussing?

          MR. TERRAZAS:  Objection, Your Honor.  There's

been no foundation laid for refreshing recollection.

THE COURT:  Which email are you referring to?

MR. SCHULZE:  This would be the top of Ramsey 0503.

THE COURT:  Okay.  What is the -- I think you just -- I think Mr. Terrazas is right.  You ask the question, and if you ask him a question and if he remembers the answers, then if he needs his recollection refreshed, then you proceed with that protocol.

MR. SCHULZE:  I can absolutely do that, Your Honor.  I apologize.  May I proceed?

THE COURT:  You may.

Q.  (BY MR. SCHULZE) Mr. Ramsey, looking at the email that we have on the screen right now, do you recall specifically what this email was replying to?

A.  I had emailed Kevin that there were various lies that Rob Wendt was evidently making at that point.  I know one was about the agreement.  I think he was also trying to tell Kevin that I had a different salary than what I actually had.  I mean you've seen in the list I've had a $120,000 salary for many years.  It was a very consistent $10,000 a month.

And then there at the last minute they were trying to change that.  I think that may have been part of their argument, not paying the 5,000, not paying the

bonus.  Rob was trying to argue that I had been overpaid, when clearly that's not the case.  And I was getting pretty heated and pretty frustrated at that point because I needed my loan back, I had been terminated, there was the holidays, I was missing my bonus.  All these things were piling up.  So I was pretty frustrated that Rob was lying to Mr. Terrazas.

Q.    So as of this January 7th, 2020 date that Mr. Terrazas replied to you, you said you were missing your bonus.  Is that that $44,000 we've talked about a couple of times?

A.    That's right.

Q.    And you were missing what else?

A.    My $100,000 loan and the interest and the -- the parts on that.

Q.    Because you had expected to receive that earlier?

A.    I had expected to receive it by then, of course. And then also I was missing salary and unemployed by then, for no good reason.

Q.    Okay.  Okay.  I'm going to scroll down here.  Can you find that matching page?  This is Ramsey 0503.

A.    Yes.

Q.    Do you see that email?

A.    I do.

Q.    Can you tell me what Mr. Terrazas was responding to

in this email?

A.    Just a moment.  Yes.  Again, Kevin and I -- or Mr. Terrazas and I had gone back and forth on a number of items.  I had listed out all of the items that were due to me: the $100,000 loan, the 10,000 interest, the bonus the missing salary, interest payments.  I had listed all of those out, and then he's saying here that he had talked with Rob and put in some responses on that.

Q.    Okay.  And it says "Have put in some further responses below"?

A.    That's right.

Q.    Do you recall how he put in those responses?

A.    We kind of went back and forth.  I had put some in bold.  I think he put some that may or may not have had "KT" ahead of it.  But, you know, an email string, and we kept -- since it was a list of bullet points, we would kind of add or change those bullet points as we went on or made notes.

Q.    And so he just -- tell me if I'm understanding this correctly.  He just -- you emailed a bullet point, and then he went back into your email and commented under that bullet point?

A.    That's right.  Like if I had mentioned the $100,000 loan, he would tell me when that was expected to be paid, the 10,000, when he expected that to be paid, on down the

line.

Q.   Okay.  So I'm going to scroll down, and this is still the response from Mr. Terrazas.

MR. TERRAZAS:  Your Honor, I'm going to object.  Can we approach?

THE COURT:  Yes.

MR. TERRAZAS:  Your Honor, if we could take that down?

(At the bench)

THE COURT:  What's Bates number page that we're on.

MR. SCHULZE:  It starts on 0504.

MR. TERRAZAS:  And, Your Honor, I can understand in terms of my responses to some of the text in there for context.  But when it says, for example, "DR" in bold, that's clearly not me.  That's Mr. Ramsey's statements.  And those absolutely have to be redacted if were going to go through this.

THE COURT:  I overrule that objection.

MR. TERRAZAS:  Okay.  I appreciate it.

THE COURT:  Thank you.

(In open court)

THE COURT:  Mr. Schulze?

MR. SCHULZE:  Thank you, Your Honor.

Q.   And, Mr. Ramsey, what we're looking at on the screen

here, and you have it in front of you in tab 10 as --
it's on page 0504, are these the responses from
Mr. Terrazas?

A.   Yes.  This was the back-and-forth with his
responses.

Q.   So let's look at Number 1 here.  Is this -- it says
"1, parenthesis, $100,000 loan principal loaned
personally November 22, 2019, secured by note."

        Did I read that right?

A.   That's correct.

Q.   What was that about?

A.   Again, that was listing out the different items that
were still due to me and open that needed to be closed.
And number one was that $100,000 loan that I made to the
company that was still due to me.

Q.   Okay.  Looking right below that, what does it say?

A.   Kevin had responded "In line to be paid in
February."

Q.   So let me look.  I'm going to scroll back up here to
the date.  What was the date of this email correspondence
from Mr. Terrazas?

A.   Looking at it, it looks like this was from, Tuesday,
January 7th.  Oh.  Well, initial comments -- am I looking
at your page on here?

Q.   Yeah.  Go ahead and look at the screen I'm showing.

A.    Yes.  This was initial comments from Kevin on December 31st, 2019.

Q.    And was this in line to be paid in February, an initial comment from that date?

A.    That was a comment from Kevin on December 31st, 2019.

THE COURT:  I mentioned this before, but, really, we should are referring to any of the attorneys in room by their honorific, so "Mr. Terrazas."

THE WITNESS:  I apologize.

THE COURT:  I realize because of the nature of the back and forth in the emails that it may be more informal.  But when we're testifying in court, I ask that all attorneys be referred to as "Mr. Terrazas."  And same for parties.  We should all be referring to each other that way.  Understood?

MR. SCHULZE:  Thank you, Your Honor. Absolutely.

Q.    Had you had any conversations with Mr. Terrazas prior to this email about that $100,000 being paid back early?

A.    I believe there had been, yes.

Q.    And so was this a surprise to you, that this $100,000 was in line to be paid in February?

A.    Yes and no.  I was surprised that they were planning

to pay it late, but at least there were some comfort in saying -- in Mr. Terrazas saying that it was in line to be paid in February. So this being, what, New Year's Eve, six to eight weeks I'm going to get my money back. There was some comfort in that.

Q. Okay. Let's talk about that paying late a little bit, because I think there's been a little bit of confusion on that. So I want to flip back over to Plaintiff's Exhibit 1, if you'll do that with me, please.

You testified earlier that, according to paragraph 3, this payment of principal was due December 21st, 2020. Do you recall that testimony?

A. I do.

Q. So now we're talking about this email, and you're saying that it was late in February of 2020, which is before the due date, right?

A. It is.

Q. Can you explain that for us?

A. Sure. When we were drafting this promissory note, originally we had on there, I believe it was, January 21st of 2020 that this would be due. So basically a two-month loan. Because, as we've shown, the purchase orders, the money was starting to flow from this very large purchase order.

Q. The very large purchase order was the Roll Form

Group?

A.   The Roll Form Group purchase order, right.

So money was flowing from that already, so we had discussed that this was going to be a very short-term bridge loan to cover that very urgent payment that was due that week in November.  And then I was going to get my money back, with interest, within a couple of months.

And then even at Rob's urging, he said, why don't we just go ahead and make that earlier and move it to up to December.  And so we quickly made it December and, unfortunately, didn't change the year.  So we bumped it up to December, but yet it still said 2020 on the promissory note.

Q.   So you-all changed the due date from January to December, but you didn't change the year from 2020 to 2019?

A.   It was an awful error, but, yes, that's what happened.

Q.   But you understand that you agreed to payment being due December 21st, 2020 under this agreement?

MR. TERRAZAS:  Objection: leading.

THE COURT:  Sustained.

MR. SCHULZE:  Withdrawn.

Q.   Ultimately, you did sign Exhibit 1, right?

A.   I did.

Q.    And having signed that, when did you agree that that payment would be due?

A.    The agreement states December 21st, 2020, so I had to live with that.

Q.    Okay.  Let's go back to Exhibit 9.

At the time that Mr. Terrazas told you that this was in line to be paid in February, had you and Mr. Terrazas already discussed the fact that it wasn't actually due until December?

A.    I don't recall that we had discussed that discrepancy on there, no.

Q.    Do you know why Mr. Terrazas would represent to you that it was due -- or that it would be paid in February?

A.    Sure.  Rob and -- I'm sorry.  Mr. Wendt and Mr. Terrazas and I were all in the understanding that it was going to be paid -- a very short-term loan, paid within a month or two of when I issued it.

Q.    Okay.  Let's move on to the next section, Number 2. Can you tell us what Element Number 2 was?

A.    I'm sorry.  Which exhibit was that now?

Q.    We are on Exhibit Number 9.  And you can see it on the screen if that's easier.

A.    It's a bit blurry up here.  Okay.  Yes.

Q.    What's element number two?

A.    Element Number 2 is the 10,000 loan interest from

the aforementioned loan.  So that would have been the $10,000 loan interest mentioned in that note.

Q.   And when did Mr. Terrazas mention to you that that would be repaid?

A.   Mr. Terrazas say, and I quote, "In line to be paid in February."

Q.   So at this point you thought you'd get the 100K back in February and the 10K back in February.  Is my understanding correct?

A.   Correct.

Q.   Let's look at Element Number 3.  And I've got it on the screen there.  It's cut in half by the pages.  But can you tell us what Element Number 3 is.

A.   Sure.  It says "Approximately $450 in costs and fees per month until the month after loan repaid in full."

Q.   And the subsection A there, is that what Mr. Terrazas responded to you?

A.   No.  I believe that was actually a note that I had added to that line, basically saying that we can discuss this, listing the current rate was about 4.3 percent.  We could do just a flat rate *ad nauseam* on there.

Q.   Okay.  And what did Mr. Terrazas respond?

A.   He responded, and I quote, "I fully expect this to be paid, but we will need documentation of the costs and fees."

Q.   And do you recall ever providing Mr. Terrazas with that documentation?

A.   I do.

Q.   Let's look at Number 3.  What is Element Number 3?

A.   That's the $5,000 missing salary payment for work done from December 16th to termination date of December 31st, 2019.

Q.   And just to clarify this, it says Number 3, but it's the second Number 3, right?  Because we looked at Number 3 before that as well --

A.   Yes.  You are correct.

Q.   -- the $450.

A.   Yes.

Q.   So what were you requesting here?

A.   That was the missing $5,000 salary from Sheet Pile for that last half-month of December.

Q.   And what did Mr. Terrazas respond to that?

A.   Mr. Terrazas said "This has already been paid."  You want me to go on further there.

Q.   Please?

A.   "The 120K salary was for the entire year.  How it should it have happened is you got 5,000 bimonthly through the end of the year, a total of 115K, with the final 5K coming on 1-10-2020.  Rob wanted to be generous to you and so prepaid the full 120K rather than spacing

it out."

Q.    Did Mr. Wendt prepay you the full $120,000 salary for the previous year?

A.    No.

Q.    Did you ever receive a big chunk payment of salary for the future?

A.    No.

Q.    Let's look back at Plaintiff's Exhibit 21, please.

Looking at the year 2019 and looking at the "paid date" column and the "paid amount" column, for the benefit of the jury, can you go over the paychecks that you received for 2019.

A.    Sure.  Okay.  So most of the months are fine.  So it was each month was for a half-month.  That very first line in 2019 is for January 1st through 15th.  Due on January 25th of 2019, a $5,000 payment from iSheetPile, paid W-2.

And then it continues on exactly the same month after month, until the very last line of working December 16th through 31st, due on January 10, 2020 would have been $5,000 that was not paid.

Q.    Okay.  So in total that would have been 24 payments of $5,000, but it was only 23 payments of $5,000?

A.    Correct.

Q.    Which in total would have been $120,000 salary.  Am

I doing my math right?

A.    That is correct.  And possibly adding to Mr. Terrazas' confusion was the very last payment for 2018 just above the line there, December 16th though 31 of 2018 would have actually been paid in calendar year 2019, January 10, 2019.

Q.    Okay.

A.    Much like the January 10, 2020 was supposed to be paid the following calendar year.

Q.    Okay.  So from January 10, 2019 where you received your first $5,000 W-2 check through December 25th, 2019 where you receive your last $5,000 W-2 check, you received a whole $120,000?

A.    Correct.

Q.    But 5,000 of that was for the previous year?

A.    For the prior year.

Q.    Makes sense.  Okay.  I'm going to go back to Exhibit 9.  So you guys were talking about your $120,000-a-year salary.  And you can see what's on my screen.  It begins, "This goes with Number 7 below as well."

        What was Kevin telling you here?  Excuse me. What was Mr. Terrazas telling you here?  This is on Ramsey 0505.

A.    Well, Mr. Terrazas was saying -- he says Rob, so he

was saying how Mr. Wendt is looking at this.  He's saying your salary before August 27th, 2019 when the agreement was signed was $60,000.

Q.    And that agreement he's referring to, is that the employment agreement that we've seen before?

A.    That's the employment agreement that we signed on about August 27th, 2019.

Q.    Okay.  Keep reading.

A.    "Therefore, for the first eight months of the year your total income, unless a bonus was provided -- and Rob is unaware of any bonuses that he authorized -- should have been $40,000.  From August 27, 2019 through December 31, 2019, (the employment agreement was not retroactive) your salary changed to $120,000.  In total, over the year your total comp should have been $80,000.  So you received $40,000 more than what you had contracted with Rob for in 2019.  I get your point on the amounts paid in January being for the prior year, but the salary for December 15 to 31 2018 was 2500.  So even then the difference would have only been 2500, and that gets more than taken care of with the $40,000 overpayment for the year."

Q.    Is this your first time that you heard the argument that your salary was only half of what you thought it was?

A.    I believe so, yes.  I was in shock to read that that's how Mr. Wendt was trying to tell Mr. Terrazas how I was getting paid.

Q.    Had there ever been a discussion previous to this between you and Mr. Wendt that your salary was only 60,000 instead of 120,000?

A.    Never.

Q.    I believe you testified yesterday that you oftentimes had communications with Mr. Wendt while you were employed there.

A.    Yes.

Q.    And I believe you testified that it was almost daily.  Is that accurate?

A.    That is accurate.

Q.    How often would you say that you and Mr. Wendt communicated while you were employed?

A.    A typical day we would communicate many times a day by phone, text, email.

Q.    Okay.  There wouldn't -- or would there be any periods of time where you-all wouldn't communicate?

A.    Very rarely.  If I was on vacation camping in remote areas with no cell phone service, preapproved, yes, that would be the time.  Other than that, we were in pretty constant communication.

Q.    Was Mr. Wendt involved in Sheet Pile's accounting

while you were employed there?

A.    Involved in kind of the financial discussions of how to go about accounting, yes.

Q.    Did Mr. Wendt know what money was coming in and what money was going out?

A.    He did.

        MR. TERRAZAS:  Objection, Your Honor: calls for speculation.

        THE COURT:  Overruled.

Q.    (BY MR. SCHULZE) And your testimony earlier was that you had numerous times discussed checks that Sempe Inc. and you were cutting?

A.    Yes.  That's correct.

Q.    Over the course of the number of years that you were being paid $10,000 a month, or $120,000 a year, did Mr. Wendt ever express any concerns that you were taking home double the salary?

A.    Never.  In fact, he even mentioned he wished he could pay me more at times, but we let it go.

Q.    Okay.  Let's go on to bullet -- or Element Number 5 here, "$44,000 bonus, per employment agreement, as submitted on 12-18-2019."  Can you tell me what A through D says what you provided Mr. Terrazas?

A.    Sure.  Do you want me to read the whole thing?

Q.    If you know what he said, you can summarize it.  If

it's easier for you to read it, you're welcome to.

A.   I guess I can read it so we're accurate.

"Please see documentation with that email, along we additional attachments.  All 10 shipments were for one Samuel Roll Form PO" --

Q.   Mr. Ramsey, read a little bit more slowly because of our court reporter.

A.   My apologies.

Q.   Thank you.

A.   -- "PO Number 2PP004775.  Samuel Roll Form directed us as to which location they wished each truckload to be delivered, but all on this purchase order.  I have attached the PO, the 10 invoices, all to this PO.  The, Sparky production list emailed to Rob weekly showing the load figures, a screenshot of a text from Rob showing where he calls each of those a truckload of 'Sparky for Roll Form order.'  There are also numerous emails in my isheetpile@ email where Rob and I discuss these truckloads."

Q.   Are those the documents that we've already seen thus far --

A.   Those are.

Q.   -- yesterday through a variety of bills of lading?

A.   Yes.

Q.   And today we went through some invoices?

A.    Yes.  That's correct.

Q.    Okay.  Move on to B, please.

A.    "B.  It is important to note that these are mostly hotshot drivers with small trucks who can only take about 17,000 to 18,000 pounds per load, thus keeping freight costs lower, along with keeping the flow of product going to the customer.  It's also very important to note that those were always considered truckloads."

Q.    Why was it important for you to include that section?

A.    I believe Mr. Terrazas and/or Mr. Wendt were starting to complain about the bonus -- the bonus line and the definition of "truckloads."

Q.    So at this point they'd already expressed to you that "truckload" meant big semitruck, not hotshot drivers?

A.    They had expressed they didn't want to pay the bonus because those weren't truckloads.

Q.    Move onto C for me.

A.    "C.  The total of these invoices is $407,250.  All of these were funded at 80 percent, and the first five of these invoices have already been paid in full.  So iSheetPile has already received $354,060 on these, with another $53,190 still on the net receivables list."

Q.    Is that 80 percent what you were discussing earlier

with the factoring company?

A. That is exactly that. That's right.

Q. And when you sent this email, did you know that Sheet Pile had already received the $354,060?

A. I did.

Q. Move on to D for me.

A. "D. If Rob wants to only pay a portion of these, I would ask that he consider the rest of the $44,000 a reasonable severance package for the seven years of faithful service, usually over 50 hours of week, with no expectations of overtime payment."

Q. Why were you offering a bonus that you were already entitled to, to be a severance package?

A. I just wanted to get my bonus one way or another. It was already listed out in the employment agreement that I had earned it. If they needed to call it something different to satisfy themselves, that's great.

Q. What did Mr. Terrazas respond?

A. Mr. Terrazas responded, and I'll quote, Will follow up with Rob about this, end quote.

Q. All right. Scroll to 05 -- Ramsey 0506. Can you tell me what it says there at the beginning, "Rob's position."

A. Sure. And this is -- this is Mr. Terrazas writing this. "Rob's position on this is that there were eight

truckloads total that were to go to Roll Form Group.  As your weekly Sparky production spreadsheet shows, the last two trucks carried weight of 42,750 and 29,046, which were far and away higher than the prior truck deliveries.  And if all the trucks had carried those quantities, it would be only eight truckloads total, which is what Rob understood the contract to be.  So it is his position that only approximately four truckloads have gone out, such that no bonus is due.  In addition, because of the overpayment discussed above with the salary and payment and six below, Rob believes that no more money is due."

Q.   What did this mean to you, or what did you take away from that section?

A.   I took away from this that they were trying to find some way not to pay me my bonus.

THE COURT:  Why don't we take one of our stretch breaks.  We'll do our lunch break at around noon.  But this is a good time to stand up.

Shall we?

Q.   (BY MR. SCHULZE) Let's look at Element Number 6 here.  And I think before we get into that, Mr. Ramsey, as part of a W-2 employee, you received certain benefits as well; is that correct?

A.   That's correct.

Q.   What were those benefits?

A.    The main one was a -- a partial company -- partially company paid health insurance plan which covered some health expenses.

Q.    Okay.  Do you recall what company that was through? Like Blue Cross Blue Shield or something like that.

A.    I believe it was United Healthcare, but I'm not 100 percent on that right now.

Q.    And did all the employees get that health insurance?

A.    No.  It was offered to, basically, managers of the company.

Q.    That would have been you and Mr. Wendt?

A.    Me, Mr. Wendt, Mr. Buitta, who was the New Hampshire operations warehouse manager.  And I believe there was one other manager in New Hampshire that was offered that, as well as at least one or two managers in Austin until we closed that warehouse.

Q.    Okay.  Did you receive any other benefits?

A.    No.

Q.    Can you tell me what section or paragraph 6 here is about?

A.    Sure.  This is about evidently there was a question on a $20,000 payment from either Sempe or Sheet Pile to myself as a reimbursement for medical expenses.

Q.    Okay.  Do you recall when that $20,000 payment was made?

A.   I believe that was mid or late 2019.

Q.   Late 2019?

A.   That's right.

Q.   So that was in addition to your payroll?

A.   That's correct.

Q.   And what was that payment for?

A.   So since Sheet Pile was becoming more cash flow positive there in late 2019, and with the upcoming -- the big purchase order and other purchase orders that were allegedly to follow that, Mr. Wendt was being generous and offering for Mr. Buitta and myself and Mr. Wendt to have our medical expenses that we had had to pay out of pocket for years, have those be reimbursed to us.

Q.   And did you keep any sort of information about those expenses that you had been incurring for years?

A.   I had -- I went back and found my expenses.  I hadn't been keeping them specifically to that point.  But when he made that offer, yes, I went back and found those payments.

Q.   And did you give Mr. Wendt any sort of summary of those expenses or anything like that --

A.   I did.

Q.   -- to reach this $20,000 number?

A.   I did.

Q.   What occurred after that?  I mean how did you get in

possession of that $20,000?  Can you explain that to us?

A.    Sure.  So I had a full list of expenses, which was kind of hard to find over seven years of employment, or almost seven years.  But I had very long, detailed list of payments that I had to come up with out of pocket, sent it to Rob.  We discussed it again, and then he said go ahead and issue the -- the $20,000 payment toward it.  It wasn't 20,000 even.  It was a little over 20,000.  But he said go ahead and pay 20,000, and we'll settle out the rest at some point.

Q.    Okay.  And so when you cut that $20,000 check to yourself, that was also something that was done with approval from Mr. Wendt?

A.    Absolutely, yes.

Q.    And what was Mr. Terrazas's response?

A.    Mr. Terrazas responded, "Will follow up with Rob about this."

Q.    Okay.  And then looking at the screen, "Rob does not"?

A.    Ah, yes.  And then further from Mr. Terrazas, "Rob does not believe this was ever raised or authorized to be paid and has no records of any authorization or discussion.  He believes that was improperly paid but is willing to leave the issue alone if you two can agree to no more funds changing hands."

Q.    At this point you were still owed the $100,000, the $44,000 bonus, the 10,000 interest, the $411,000-a-month payments [sic], the costs so to speak.  And essentially here he's contesting the $20,000, so -- and I'll revise my question.

What was your position on how much money was owed to you at that point in time?

A.    My position was, as I listed out in this email, the 100,000, plus the 10,000, plus 44,000, plus the 5,000 back pay, plus the monthly interest payments of 400 and so on the loan.

Q.    Did you agree that this issue was never raised or authorized to be paid?

A.    No.

Q.    At any time during your employment, from January of 2013 through December of 2019, did you ever self-authorize yourself to take a large sum of money?

MR. TERRAZAS:  Objection: leading.

THE COURT:  Overruled.

A.    No.

Q.    Let's go on to Element 7.  Can you tell me what Element 7 is about?

A.    Sure.  "Payroll paid out in November and December. I understand this is another concern?  Originally Rob had directed me to pay out the remainder of my 2019 payroll

in late October or early November, as he had concerns about the New Hampshire productively levels in the fourth quarter. I explained that one lump sum on payroll was going to screw up my taxes in the short term, as it would likely get taxed as a bonus payment. So I explained that we would just keep that reserve in the operating account for two months and pay out the regularly scheduled payroll. That is exactly what I did, nothing nefarious whatsoever. I hope this explanation is sufficient."

Q.    And what was Mr. Terrazas's response?

A.    Sure. "Thanks. Not sure I understand. The overall question is how much did you get paid for payroll in 2019? Was it 120K or was it more, whether designated as salary or bonus or otherwise? Rob believes the full 120K was paid out in September or October and that there was some additional payments made after that time. Can you send me all the payroll and any other payments made to any employee for 2019 (for everyone)?

Q.    What did that mean to you?

A.    It sounded like they were getting very confused on my payroll payments. It sounded to me like Mr. Wendt was trying to explain to Mr. Terrazas that I had already gotten my 120K for the year and I wasn't due any more.

Q.    Did this relate to that $5,000 you were still owed?

A.    I believe this related to that last $5,000 payment,

yes.

Q.   Okay.  Let's go down to Number 8.  What was section 8 about?

A.   This was about medical insurance and making sure that I was still going to be covered on medical insurance for about another month or so.

Q.   And what did Mr. Terrazas reply?

A.   "Will follow up with Rob about this, but would expect you keeping your insurance through January and then having the option for COBRA to be fine."

Q.   And did you maintain your family on health insurance through the end of January?

A.   I did.

Q.   Let's go to Number 9.  What was this section about?

A.   This was a $200 miscellaneous request.  They were asking me to put everything on hard drive and print papers and supplies and everything.  So I was just looking for an allowance to get a hard drive to put every thing onto.

Q.   Okay.  And did you end up doing that?

A.   No.

Q.   What was Kevin's response to this request?

A.   He said, "Will follow up with Rob about this, but generally I can get you a hard drive to download any documents.  What would you need in terms of paper and

supplies?"

Q.   What kind of documents are we talking about?

A.   At the time I wasn't sure how many electronic documents I had versus physical documents that I needed to turn over, because I was going to of course turn everything over to Mr. Terrazas.  We had a meeting coming up to hand off stuff.  Since I did work remotely from home, I had a lot of paperwork at home that I needed to turn over to him.

Q.   After you were terminated on December 31st of 2019, did you continue working with Mr. Terrazas and Mr. Wendt to hand over all the company documents?

A.   Directly with Mr. Terrazas, yes.

Q.   And part of those were on a hard drive and part of those were physical, or how was that?

A.   That's correct.

Q.   How were the documents?

A.   I had at least one or two large boxes of physical files, and then also I forget how many hundreds or thousands of documents on a hard drive that I also used my own personal hard drive and copied it to that, deleted my personal copy, and then gave him the hard drive to -- him being Mr. Terrazas, to download all of the electronic documents.

Q.   But you received that hard drive back?

A.   And I got the hard drive back, yes.

Q.   Without the documents on it?

A.   Without the documents, yes.

Q.   Let's go down to "other assorted notes."  Can you tell me what it says below that?

A.   Sure.  "Other assorted notes:  Assuming we get these items listed out and agreed soon, I look forward to meeting with you in your office on January 13 to turn over all records, notes, files, keys, credit cards, blank checks, et cetera."

Q.   And Mr. Terrazas responded?

A.   He did.  "I have it on my calendar."

Q.   And did you-all meet on January 13th?

A.   I believe it was within one day of that.  I think we had a scheduling conflict and moved it by one day.

Q.   Okay.  But did you and Mr. Terrazas meet in order to turn over records, notes, files, keys, credit cards, blank checks, et cetera?

A.   Yes, we did.

Q.   And did you in fact turn over all of those documents?

A.   Yes, I did.

Q.   Below that, "Please let me know in which format," can you read that section for me?

A.   Yes.  Sure this was me typing, "Please let me know

in which format I should turn over the Quickbooks files.
There are a couple of options, and I can pick the logical
options if otherwise not notified."

Q.   And what did he reply to that?

A.   He asked for what options do I recommend.

Q.   And did you offer a recommendation?

A.   I did.  There's a pretty common portable Quickbook
file function, and so I went that route with it.

Q.   And did Mr. Terrazas respond to that?

A.   He said "The portable Quickbooks will be fine."

Q.   And after you made that -- after you recommended the
portable Quickbooks file, did you in fact turn that file
over in that format?

A.   Yes.  That was on that hard drive.

Q.   Okay.  Let's go down to almost the bottom where it
begins with "I also really need."  Do you see that
section?

A.   I do.

Q.   Can you read that for us.

A.   "I also really need some guarantee that these will
be paid out ASAP.  Rob had promised the loan to be paid
out in 30 days, then 45.  I need it to not drag out, but
I respect the other company commitments."

Q.   And that 30 days and then 45 is what you were
referring to earlier where you believe that the

promissory note was to be paid sooner.  Is that accurate?

A.   That is correct.

Q.   You say "I need it not to drag out."

A.   That's right.

Q.   What did that mean?

A.   Well, I felt at risk being unemployed with Mr. Wendt and his companies at that point, and I was on the hook for the interest payments every month.  I needed it to get closed out as it had been promised.

Q.   Okay.  And what did you mean by "respect the other company commitments."

A.   I'm not sure what the context of that was, but I believe it was all the other commitments in the employment agreement.

Q.   And what did Mr. Terrazas respond?

A.   "Not sure what you mean here.  The 100K loan has a maturity date of December 21, 2020, so in a year.  Let me know if I am missing something."

Q.   Is this the first time you and Mr. Terrazas discussed the fact that that maturity date wasn't until the end of the year?

A.   I believe that was, yes.

Q.   But going back up to the beginning of this email, did he represent to you that this would be paid in February on Elements 1 and 2?

A.   Yes, he did.

Q.   Are we talking about a different loan or the same loan?

A.   Same loan.

          MR. SCHULZE:  Your Honor, I know we're 15 minutes early, but I'm at a real good stopping point. Would the Court prefer to stop early, or shall I jump into it?

          THE COURT:  Let's keep going.

          MR. SCHULZE:  Absolutely.

          Can I pull that off the screen so I can shift something here?  Thank you.

Q.   Mr. Ramsey, will you flip to Exhibit 12.  I'm sorry. Tab 12, Exhibit 11.

A.   Okay.

Q.   Do you recognize this email chain?

A.   I do.

Q.   And that first email, is that an email between you and Mr. Terrazas?

A.   The top email, yes.

Q.   And those are the same email addresses that we've discussed throughout this case?

A.   Yes, they are.

Q.   If you will look down to the very bottom of the first page, is that also an email between you and -- or

from Mr. Terrazas to you?

A.    It is.

Q.    Okay.  If you'll scroll down to the page that has the Bates label 0058 on the top, right.

A.    Okay.

Q.    Is that also an email from Mr. Terrazas to you?

A.    It is.

Q.    And those are email addresses that you recognize?

A.    They are.

         MR. SCHULZE:  Your Honor, I move to admit Plaintiff's Exhibit 11.

         THE COURT:  Any objection?

         MR. TERRAZAS:  Yes, Your Honor.  408.

         THE COURT:  Your response?

         MR. SCHULZE:  This was prior to any lawsuit, Your Honor.  There were no discussions about settlement. There were discussions about payments of the -- as in the previous set of emails, there were discussions about payments of the loan and response --

         THE COURT:  Give me just a second here to look at this and see.  I sustain the objection to Plaintiff's Exhibit 11.

Q.    (BY MR. SCHULZE) Mr. Ramsey, will you please flip the page to tab 13, which will be Exhibit 12.  Are you there?

A.    I'm there.

Q.    And looking about halfway down the page, there's an email that looks like it's from Mr. Terrazas?

A.    Yes.

Q.    Do you see what I'm talking about?

A.    Yes.

Q.    Is that an email between you and Mr. Terrazas?

A.    From Mr. Terrazas to myself, yes.

Q.    Okay.  And then go down to page 2.  This is Ramsey 0564.  Midway through the page, is that also an email from Mr. Terrazas to you?

A.    It is.

Q.    On January 13th?

A.    Yes.

        MR. SCHULZE:  And I have the rest redacted out, Your Honor.  I'd like to move admit Plaintiff's Exhibit 12.

        THE COURT:  Any objection?

        MR. TERRAZAS:  Your Honor, with the redactions, no objection.

        THE COURT:  The court admits Plaintiff's 12, as redacted.

        MR. SCHULZE:  May I publish 12 to the jury, Your Honor?

        THE COURT:  Provided the redactions are in

place.

MR. SCHULZE:  The redactions are in place, Your Honor.

THE COURT:  Very good.

Q.  (BY MR. SCHULZE) Mr. Ramsey other than the big black box that's on the screen, is the same document that you're looking at in the binder?

A.  Yes, it is.

Q.  All right.  I'm going to actually start backwards here.  So if you will go to page 2, do you see that email?

A.  Yes.

Q.  That email is from Mr. Terrazas to you?

A.  It is.

Q.  And what was he asking for?

A.  He was asking for copies of original loan documents for the $100,000 line of credit.

Q.  Okay.  Do you know what were the circumstances surrounding this request?

A.  He was looking for documentation on the loan and making sure that everything was done as we had agreed and expressed.

Q.  Had you previously sent Mr. Terrazas an email?

A.  I had.

Q.  And was this a reply to that email?

A.    This was a reply to that email.

Q.    Do you remember what you were asking for or what you had said in the email that this was a reply to?

A.    I believe I was asking about the interest payments that were due and that they were still ongoing and due monthly at the time.

Q.    And so as of, presumably sometime in January of 2020, you were -- what interest payments were you telling Mr. Terrazas about?

A.    The 411-and-change monthly interest payment -- or interest charge from my bank that I was having to pay.

Q.    And do you know if you sent him any supportive documentation?

A.    I did.

Q.    And is that that documentation that we've looked at earlier in this case?

A.    It is.

Q.    And so then he replied on January 13th, "Can you send me the original loan documents for $100,000 line of credit."  Did you send him any original loan documents?

A.    Originally I responded that I was a little bit confused that he needed the personal loan documents from my line of credit, you know, my credit application, et cetera, because he was saying "original loan documents for the line of credit."  And then he clarified in a

subsequent email.

Q.   And is that the subsequent email on the screen at this point?

A.   That's the one, yes.

Q.   And were you able to send him the documents in reply to this?

A.   I was.

Q.   Do you know if there were any other discussions after this request about original loan documents or support?

A.   I'm not sure that there were.  Monthly after that point I was sending a copy of my monthly bank statement and the interest charge that was on there to Mr. Terrazas.

Q.   Okay.  But even after you sent that supported information and requested that $411, did you ever receive payment on that?

A.   No.

         MR. SCHULZE:  Can I pull the exhibit off the screen so I can shift without -- thank you.

Q.   In the beginning of January of 2020, so after you were terminated, did you continue working with Mr. Terrazas?

A.   Yes.

Q.   And what were you and Mr. Terrazas working on?

A.   Well, as I mentioned, I was sending at that point, or after that point, monthly statements from my bank showing the $411, and also reminder emails that he had committed from Mr. Wendt that the loan was going to be repaid in February.  So I sent reminder emails every month.

Q.   And was that it?  Was that the only things you guys were working on?

A.   That was essentially it, trying to get all the open items: the loan, the balance, the back pay, the interest payments.

Q.   If you'll do me a favor and flip over to tab 17, this will be Plaintiff's Exhibit 16, for me.  And about halfway down that first page, do you see an email that starts with, "On Thursday, January 16th, 2020"?

A.   Yes.

Q.   Who sent you that email?

A.   Mr. Terrazas.

Q.   And that went to your personal email address?

A.   Same personal email.

Q.   Okay.  And that was sent on January 16th, 2020?

A.   Yes.

Q.   Scrolling down a couple of pages to the page that begins with Ramsey 0574 --

A.   Okay.

Q. -- is that also an email that was received by you from Mr. Terrazas?

A. Yes, it is.

Q. Okay. And same email addresses?

A. Both same emails.

Q. And this was January 24th, 2020?

A. Yes, it was.

Q. We'll go down to page Ramsey 0575, about halfway down the page. Is there an email from Mr. Terrazas on January 21st, 2020?

A. There is.

Q. And was that also from the email address that you recognize for Mr. Terrazas?

A. Yes, it is.

Q. And it was sent to your email?

A. Correct.

Q. Keep going to the next page, actually, to page 0577. About a quarter of the way down, there's an email on Wednesday, January 29th. Do you see that?

A. I do.

Q. Is that also an email from Mr. Terrazas to you?

A. Yes.

Q. And also the same email addresses that you recognize?

A. Yes.

Q.    And looks like it was sent on January 29th, 2020?

A.    Correct.

Q.    Keep going.  We're going to go to page 0579.
There's a Tuesday, February 4th email.  Do you see that?

A.    Yes.

Q.    Is that from Mr. Terrazas to you?

A.    It is.

Q.    Same email addresses?

A.    Yes.

Q.    Keep going down at the very bottom of that page,
February 4th at 4:13 p.m.  Is that also from Mr. Terrazas
to you?

A.    Yes, it is.

Q.    And same email addresses, yes?

A.    Yes.

Q.    Keep going.  We're now on page 0580.  At the very
bottom on February 4th at 1:13 p.m., there's and email
from Mr. Terrazas to you?

A.    Yes.

Q.    And do you recognize that -- excuse me -- that email
address?

A.    Yes.

Q.    And it also went to your personal email?

A.    Yes.

Q.    Go to the next page, 0581, and also at the bottom.

A.    Yes.

Q.    On email that starts with "Doug."  Do you see what I'm talking about?

A.    I see it.

Q.    And that's an email to you from Mr. Terrazas?

A.    Correct.

Q.    Received by your personal email address?

A.    Yes.

Q.    Go to 0583.  And about a quarter of the way down, a February 11th email?

A.    Yes.

Q.    Also from Mr. Terrazas?

A.    It is.

Q.    And from his email address to your email address?

A.    Yes, sir.

Q.    Almost done.  Go to page 0584.  About halfway down, Tuesday, February 11th, 7:39.  Do you see that email?

A.    I see it.

Q.    Who is that from?

A.    From Mr. Terrazas.

Q.    And to you?

A.    It is.

          MR. SCHULZE:  Your Honor, I have redacted the remainder of the emails, and I'd like to move to admit Plaintiff's Exhibit 16.

THE COURT:  Any objection to Plaintiff's 16 with redactions?

MR. TERRAZAS:  Your Honor, can I just have him scroll to 572 and 573 real quick?

Your Honor, with the redactions, no objection.

THE COURT:  Okay.  The court admits Plaintiff's 16 with the redactions.

And why don't we -- this probably a logical enough place to stop rather than jumping into all the questions in this.  So it's a little before noon.  Why don't we plan on resuming at 1:00 p.m., okay?

Rise for the jury, please.

(Jury recessed)

THE COURT:  Anything for us to address before we break for lunch?

MR. SCHULZE:  No, Your Honor.

MR. HUDSON:  Just briefly, Your Honor.  So we're not through Mr. Ramsey yet.  I anticipate Mr. Wendt may go the rest of the day and into tomorrow.  Once we start our case in chief, we're planning on playing deposition clips.

We never received any objections.  I don't know if you've have any, but we never received objections to any of the deposition clips.  I want to raise that now because, if were going to play those, if there's any --

any dispute or the Court is going to entertain objections that have been posed, we need do know that so we can get the clips cut. I'd like to do that now so we're not doing this in the middle of trying to figure out what we're playing tomorrow.

THE COURT: I hope I anticipate what you're going to say in response to this Mr. Schulze.

MR. SCHULZE: I have no objections to the deposition clips. The only thing that I would ask is that there are three questions where the full clips should be played rather than it piecemealed together.

I received an updated essentially notice of the deposition testimony, and it has some sections cut out that actually contain the -- the question that's responded to. And so the way I read what was most recently produced is not an accurate depiction of what was stated.

THE COURT: Have you-all talked about what you think is missing and what can be inserted?

MR. SCHULZE: We have not.

MR. HUDSON: This is the first time I've heard of it.

MR. SCHULZE: I'm happy to do that.

MR. HUDSON: We can meet and confer about that if there's still an issue. Same question, we're also

planning on admitting the exhibits that were identified at the depositions, you know, if there's no objection to that.

MR. SCHULZE:  No.  None.

MR. HUDSON:  Okay.  If there's no objection, that makes life pretty much easier.  I'll get with Mr. Schulze, and we can talk about the piece that he's referencing.

THE COURT:  Good.  Great.  That all sounds very straightforward.  It sounds like we're moving along.  I guess time-wise and looking at Ms. Thompson's clock it looks like you've used about five hours and 15 minutes of your 10 hours.  You're pretty much right at the halfway point.  And I think this can be off the record.  Thank you, Madam Court Reporter.

     (Discussion off the record)

     (Recess)

     (Open court, no jury)

THE COURT:  Anything for us to discuss before we bring in the jury?

MR. SCHULZE:  No, Your Honor.

MR. TERRAZAS:  No, Your Honor.  Thank you.

     (Open court, jury present)

THE COURT:  Mr. Schulze, whenever you're ready.

MR. SCHULZE:  Thank you, Your Honor.

Q.   Mr. Ramsey, we were last looking at Plaintiff's Exhibit 16.  This is a set of emails.

MR. SCHULZE:  And if I may publish 16?

THE COURT:  You may.

MR. SCHULZE:  Thank you.

Q.   All right.  Mr. Ramsey, you're still looking at Exhibit 16 in your binder, correct?

A.   I am.

Q.   Perfect.  If you will do me a favor and flip down to the very last page, page 12.  Do you see an email from Mr. Terrazas, from Sheet Pile's counsel?

A.   Yes, I do.

Q.   And can you tell me what that email said?

A.   Yes.  This was from February 4th from Mr. Terrazas: "Doug, sorry to bother you, but we are trying to get Rob's child support payments straight.  The State says there is an automatic payment account that was set up, but Rob doesn't know about it.  Did you set that up?  If so, do you have that log-in information?"

Q.   Why would you have set up Mr. Wendt's child support account?

A.   Sure.  Some of the many various tasks I did, especially for Sempe Inc., were handling Rob's personal matters -- or Mr. Wendt's personal matters.  Excuse me.

Q.   And what did Mr. Wendt's child support have to do

with the company?

A.   Almost nothing, other than the payroll went into his personal accounts, and then his personal child support payment needed to be paid out of his personal account. And so I managed that as well.

Q.   And you were making that payment on his behalf?

A.   I was making that payment on his behalf and making sure it was timely every month.

Q.   Okay.  And so in this email Mr. Terrazas is trying to get information about that account?

A.   Yes.  That's correct.

Q.   So were you 100 percent in charge of this child support payment?

A.   Mr. Wendt was aware of it, but I was in charge of it.  At the time of my termination, I was.

Q.   Okay.  I'm going to go back a little bit, and this is an email that was a little bit later, on Tuesday, February 4th.  Can you tell me what Mr. Terrazas said there?

A.   Yes.  This was later.  "Doug, we tried again, and it didn't work because your account is linked to Rob's.  Can you unlink it and let me know when that is done?"

Q.   Did you have your own child support account?

A.   It wasn't my own child support account.  I don't have any child support issues.  But I managed child

support for a couple of different individuals, and I believe they were all linked in one account.

Q.   And did you ultimately give Sheet Pile this access that they needed in order to do Mr. Wendt's child support payments?

A.   I did.  Immediately after.

Q.   And that's a little bit later that afternoon, February 4th, 2020.  Do you see that email?

A.   Yes.

Q.   Is that just Mr. Terrazas confirming?

A.   Yes.  That is him -- Mr. Terrazas confirming that I've been removed as -- actually, that's something different.  That's confirming that I was removed as a signer for various bank accounts, I believe, if I recall correctly.

Q.   Understood.  So this was not child support-related?

A.   This was not related to the child support, no.  It was just various cleanup that we were doing.

Q.   Were going to go back in time because of the order of these emails in this document, but do you see the email that's shared on the screen?

A.   I do.

Q.   And this is going to be on Ramsey 0577, if you prefer the paper copy.  Can you tell me what Mr. Terrazas emailed you here?

A.    Yes.  "Can you tell me what address they were sent to and provide a copy, picture or otherwise, or the picture of the envelope they were sent in?  We are trying to ensure all mail gets properly routed, so want to see who we need to talk with to get it straightened out."

Q.    What is this about?  What is he talking about?

A.    As I recall this, this was the end of January 2020, and the payroll provider, Hill Country Payroll, had still inadvertently sent a FedEx packet, or a FedEx type packet, of hard copies of the 1099s and W-2 information -- excuse me -- specifically W-2 information to my house instead of to the company to be distributed to employees.  And so --

Q.    Okay.  When you received that, you were no longer employed at Sheet Pile; is that right?

A.    That's correct.

Q.    What did you do with that information once you received it?

A.    I kept my W-2 stub because it was going to get mailed to me anyway and then mailed the rest of those off to Mr. Terrazas, I believe.

Q.    Okay.  Going back in time a little bit further, January 21st, 2020?  Can you tell me what this email says?

A.    "Doug, we have downloaded everything off the hard

drive and have wiped it, so it is ready for pickup whenever. I will be out tomorrow and Friday at depositions. So, if I'm not there, it will be on reception desk."

Q. What hard drive are they referring to, or what documents are being referred to by Mr. Terrazas?

A. Sure. That was the hard drive we mentioned earlier. The hard drive where I had copied any remaining soft copies of corporate documents and put them on my personal hard drive to hand off to Mr. Terrazas. And then Mr. Terrazas took those documents off there, wiped the hard drive clean, and then I could pick it up from his office.

Q. And those were all of the corporate documents that you had that related to Sheet Pile; is that correct?

A. That's correct. All of the soft copy documents. I also turned in the physical documents, as we discussed.

Q. Understood. Look at Ramsey 0571, the first page, a January 16th, 2020 email. Can you read the first sentence of Mr. Terrazas's reply to you.

A. Sure. "Thanks. I can confirm that I received a number of documents and a hard drive that you represent contains everything on that sheet."

Q. So he was just confirming to you that he got what you had delivered to him?

A.    That's correct.

Q.    If you'll do me a favor and flip to the next tab in your binder.  This is going to be Plaintiff's Exhibit 17.

MR. SCHULZE:  And, Your Honor, counsel and I spoke prior to resuming, and I don't believe there are any objections to the admission of 17.  Is that accurate?

MR. TERRAZAS:  Your Honor, as redacted we have no objections.

MR. SCHULZE:  Your Honor, I'd like to move to admit the redacted version of Plaintiff's Exhibit 17.

THE COURT:  The court admits Plaintiff's Exhibit 17 as redacted.

MR. SCHULZE:  May I publish to the jury?

THE COURT:  You may.

Q.    (BY MR. SCHULZE) Mr. Ramsey, do you see the email that's on the screen in front of you?

A.    I do.

Q.    Is that the same as what you're looking at in Plaintiff's Exhibit 17?

A.    Other than the redaction, yes, it is.

Q.    Perfect.  I'm going to scroll down.  These are -- and can you identify for me real quick the email address you see here?

A.    Sure.  It's from Kevin Terrazas at his kterrazas@clevelandterrazas.com address.

Q.   And that's Mr. Terrazas, Sheet Pile's counsel?

A.   That's correct.

Q.   I'm going to scroll -- actually, let's start with this:  Can you tell me what Mr. Terrazas was emailing you about on March 4?

A.   Yes.  He says, apparently, there is a software license or something for Quickbooks that Sheet Pile needs, et cetera.  So Sheet Pile and all of Mr. Wendt's companies used Quickbooks for their accounting. Mr. Terrazas here is asking for a software license number so that they could utilize the files that I had transferred to them on the hard drive.

Q.   And did you provide them with that information?

A.   I did.

Q.   So even several months after you were terminated, you were still working with Mr. Terrazas?

A.   Yes.  To wrap up these loose ends.  This was early March 2020.

Q.   Okay.  And then can you tell me what happened here on March 5th?

A.   Evidently they had an issue with that license number, and so Mr. Terrazas was asking for me to check it again.

Q.   And did you provide them up with updated license numbers?

A.    I did.  I checked it and responded almost -- well, within six minutes of a -- with the corrected license number for them to use.

Q.    And, to your knowledge, did that solve the issue related to the Quickbooks license?

A.    I believe that did.

Q.    Okay.  At this time we're talking March of 2020, you were -- had already been terminated for a couple of months.  Had you at this point received your $5,000 payment for the last two weeks -- or excuse me -- second half of December?

A.    No.

Q.    And you also hadn't received your bonus or repayment on the loan or anything like that, right?

A.    That is correct.

Q.    Were you following up with Mr. Terrazas on that loan during this period?

A.    I certainly was.

Q.    And on the bonus and all that as well?

A.    Yes.

Q.    I pulled up an email from February 11th, 2020.  This is -- appears to be from Mr. Terrazas to you; is that correct?

A.    That is correct.

Q.    And what does Mr. Terrazas tell you?

A.    He is saying, "Thanks.  I had just talked to him about it again this morning.  He is prioritizing for good reason the 225K payment to the trustee due at the end of the month but has this on his list to pay as well."

Q.    And what is he talking about this on his list?  What is on his list?

A.    That would be all the various amounts due to me: the loan, the interest, the bonus.

Q.    So was this a response to you asking about the money you're owed again?

A.    This would have been a response, yes.

Q.    Okay.  What did it mean to you that he's -- it's on his list to pay?

A.    Always in my employment with Mr. Wendt, we always discussed, you know, the triage of payments, what was coming up to be paid, and there was always a "on the list to pay," you know, the top -- top items to be paid on the list.  So for Mr. Terrazas to tell me this, it told me, okay, I was at or near the top of the list to be paid.

Q.    And you believed based on this representation that you would get paid?

A.    I did.

Q.    A couple of days later, there is another email from Mr. Terrazas to you.  Can you tell me what this email says?

A.    Yes.   "I know Rob is working on it, but no update. I am" -- oh.  I'm sorry.

Q.    Forgive me.  What is he working on?

A.    Working on payments to me.

Q.    So same subject?

A.    Same subject.  It's why we're here.

Q.    Forwarding to March 2nd, another email from Mr. Terrazas.  Can you tell me what this email says?

A.    Sure.  "No update.  I reminded Rob about it last night in a depo in San Diego and was out most of last week traveling as well."

Q.    And what -- what is he talking about in this email?

A.    Still no update on when I may expect to get my loan and bonus, et cetera, repaid.

Q.    Was this email a reply to another email?

A.    I imagine this was, yes.

Q.    And so he was -- you were looking for an update, and he said there is no update?

A.    That's correct.

Q.    Couple of days later, March 9th, this is another email from Mr. Terrazas?

A.    It is.

Q.    What does he say here?

A.    "Sorry.  I've been traveling and still traveling. In Las Vegas at the airport.  No update on estimate.  I

keep pushing."

Q. So is this in response to another follow-up by you?

A. It is, indeed. Especially since he had said at one point it was going to get paid in February. So I was following up fairly frequently at this point.

Q. Okay. A couple of days later, March 11th, another email from Mr. Terrazas. Can you tell us what it says?

A. Yes. "Doug, as I have told you before, it is very high on my list and I am constantly reminding him. Your repeated messages and attempts to call employees of Sheet Pile are not helping your cause. I would suggest being patient on this. Rob understands what the contract says and a timeline of when it has to be paid."

Q. What, again, is he referring to that is high on his list?

A. Again, it's the loan payments, the bonus payments, the back pay. All of it.

Q. What did you believe was going to happen by Mr. Terrazas repeatedly reminding Mr. Wendt of these obligations?

A. I was hoping that was going to keep it on the top of the list so long that they were going to get tired of hearing from me and actually come through on their responsibilities.

Q. And that last sentence that you read for us, "Rob

understands what the contract says and the timeline of when it has to be paid." Did you believe you were going to get paid?

A.   I believed I was going to get paid. This was kind of a veiled message to me of saying that, yes, there is the incorrect maturity date of December 2020 on there.

Q.   But you believed by this message to mean that you would be paid, at the latest, by December of 2020?

A.   Absolutely, yes.

Q.   March 27th, so getting to the end of the month, another email from Mr. Terrazas?

A.   Yes. I'm sure I emailed again before that asking for an update and got this short response March 27th from Mr. Terrazas. "No update. Sorry."

Q.   And now we're back to talking about Quickbooks licenses. So if you'll do me a favor, flip to the next tab in your binder. This is going to be Plaintiff's Exhibit 18.

          MR. SCHULZE: And on that same token, Your Honor, counsel and I spoke prior, and I believe there's no objection to the redacted version of Exhibit 18?

          MR. TERRAZAS: That's correct, Your Honor.

          THE COURT: Court admits Plaintiff's Exhibit 18 as redacted.

MR. SCHULZE:  May I publish to the jury?

THE COURT:  You may.

MR. SCHULZE:  Thank you.

Q.   Mr. Ramsey, do you recognize this email?

A.   I do.

Q.   What's the date?

A.   It is April 20th of 2020.

Q.   And it's between you and Mr. Terrazas?

A.   It is.

Q.   Perfect.  And what does Mr. Terrazas tell you here?

A.   He is telling me to "Just save the statements.  We know what the interest is.  You will get paid as soon as possible."

Q.   What statements is he talking about?

A.   I believe I had sent yet another batch of the documentation from my bank showing the interest, another reminder of the loan due, most likely an updated balance of the loan, the interest, the late charges, the bonus, the back pay, and so all the documentation, as I would do essentially monthly at this point.  And so that was his response to that.

Q.   What did you believe he meant by you would get paid as soon as possible?

A.   I was starting to lose faith at this point.  I didn't know what "as soon as possible" might mean.  It

was no longer you'll get paid in February, you'll get paid next.  It moved to this "as soon as possible."

Q.   This is an April 20th email from Mr. Terrazas.  Can you tell us what this email says?

A.   Sure.  "Thanks.  But unless you receive an undeliverable message, you can trust it was received.  And this does aggravate the situation.  The loan says that no payments due until December 2021," he puts in here is, which is also incorrect.  "I'm working to get that paid sooner, but by continuing to suggest it must be paid sooner, it greatly aggravates the situation.  I won't go into all details, but it is my sense that the more you reach out about it, the less willing Rob is to paying earlier, as it is costing him time and money having to," use his words, "deal with this."

Q.   Okay.  That December 2021 is a typo in there.  It's a mistake?

A.   That is also a typo, ironically.

Q.   There is no loan or anything that is due December of 2021?

A.   No, there is not.

Q.   The only loan is this promissory note that we've looked at earlier, and what's the due date of that?

A.   December of 2020.

Q.   Okay.  So he says here that it greatly aggravates

the situation.  What was greatly aggravating the situation?

A.    I guess my monthly requests to get an update on my payments and to send him the updated balance.

Q.    Okay.  And we saw an email earlier that said that the loan payment's not due until the end of 2020, until December?

A.    Correct.

Q.    Were you led to believe that you would get paid before December?

A.    I absolutely was, from some of those earlier emails saying get paid in February.

Q.    And, in fact, even this email says, "The more you reach out about it, the less willing Rob is to paying earlier, as it's costing him time and money having to deal with this."

            So even in this email, did you understand that you were going to get paid sooner than December of 2020?

A.    I understood that I was, and I also knew that by sending it to them monthly it would have the updated amount that was getting higher and higher each month, so they could actually save money by getting it paid, too.

Q.    There's a previous April 20 email.  Can you tell me what Mr. Terrazas said in this one?

A.    "Doug, received.  No need to keep reminding me.

Trust me, it is not helpful, as I need to then pass along to Rob, which aggravates the situation.  If there was money there to give you, it would be given.  Rob does not agree that the contract has any mistakes in it, and he knows and fully plans to pay you.  The funds simply are not there right now."

Q.   So as of April 2020, payment was still due December of 2020.  But here he states that Rob fully plans to pay you.  Did you believe that statement?

A.   I was holding on to hope, and I also knew that, with the mistake in the contract, I was probably going to have to wait until December to get paid.

Q.   Okay.  And you were prepared to wait until December?

A.   I knew that I had to at that point.

Q.   Oh.  Go ahead and flip to the next tab, please. Actually, flip to Plaintiff's Exhibit 22, and in your folder this would be tab 23.

        MR. SCHULZE:  And, Your Honor, we covered this earlier as well.  I don't believe there's any objections to admitting Exhibit 22.

        MR. TERRAZAS:  Correct, Your Honor.

        THE COURT:  The court admits exhibit -- wait a minute.  This is Plaintiff's Exhibit 22?

        MR. SCHULZE:  Correct.  It will be tab 23 in your binder.

THE COURT: And this also has redactions, correct?

MR. SCHULZE: There are no redactions on this one because it's only a one-page email.

THE COURT: The court admits Plaintiff's Exhibit 22.

MR. SCHULZE: May I publish to the jury?

THE COURT: You may.

Q. (BY MR. SCHULZE) Mr. Ramsey, is what you see on the screen a copy of what you have in front of you in the binder?

A. It is.

Q. Can you tell us what this email is or who it is to and from?

A. From Mr. Terrazas to myself, same email address as we've been discussing.

Q. Okay. Will you start reading the first -- the first paragraph, and I'll interrupt you in a moment.

A. "Will talk with Rob about the interest. In terms of the date correction, I looked at the initial draft that you made, and it had December 20, 2020. It was changed to December 21, 2020, so I don't see how that was an error. Also, the problem with changing it is that after December 20th of 2020, there is an additional late fee of $1,000 per month. So changing it would indebt Sheet Pile

even more and at an extremely high interest rate."

Q.    So that was what we were discussing, that you and Mr. Wendt had a difference in opinion of what the original due date of that loan was supposed to be?

A.    Well, originally we had the same opinion.  But then it seemed to vary after that, yes.

Q.    Understood.  Go ahead and keep reading for me, please.

A.    "So I don't think I could recommend to Rob that he change the date.  Rob has confirmed with me that he plans to pay off the loan in full in February and has no intention of dragging this out."

Q.    So this email was sent on January 13th, 2020?

A.    It was.

Q.    And based on Mr. Terrazas' representation, you believed you were going to get paid the following month?

A.    I did.

Q.    That didn't happen?

A.    It did not.

Q.    Go ahead and keep reading for me, please.

A.    I will stay on him about that, because I do believe that you did Sheet Pile a favor with the loan and that it needs to be paid back as soon as possible.  As you know, money is tight with the trustee payments which cannot be missed or it risks Sheet Pile losing all of the aspects

from the bankruptcy sale."

Q.   Mr. Terrazas believes that you did Sheet Pile a favor with the loan.  Do you believe that you did a favor for Sheet Pile with the loan?

          MR. TERRAZAS:  Your Honor, I'm going to object to the sidebar and testimony from counsel.

          THE COURT:  Sustained.

Q.   (BY MR. SCHULZE) The email from Mr. Terrazas states that he believes that you did Sheet Pile a favor.  Did I read that correctly?

A.   You did.

Q.   Do you believe that you were doing Sheet Pile a favor?

A.   I certainly do.

Q.   We've established numerous times that the original loan amount was $100,000, and you haven't received that $100,000 back?

A.   That is correct.

Q.   The original note promised that you would receive interest on your loan of how much?

A.   The flat rate interest of 10,000.

Q.   Okay.  So that brings it to what?

A.   110,000.

Q.   Okay.  You're also incurring a monthly interest amount that you're having to pay the lender, correct?

A.    That's correct.

Q.    And how much that monthly interest amount?

A.    I believe that was about $411.67.

Q.    And when did that payment -- when did that start?

A.    Immediately.

Q.    When was that, immediately?

A.    I'm sorry.  From the beginning of the loan of November [sic] 2020.  There was a prorated month of 290 or so.  And then monthly, from December onward, it was 411 or so.

Q.    So since December 1st of 2020, you've been incurring $411 and some change in fees?

A.    Since December of 2019.

Q.    Excuse me.  2019.

A.    Yes.

Q.    So as of December 21st, 2020, when the note was due, you were owed 12 months worth of that $411 interest?

A.    That's correct.

Q.    And do you happen to know off the top of your head how much that number is at this point?

A.    That would have been roughly another 4900, give or take.

Q.    Okay.  If I told you it was $4,940.04, would that be correct?

A.    I would take that, sure.

Q.   So that's in addition to the $110,000?

A.   That's correct.

Q.   And so that brings us to $114,940.04?

A.   That sounds right.

Q.   Okay.  And I think we established earlier when we were looking at the promissory note that every month that Sheet Pile was late on the payment of that note, they were incurring a late fee of $1,000?

A.   That's correct.

Q.   And that $1,000 is in addition to the $411.67 you were incurring?

A.   Yes.

Q.   So after the note came due at the end of December of 2020, the monthly amount went to $1,411.67?

A.   That's correct.

Q.   And it's fair to say that that's been going on every month since December 21st of 2020?

A.   That's correct.

Q.   That means, as of January 21st, 2021, so a month later, we would just add another $1,411.67 to the note?

A.   That is correct.

Q.   And would you agree with me that that brings it to about $116,351.71?

A.   With that first month, that sounds about right, yes.

Q.   In February of 2021 -- February 21st of 2021, we

would add another 1,411.67?

MR. TERRAZAS:  Objection: leading.

THE COURT:  Sustained.

Q.   (BY MR. SCHULZE) The following month, would you add that amount -- excuse me -- would you add that amount again?

A.   I would add another 1411 to the balance, yes.

Q.   And the following month, the same thing?

A.   Each month, yes.

Q.   As of May of 2023, this month, do you know what the number has grown to?

A.   I would need to do the math again, but I believe in the order of 155 or 160,000.

Q.   If I told you that the math adds up to $155,878.47, would you agree with me?

A.   That sounds right, yes.

Q.   And in addition to that amount, you're owed the $44,000 bonus payment?

A.   That's correct.

Q.   And the $5,000 in payroll that you're missing?

A.   That's correct.

Q.   So adding those two numbers in, would you agree with me that your outstanding balance is $204,878.47?

A.   That sounds right, yes.

Q.   And you filed this lawsuit on March 1st, 2021,

correct?

A.   Yes.   That's correct.

Q.   And that was over two years ago.  And over the course of those two years, have you been incurring attorneys' fees?

A.   I have, indeed.

Q.   And have you been paying those attorneys' fees?

        MR. TERRAZAS:  Objection, Your Honor: relevance.

        THE COURT:  Overruled.

A.   I have been paying those, yes.  Very timely.

Q.   Okay.  And off the top of your head, do you know about how much you've paid in attorneys' fees thus far?

A.   It's close to $100,000 at this point.

Q.   And are you asking the jury to award you a judgment against Sheet Pile for the $204,878.47?

        MR. TERRAZAS:  Objection, Your Honor: relevance?

        THE COURT:  This is with respect to the attorneys' fees?

        MR. TERRAZAS:  Yes, Your Honor.

        THE COURT:  They are recoverable in a breach of contract action, right?

        MR. SCHULZE:  And this was the actual damages number.  We haven't heard testimony on attorneys' fees,

so I'm not presenting attorneys' fees at this moment.

THE COURT: Overruled.

Q. (BY MR. SCHULZE) Let me ask you that question again.

At this point are you asking the jury to award you a judgment against Sheet Pile for $204,878.47?

MR. TERRAZAS: Objection: leading.

THE COURT: Overruled.

A. Yes. At the minimum.

Q. And, in addition to that, you're asking the jury to award your attorneys' fees and costs?

A. Yes. Absolutely.

Q. And if you were awarded that principal balance and your attorney fees, would that make you whole again?

A. I don't know about whole. There's been a whole lot of opportunity costs. I've been working as my own paralegal. There have been a lot of not explicit costs that have been a part of this ordeal for three years.

Q. And if the jury finds Sheet Pile responsible for committing fraud, are you asking the jury to award you exemplary damages as well?

MR. TERRAZAS: Objection, Your Honor: calls for a legal conclusion and relevance.

THE COURT: Overruled.

A. Would you mind asking again, please?

Q. If the jury finds Sheet Pile responsible for

committing fraud in addition to breach of contract, are you asking the jury to award you exemplary damages as well against Sheet Pile?

A.    Since that's an egregious act, absolutely.  Yes, I am.

            MR. SCHULZE:  I'll pass the witness, Your Honor.

            THE COURT:  Any cross?

            MR. HUDSON:  Your Honor, we're going to reserve our cross for our case in chief.

            THE COURT:  Okay.  Then you can step down, Mr. Ramsey.

            THE WITNESS:  Thank you, Your Honor.

        (End of requested transcription)

**UNITED STATES DISTRICT COURT**      )

**WESTERN DISTRICT OF TEXAS**         )

I, Arlinda Rodriguez, Official Court Reporter, United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

WITNESS MY OFFICIAL HAND this the 11th day of November 2023.

                              /S/ Arlinda Rodriguez
                              Arlinda Rodriguez, Texas CSR 7753
                              Expiration Date:  10/31/2025
                              Official Court Reporter
                              United States District Court
                              Austin Division
                              501 West 5th Street, Suite 4152
                              Austin, Texas 78701
                              (512) 391-8791