**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

DOUGLAS RAMSEY,                              ) AU:21-CV-331-LY
                                             )
    Plaintiff/Counter-Defendant,             )
                                             )
v.                                           ) AUSTIN, TEXAS
                                             )
SHEET PILE LLC,                              )
                                             )
    Defendant/Counter-Plaintiff.            ) MAY 17, 2023

        *********************************************
            TRANSCRIPT OF JURY TRIAL TESTIMONY OF
                    DOUGLAS RAMSEY
            BEFORE THE HONORABLE DUSTIN M. HOWELL
        *********************************************

APPEARANCES:

FOR THE PLAINTIFF:    GERRIT SCHULZE
                      SHUMWAY VAN, LLC
                      13750 SAN PEDRO AVENUE, SUITE 810
                      SAN ANTONIO, TEXAS 78232

FOR THE DEFENDANT:    KEVIN JAMES TERRAZAS
                      ERIC A. HUDSON
                      TERRAZAS, PLLC
                      1001 S. CAPITAL OF TEXAS HIGHWAY
                      AUSTIN, TEXAS 78746

COURT REPORTER:       ARLINDA RODRIGUEZ, CSR
                      501 WEST 5TH STREET, SUITE 4152
                      AUSTIN, TEXAS 78701
                      (512) 391-8791

Proceedings recorded by computerized stenography, transcript

produced by computer.

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

**EXHIBIT INDEX**

|  | OFFD/ADM | |
|---|---|---|
| Defendant | | |
| 58 | 57 | 60 |
| 60 | 82 | 83 |
| 61 | 60 | 60 |
| 63 | 60 | 60 |
| 74 | 24 | 24 |

(Open court, jury present)

THE COURT:  The defendants can call their next witness.

MR. TERRAZAS:  Yes, Your Honor.  We call Douglas Ramsey.

THE COURT:  Mr. Ramsey, if you'll come on up.

And I will remind you of the oath that you took yesterday.

THE WITNESS:  Thank you.

THE COURT:  And, ladies and gentlemen of the jury, I was thinking 2:40 for our afternoon break.  How does that sound?  Is that good?  I'm seeing nodding heads.  I'm not seeing any furrowed brows.  Okay.  2:40 it is.  Mr. Terrazas?

MR. TERRAZAS:  Thank you, Your Honor.

### DIRECT EXAMINATION

**BY MR. TERRAZAS:**

Q.   Good afternoon, Mr. Ramsey.

A.   Good afternoon.

Q.   Mr. Ramsey, you're a pretty smart guy, aren't you?

A.   I would say so.

Q.   Yeah.  I mean, you went to Rice University, didn't you?

A.   Yes.

Q.   That's a top college in this nation, isn't it?

A.   It's a good institution, yes.

Q.   I mean, it's a top 25, even probably top 15 college, wouldn't you say?

A.   I don't know the numbers.

Q.   But you'd say it's probably somewhere around there, right?

A.   I wouldn't argue that, no.

Q.   Okay.  And you graduated with a business management degree, correct?

A.   Correct.

Q.   That's a pretty complex field.

A.   Is that your question?

Q.   Would you agree?

A.   Yes.

Q.   And prior to Mr. Wendt hiring you, you had no experience working in the sheet piling business, correct?

A.   Correct.

Q.   He brought you into the business?

A.   He did.

Q.   He trusted you, didn't he?

A.   Yes.

Q.   I mean, he trusted you a lot, didn't he?

A.   Yes.

Q.   You would agree he gave you kind of the keys to the kingdom?

A.   If you want to put it that way, yes.

Q.   And he's also -- you know Mr. Wendt.  He's a pretty hands-off guy, isn't he?

A.   I don't know if I'd classify him as hands-off.

Q.   Well, I mean, he delegates a lot, doesn't he?

A.   He likes to be a part of a lot of things and is hands-off.  It's a combination.

Q.   I mean, he doesn't look over your shoulder when you're doing your job, right?

A.   I wouldn't classify it as that, no.

Q.   Sorry.  Just to be clear, he doesn't look over your shoulder when you're doing your job, correct?

A.   Correct.

Q.   And you were actually in a different office than him, correct?

A.   Most of the time.

Q.   Yeah.  Most of the time.  I mean, you were hundreds, thousands of miles apart most of time, right?

A.   Most of time, yes.

Q.   On you'd agree that Mr. Wendt generally is very trusting, isn't he?

A.   He is, yes.

Q.   And you'd agree that he gives people a lot of responsibility and liberty?

A.   He does.

Q.    You worked as a chief financial officer, also referred to as a CFO, for Sheet Pile, didn't you?

A.    Yes.

Q.    And that's a very trusted position in the company. Would you agree?

A.    It is.

Q.    It's a position that has access and power in the company, right?

A.    Yes.

Q.    And you managed all the financial affairs of Sheet Pile?

A.    In coordination with Mr. Wendt, yes.

Q.    But you were in charge of all the financial affairs, weren't you?

A.    Yes.

Q.    And you managed the Austin operations, correct?

A.    I did.

Q.    And you managed the inventory and financial reporting for Sheet Pile, right?

A.    Yes.

Q.    And Sheet Pile trusted you to communicate with customers, correct?

A.    Yes.

Q.    And they trusted you to communicate with vendors?

A.    Yes.

Q.   An Sheet Pile trusted you to move products across the United States, correct?

A.   In coordination with our logistics folks, yes.

Q.   Understood.  And on all orders, your responsible for financial reporting, correct?

A.   Yes.

Q.   And on all orders you were responsible for inventory management; is that right?

A.   Again, in coordination with our warehouse operations, but yes.

Q.   But that was part of your role, right?

A.   Yes.

Q.   And on all orders you were responsible for invoicing, right?

A.   Yes.

Q.   And you regularly made visits to New Hampshire to observe the operations there, correct?

A.   To observe and to work with the employees there, yes.

Q.   And that was sort of the central hub for Sheet Pile, right, New Hampshire operation?  That's where all the manufacturing occurred?

A.   Once we moved out of Texas, yes, it was.

Q.   During 2018-2019, that was the hub, right?

A.   Yes, it was.

Q.    An during your tenure as CFO, you had access to very highly confidential information belonging to Sheet Pile, right?

A.    Yes.

Q.    And that includes the identities of customers and their employees?

A.    Yes.

Q.    And the identify of vendors?

A.    Yes.

Q.    And pricing strategies?

A.    Yes.

Q.    And logistics?

A.    Yes.

Q.    And methods of designing and manufacturing sheet pile?

A.    For the most part, yes.

Q.    And methods of designing and manufacturing piling connectors?

A.    Yes.

Q.    And business strategies?

A.    Yes.

Q.    And financial data?

A.    Yes.

Q.    And so you'd agree that you had access to some of the most sensitive parts of the company?

A.   Yes.

Q.   And all that information was proprietary and secret. Would you agree?

A.   I would say yes.

Q.   In fact, you could not have performed duties without having access to all that information, right?

A.   Without having access?  Is that what you said?

Q.   Uh-huh.  Without.

A.   Yes, sir.

Q.   And you had full access to the bank accounts, right?

A.   I did.

Q.   You were the one that was regularly transacting business from the bank account from Sheet Pile to outside it, correct?

A.   Yes.

Q.   And you were really the only one doing any accounting, correct?

A.   That's right.

Q.   And you would write, for example, yourself your own checks.  Would you agree?

A.   With Mr. Wendt's permission, yes.

Q.   Well, let's -- I'm showing you Plaintiff's Exhibit 14.  It's already been admitted.

     And, Mr. Ramsey, this is an example of a check you wrote yourself, correct?

A.    It is.

Q.    And that's on December 11th, 2019?

A.    Yes.

Q.    You didn't present this check to Mr. Wendt before you signed it for yourself, correct?

A.    I don't believe I presented the check, but we discussed cutting a check.

Q.    All right.  You remember a specific conversation about cutting a check for $290.72?

A.    Yes.  Because any checks to myself we certainly needed to discuss, and this was the first interest payment on this loan.

Q.    So if Mr. Wendt testifies that you don't go to him regularly when you cut a check to yourself, you're saying that he's not telling the truth?

A.    That is correct.

Q.    So -- and we saw some of those Quickbooks you saw with Ms. Minteer's testimony.  We saw some of the Quickbooks entries, and there was a lot of checks in there to you.

A.    Okay.

Q.    Would you agree?

A.    Yes.

Q.    And you're saying, for every single one of those, you went to Mr. Wendt ahead of time?

A.    Yes.

Q.    You transferred money from yourself to -- or from -- sorry.  Strike that.

      You transferred money from Sheet Pile to Sempe Inc. on a regular basis, didn't you?

A.    Yes.

Q.    And I'm going to pull up Plaintiff's Exhibit 21, and we've seen this before.  And you actually created this, didn't you, Mr. Ramsey?

A.    Yes.

Q.    And so this is your summary after you left Sheet Pile of what you contented was paid to you, correct?

A.    Correct.

Q.    All right.  And there's some things in there of what you contend should have been paid to you, right?

A.    One line item at the end, yes.

Q.    Okay.  You would agree this Sempe Inc., that its purpose was to manage PilePro Steel, correct?

A.    Not entirely, no.

Q.    Okay.  What was its purpose?

A.    It was a management company that Mr. Wendt owned that managed several other operations, if you will.  It managed the -- the -- the Wadit, which is the steel sealant installer.  It managed the Origami Steel, helping it get funding.  It took care of Mr. Wendt's personal

items.

And that's why I was a contractor with Sempe, is to work with Sempe for some of those other outside items. It also paid Mr. Buitta up in New Hampshire occasional stipends, payments up there, to manage Mr. Wendt's personal property.

Q. So how much work would you say you did for Sempe on a monthly basis in 2018-2019?

A. Oh, I don't know. Probably, very ballparking, maybe 25 to 30 percent of my time.

Q. Twenty-five to 30 percent of your time for all that?

A. That's right.

Q. But I thought you were working full-time for Sheet Pile then?

A. It was full-time for all Mr. Wendt's companies. There really wasn't a delineation of, oh, at 8:15 I'm stopping at one company and working for the other. It was all in there.

Q. I mean, wouldn't you agree, once Sheet Pile bought the assets of PilePro Steel, there really wasn't anymore need for Sempe?

A. No.

Q. Now, you paid yourself $5,000 in -- if we look here, in May of 2017 -- okay, and I'm just going to highlight that one. This payment in May of 2017, you see that? I

can blow it up a little bit.  That might be easier for everybody.

A.   Yes.  I see that.

Q.   Okay.  But you applied that to what you said was a pay period back in November and I guess maybe December of 2016.  Do you see that?

A.   It looks like from November.  Yes, sir.

Q.   So five to six months later, maybe even closer to seven months, you're making a payment to yourself from Sempe, you're signing the checks, for a pay period that's six, seven months before?

A.   Yes.

Q.   And you're saying you got that approved through Mr. Wendt?

A.   Yes.

Q.   You said, Hey, Rob, 5,000 -- I need $5,000 for six to seven months ago?

A.   That's not how I would lay it out.  There would be a list of payments, and we would discuss cash flow every week, sometimes multiple times a week, because cash flow was tight.  We would always have a list of what are the upcoming payments.  And as cash flow allowed, then some of my Sempe payments would come through, as well some of Mr. Wendt's payments, some of Mr. Hollister's payments, Mr. Buitta's payments, numerous other payments.  Sempe

was notoriously behind on paying consultants and contractors.

Q.   So you would tell him specifically this is for a payment six or seven months ago that was due?

A.   Yes.

Q.   That's your testimony?

A.   That's my testimony.

Q.   All right.  And if this -- you had testified before, though, you were getting paid $10,000 a month in salary.

A.   10,000 a month between the two companies.

Q.   Well, because that was your compensation, right?

A.   That was my compensation.

Q.   Well, if you weren't paid this 5,000 for over six months, wouldn't that be violation of your agreement?

A.   It was a verbal agreement.  It was a verbal understanding.  I was willing to be patient to get those payments.  And you'll see over in Sempe that they were consistently five, six, seven, eight, even longer, months later.

Q.   Yeah.  But Mr. Wendt wasn't characterizing those, were they -- was he?

A.   What do you mean he wasn't characterizing?

Q.   He wasn't the one saying, Hey, you need $5,000 for six months ago.  He wasn't saying that, was he?

A.   I don't understand what you mean by that.

Q.   Well, you're suggesting that you were talking to Mr. Wendt, and he was the one that was saying, Oh, yeah. You need to get paid this amount because you're owed it. Is that what you're saying?

A.   I would push for it and say my payment is now six months late.  Can we get this one taken care of so that we can keep it forward and try to get caught up.

Q.   And there's several transactions in here I see.  For example -- like, for example, in March of 2018, you paid yourself $15,000 in a matter of two weeks, correct?

A.   Yes.

Q.   And you're saying that that was for payments that were due almost a year before --

A.   That's correct.

Q.   -- starting in May of 2017?

A.   That's correct.

Q.   And then again you pay yourself in May of that same year in 2018 another 15,000.  You see that?  In a matter of about three weeks?

A.   Yes.

Q.   And then in July you do it again, and in two weeks you pay yourself another 15,000.  Do you see that?

A.   Yes.

Q.   And, again, these are for periods that are for months and months before.  And every time you're saying

you went to Mr. Wendt on this?

A.    Yes.

Q.    And, again, if he says differently, you're saying that he's incorrect?

A.    He's outright lying if he says differently, or he forgets, incorrectly.

Q.    Now, I counted $40,000 in payments from Sempe in 2017 to you.  Does that sound right?

A.    That looks right on this list, yes.

Q.    Okay.  And I counted $55,000 in payments in 2018 to you, correct, from Sempe Inc.?

A.    That looks about right.  If you scroll down a little bit, yes.

Q.    Yes, sir.  No problem.  You see it?

A.    That's about right.

Q.    Okay.  And I counted -- let's go to 2019 here.  In 2019 -- in July of 2019, you paid yourself $40,000 on the same day from Sempe, correct?

A.    Correct.

Q.    And you didn't characterize it as $40,000.  You characterized it as five -- of eight $5,000 payments, correct?

A.    Because those were from eight past due months from, looks like, 2018.

Q.    And, again, yes.  It's for about a year ago or more.

You're saying that Mr. Wendt approved $40,000 for you to get from Sempe Inc. for over a year ago?

A.   That's correct.

Q.   And then another one in November of 2019, right?

A.   That's correct.

Q.   And we'll get into it a little bit more.  But isn't -- by November 2019, isn't that when you're making the loan to Sheet Pile?

A.   It is.

Q.   And, yet, he approved -- when you're saying Sheet Pile didn't have any money, he's approving a $5,000 payment from Sempe Inc. for a year ago?

A.   Yes.  Because if you look at that, that was the last one that was due from 2018, and then we could be done with those past due payments.

Q.   And Mr. Wendt specifically approved that, knowing that Sheet Pile didn't have any money and had to take out a loan that you were charging a very high interest rate for?

A.   Those are two different questions.  He did approve this $5,000 payment, yes.

Q.   I'm asking, during the time when you made a loan to him that you're charging $10,000 just up front?

A.   Yes.

Q.   But he approved that?

A.   Yes.

Q.   And you're in different offices during this time, right?

A.   I don't remember the exact specifics, but yes. Other than we may have met in Austin or New Hampshire, for the most part, we were in different places.

Q.   I understand, sir.  I'm talking about your normal, everyday operation.  There's times, of course, people travel.

A.   Correct.

Q.   Okay.  But normal, everyday, you were not in the same office right?

A.   Correct.  He'd be at his house in California or wherever, and I'd be at mine.

Q.   But we haven't seen a single communication by email approving any of those Sempe payments, correct?

A.   Not that I've seen.  But we had phone conversations multiple times every week and the cash flow reports that are in the emails that list out these payments that we would discuss.

Q.   And much of your communications with Mr. Wendt were by email, right?

A.   Much by email, many by phone.

Q.   And you would agree that a W-2 payment suggests an agreed salary, right?

A.    It does.

Q.    All right.  And so, as we look at your -- your chart -- and just to make sure, we're looking at this column that says "paid amount."  Do you see that?

A.    Yes.

Q.    That's what was paid?

A.    Correct.

Q.    So starting in 2014, we see what is paid to you in W-2 wages going all the way for about five years is $2500 every two weeks.  Do you see that?

A.    I see it.

Q.    And it just keeps going.  But, all of a sudden, in December of 2018, you change it to 5,000 every two weeks, correct?

A.    I don't change it.  That was a decision with Rob and myself, as we were winding down Sempe to move all the payroll, contractors, myself, everybody, into iSheetPile.

Q.    Sir, you physically changed it, correct?

A.    I physically changed it, based on our agreement and conversation.

Q.    So you physically changed it to 10,000 per month without any agreement -- any written agreement, correct?

A.    I don't recall if there was an email or text about it at the time.

Q.    Okay.  And do you remember your counsel's questions

to you about the -- I apologize.  Maybe it wasn't to you. It might have been to Mr. Wendt.  But your counsel's questions about why would anyone be a CFO for $5,000 a month, right?  Do you remember that?

A.   I vaguely recall that, yes.

Q.   Okay.  But, in fact, you started working for SteelWall basically as their CFO for 4,000 a month?

A.   I do not work for SteelWall as a CFO at all.  We've covered that many times in depositions, discovery, all of it, Mr. Terrazas.

Q.   Sir, we'll go over that?

A.   Gladly.

Q.   Because you're doing basically the same things at SteelWall that you did at Sheet Pile, correct?

A.   Not even close.

Q.   Okay.  The 4,000 a month is less than the 5,000 a month that you're being paid starting 2018 all the way back to 2014, correct?

A.   Yes.

Q.   I'm going to pull up Defendant's Exhibit 68, which has been already admitted.

And so you understand this to be your first year of payments at Lone Star Global from SteelWall, right?

A.   It looks accurate, yes.

Q.    All right.  And so besides some bonus payments in the end and this initial payment on February 4th, 2020, right?

A.    Yes.

Q.    All these are correct?

A.    These look correct, yes.

Q.    Okay.  And so it's your claim that you were terminated from Sheet Pile at least sometime in December of 2019, right?

A.    Correct.

Q.    So less than six weeks later -- fewer than six weeks later, you're getting paid from SteelWall?

A.    Yes.

Q.    And you testified previously in your deposition, didn't you, that your duties at SteelWall are similar to that of a vice president?

A.    Somewhat similar to a vice president, yes.

Q.    Well, you didn't say "somewhat similar to a vice president."  You said "similar to a vice president," didn't you?

A.    Okay.  Let's call it similar.

Q.    So you'd agree that your -- your duties at SteelWall are similar to vice president of a company?

A.    I'm not sure if that's entirely accurate.  It's -- it's a part-time clerical bookkeeping.  It is his

*de facto* VP, but it is finance and operations.

Q. I mean, you testified before in your deposition, isn't that correct, that it was similar to a VP position?

A. There are some similarities, if you had to put a title on it. I also believe I said, "if you had to put a title on it."

Q. Right. If you had to put a title on it, it would be like a vice president, right?

A. I don't like getting pigeonholed into "vice president." The duties vary.

Q. Sir, I'm just going by what your testimony was. Do you need to see it?

A. Sure.

Q. All right. I'm going to go to page 182, lines 1 through 3.

MR. TERRAZAS: Well, Your honor, may I approach?

THE COURT: You may.

Q. (BY MR. TERRAZAS) Actually, I'm going to hold off on that. You testified that there was never any other written agreements that justified your salary, right?

A. I'm sorry. Could you clarify "written agreements"?

Q. Sorry. I thought that you testified that, at -- at Sheet Pile, that there was never any other written agreements.

A.    Other than --

Q.    Other than the one on August 27th, 2019.

A.    Okay.

Q.    Sorry.  Thank you for the clarification.

A.    I wanted to clarify.  I believe that's the only written employment agreement.

Q.    Well, you heard Mr. Chang testify that he had a employment agreement, right?

A.    I'm sorry.  With?

Q.    With Sheet Pile or one of the related entities?

A.    Or its predecessors.  I did hear that, yes.

Q.    Okay.  And, in fact, you had another written agreement in 2014 with Sheet Pile, didn't you?

A.    I don't believe we ever finalized any written agreement -- any other written agreement.

Q.    Well, that's very interesting, sir.  You said you didn't finalize any other written agreement.

        MR. TERRAZAS:  If we can -- Ms. Thompson, can you pull that down but allow the witness to see the document.

        Mr. Ramsey, can you see on your screen this document which is Defendant's Exhibit 74?

A.    It's rather blurry, but, yes, I can see it on here.

Q.    Let me try to blow it up.  Does that help at all?

A.    Yes.  That helps.

RAMSEY - DIRECT

Q.   Sir, this is something you provided to us in this litigation, correct?

A.   Yes.  Looks like one of my discovery.

Q.   And this is the independent consulting agreement that you negotiated with Mr. Wendt, correct?

A.   We were in negotiation with it.  I see the date is January of 2013, so that was early on.  So it was one of the proposed draft agreements that we had, yes.

Q.   Okay.  And this is a true and correct copy of this agreement, correct?

A.   I believe this is a true and correct copy of this draft agreement.

Q.   All right.

          MR. TERRAZAS:  Your Honor I move to admit Defendant's Exhibit 74.

          THE COURT:  Any objection?

          MR. SCHULZE:  We object it lacks foundation. It's an unexecuted -- excuse me.  Lacks foundation.

          THE COURT:  What is the foundation for admitting this?

          MR. TERRAZAS:  Your Honor, I think he just testified this is one of the draft agreements that he negotiated with Mr. Wendt.

          THE COURT:  Overruled.  The court admits --

          This the Defendant's 74?

MR. TERRAZAS:  Yes, Your Honor.

THE COURT:  -- Defendant's Exhibit 74.

Q.   (BY MR. TERRAZAS) So this is, as we were talking about, an independent consulting agreement between Sempe Inc. and you personally, right, in 2013?

A.   A draft agreement, yes.

Q.   Okay.  And it says, "While the consultant was originally retained on January of 2013, this agreement is meant to formalize all contracting terms in order to improve the understanding of the terms for the mutual benefit of consult and company."  Do you see that?

A.   I see that.

Q.   And then I thought you testified before that there was no other documents anywhere that might lay out your CFO duties, right?

MR. SCHULZE:  We would object to this line of questioning.  This is not relevant.  This is not a contract that's been executed.  He's not testified that it's an agreement between the parties or that it's got any foundation.

THE COURT:  Overruled.

Q.   (BY MR. TERRAZAS) Didn't you testify to that, sir?

A.   Would you mind asking the full question again?

Q.   Sure.  You testified before that there was no document anywhere where prior to August 27, 2019 that

laid out your CFO duties.

A.    I said I believed that there was not anything fully executed, and this is not even executed.

Q.    You didn't say "that wasn't fully executed."  You said there wasn't a document, right?

A.    Well, to me this doesn't -- it's not finalized, so it's not complete.  I also said I don't believe that there are any others.  I did not recall this one.

Q.    Okay.  So -- but even if this is executed or not, you would agree this lays out all the duties of the CFO, right?

A.    It's a draft list of some of the duties.  I don't remember what stage this was in, whether I had come up with it or Rob had come up with it -- or excuse me -- Mr. Wendt, or if we were still going back and forth.  I don't recall the stage on this.

Q.    Well, it says specifically in here, "Consultant agrees to work with the company in the role of chief financial officer."  And it's not only chief financial officer for Sempe.  It's chief financial officer for all related companies, including PilePro LLC, Origami Steel, PilePro Sales Corp.  See all that?

A.    That's not all the related companies.  This is clearly separate from PilePro Steel LP, which would have been a separate company.  It may have also had some draft

agreements.

Q.    Sir, it says "et cetera," right, including saying there's potentially more.  It wasn't saying all of them?

A.    It says "such as."  But I know in 2013 PilePro Steel LP and Sempe Inc. were being handled very differently.

Q.    Well, sir, are you sure PilePro Steel was even formed by then?

A.    In 2013?

Q.    Yes, sir.

A.    100 percent.

Q.    It says "et cetera" here, which includes all -- it says "any related entities."  You see that?

A.    I see that.

Q.    And you would agree that PilePro Steel would be a related entity to PilePro LLC, Origami Steel, PilePro Sales Corp, and Sempe Inc., right?

A.    It would be related, yes.

Q.    Okay.  So it would fall under this language?

A.    I'm not sure.  I'm not an attorney.  I'm not sure it would fall under this if it had its own separate agreement.

Q.    Okay.  And it says that you were going to manage all financial aspects and other financial or legal tasks as requested.  You see that?

A.   I see that.

Q.   And it's also going -- it says that you "will also work with the company management to provide a list of financial recommendations for success, which may include process changes, resource changes, a variety of other forward-looking business principles."  Do you see that?

A.   I see that.

Q.   Okay.  And it says, "as well as provide the founder accurate data to make informed business decisions," right?

A.   I see that.

Q.   And for all this work as a CFO, how much were you going to get paid?

A.   Well, again, this was a draft agreement --

Q.   Sir, I just need to know --

A.   -- so it was a negotiation.

        MR. TERRAZAS:  I'm going object as nonresponsive.

        THE COURT:  Sustained.

Q.   (BY MR. TERRAZAS) Sir, you just need to answer my question.  For all this work, how much were you going to get paid?

A.   For this agreement, on this agreement, 5,000 per month.

Q.   A flat rate of 5,000 per month, right?

A.    Right.

Q.    If we go back to Plaintiff's Exhibit 21 and we see the W-2 and you're getting paid 5,000 a month to CFO, correct?

A.    For Sempe Inc.

Q.    5,000 a month for W-2 salary, correct?

A.    For PilePro Steel LP, which is separate.

Q.    And yet you're claiming that somehow, separately, that you should be paid 10,000 a month for doing the same duties that were represented in Defendant's Exhibit 74, correct?

A.    Same duties for both sets of companies, yes, as were my predecessors.

Q.    I don't think we have any evidence of any predecessors?

A.    Ask your client.

Q.    But, sir, again, you're saying that somehow, as a CFO for a bunch of companies, that you're somehow going to get 5,000 for that one but then 5,000 extra somewhere else, no agreement?

A.    There were no executed agreements for either company for six and a half years.  So, yes, 5,000 from each company.

Q.    Okay.  Let's go to your employment contract in 2019. We've seen this a lot.  You read it before you signed it,

right?

A.    Yes.

Q.    You understood it before you signed it?

A.    Yes.

Q.    And this new agreement gives you $10,000 a month in salary, right?

A.    Yes.

Q.    And it wasn't retroactive, was it?

A.    No.

Q.    It was just going forward, from August 27 forward, right?

A.    As this is written, yes.

Q.    All right.  Just assume for me for now -- I know you dispute this.  But assume that the 10,000 in salary you were just supposed to be receiving from August 27th going forward, then and as we saw in your Exhibit 21, at least $62,000 was paid to you extra in salary for all the periods before August 27th, correct?

A.    Well, clearly I disagree, which is the big reason we're here.

Q.    I understand, sir.  I'm just talking about numbers here.  62,500.  Would you agree with that number?

A.    I disagree that I was overpaid that.

Q.    It's not my question, sir.  My question is simply: Would you agree that 62,500 was the extra amount in

salary above the 5,000 a month that Mr. Wendt says was the agreement until August 27?

A.    I would take your number that that is the difference between 5,000 a month and 10,000 a month.

Q.    Okay.  For the periods that we're talking about?

A.    That sounds about right.

Q.    All right.  And, again, as we look at -- because, again, your sheet, it's a little odd, I think, to have $40,000 paid in July and then another 5,000 paid in November from Sempe Inc. in 2019, but you're not really showing it on your sheet as applying to 2019.

A.    Because it doesn't apply to 2019.  It applies to 2018.

Q.    And I understand that that's your testimony, sir.

A.    No.  It's the facts.

Q.    But $40,000 there, 62,500 there.  So there's over a $100,000 that's disputed.  Would you agree?

A.    I don't dispute it.

Q.    You know Sheet Pile disputes it, right?

A.    Okay.

Q.    And it's over $100,000, right?  Is that right?

A.    What is over 100,000?

Q.    45,000 plus 62,500?

A.    Yes.  That math adds up.

Q.    I mean, it actually adds up to 107,500?

A.   Right.

Q.   Yeah.  And then you turn around and you loan Sheet Pile -- we can't get a loan anywhere else.  You loan Sheet Pile $100,000, right?

A.   I did.

Q.   And, again, you got 10,000 interest right away, plus additional fees, plus additional interest on top of that.

A.   I didn't get any of it right away.

Q.   So that's what was attached right away under your position.  Are you saying you're not seeking --

A.   Attached, yes.  But I certainly didn't get it right away.

Q.   And you would agree that's a lot of interest?

A.   Well, that was $10,000 immediately anytime in the first year.  So I don't think that's a lot of interest.

Q.   Now, I think you testified before that you paid this money to wherever Sheet Pile directed it, right?

A.   That's correct.

Q.   But you represented to the court that you paid this money directly to Sheet Pile, didn't you?

A.   I believe it was to the accounts that Sheet Pile directed.

Q.   Okay.  Well, I'm going to show you your complaint. Do you see this?

A.   I have nothing on my screen, no.

Q.    You sure it's not on your screen?

A.    It's popping up now.

Q.    Okay.

A.    If you can zoom in a little, please.

Q.    Sure.  Great.  This is your complaint, right?

A.    This looks right, yes.  Amended complaint.

Q.    Right.  Amended complaint.  Okay.  It's the one that's active.  You understand that?

A.    I understand that.

Q.    And so it's your latest representation to the court, correct?

A.    I believe it is.

Q.    If you look at paragraph 8, you say:  "The sum of a $100,000 was transferred into the defendant's account," right?

A.    I see that.

Q.    That's in Sheet Pile's account, correct?

A.    It was the defendant's directed account.

Q.    No, sir.  That's not --

A.    I don't know if that account was owned by Sheet Pile or their bankruptcy trustee or the metrics of that.

Q.    Sir, you say in here it was transferred into Sheet Pile's account.  That's who the defendant is, right?

A.    That is the defendant, yes.

Q.    And it wasn't transferred into Sheet Pile's account,

was it?

A.   I don't know if it was a Sheet Pile account, a holding account, a trustee account.  I don't know how that works, Mr. Terrazas.

Q.   Sir, you do know how it works.  You were the CFO at the time?

A.   I was given --

Q.   You knew what accounts were Sheet Pile's, didn't you?

A.   I was given account numbers.

Q.   You didn't know whether that was a Sheet Pile account or not, as the CFO?

A.   It was not a working bank account that Sheet Pile used, no.

Q.   So it wasn't a Sheet Pile account?

A.   I don't know if Sheet Pile is a cosigner on it.  I don't know metrics of that.

Q.   As --

A.   In fact, I believe you directed me to send it to that account.

Q.   As CFO, you didn't know?  That's your testimony?  You didn't know?

A.   I didn't know if Sheet Pile is a cosigner on that account or if it was specifically your bankruptcy attorney or trustee or any of that.  You directed me to

send it that account number.

Q.   Sir, I'm not asking about where it was directed to be sent or anything else.  I'm asking about your representations to the court.

A.   Okay.

Q.   And you say that $100,000 was transferred into Defendant's account.  Not Defendant's designated account, not where Defendant told us to put it.  In their account, right?

A.   Right.

Q.   And you're the one that actually approached Sheet Pile about the loan, correct?

A.   Mr. Wendt and I mutually discussed it.  I honestly don't remember if it was he that asked for it or I proposed it as a solution.  I had given a loan before, and so we both knew that that was an option.  And so it came up organically between the two of us.

Q.   Okay.  So your testimony now is you're not sure who raised it, because I'm pretty sure that you testified before that absolutely Sheet Pile raised it to you.

A.   Okay.

Q.   And you're not sure anymore, right?

A.   I really think that Mr. Wendt brought it up with me, but I can't remember the exact specifics sitting here right now.

MR. TERRAZAS:  And if we go to the promissory note, if we can pull this up?  Thank you, Ms. Thomson.

Q.   And the promissory note made it very clear that no payment was due until December 21st, 2020, correct?

A.   Correct.

Q.   But yet you repeatedly tried to collect on this early, right?

A.   I made requests for payment, yes.

Q.   Repeatedly?

A.   Yes.

Q.   Now, you testified yesterday that you only made those requests every month.  Just once a month, right?

A.   Early on it was more frequently.  You kept making representations to me going that it was going to be paid in February, paid soon, paid quick.

Q.   Sir, I'm going to object as nonresponsive?

A.   Well, those are the facts.

THE COURT:  When there's an objection, you need to give me an opportunity to rule on it.  Do you understand that, Mr. Ramsey?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Sustained.

Q.   (BY MR. TERRAZAS) Sir, I'm just asking you:  Didn't you testify yesterday that you only requested an update once a month?

A.    I believe I testified, after the first few months of communication, that it was a monthly request.

Q.    Okay.  So I don't remember hearing that first part. But it's not true that you only tried to request once a month.  You requested repeatedly throughout the -- the months, correct?

A.    Repeatedly the first few months, yes.

Q.    And this is Exhibit 18 -- Plaintiff's Exhibit 18. And these are multiple dates:  April 20th, April 20th, another April 20th, March 27th, March 11th.  It was repeated throughout, correct?

A.    Yes.

Q.    And that wasn't in accordance with the agreement, was it?

A.    Not according to the written agreement, no.

Q.    Not according to the promissory note that you signed, right?

A.    Correct.

Q.    And wasn't it that you were seeking to get paid early because you were worried that Sheet Pile was going to find out about all the discrepancies in the books and record, about all the payments you'd been paying yourself, and the fact that you were now working for its direct competitor?

A.    Absolutely not.

Q.   And you knew at that time, when you were asking for all these payments, that there were additional large sums that were owed to pay for those IP assets that that 100,000 that you loaned were going to have to go to, right?

A.   You mind re-asking that, please?

Q.   Sure.  No problem.  During those months that you were asking -- repeatedly asking for early payments on this promissory note, you knew that Sheet Pile was under the gun to make these other payments, large payments, up to $800,000 that we heard about before, related to these IP assets that it was purchasing, correct?

A.   I knew that there was several large payments due on a schedule as of when I left, yes.

Q.   But you didn't care about that.  You were trying to get your money as soon as you could, even though the promissory note said it wasn't due for many, many months later?

A.   Yes.

          THE COURT:  If this is good time, why don't we take our afternoon break.  So it's just before 2:40. We'll plan on coming back at 2:50.

          (Recess)

          (Open court, jury present)

Q.   (BY MR. TERRAZAS) Mr. Ramsey, I'm showing you what

is Plaintiff's Exhibit 17 that you went through yesterday.  And this is at Page 602.

On February 11th, 2020, you testified -- I'm sorry.  Can we -- sorry about that.

All right.  Here we go.  Mr. Ramsey, can you see that okay?

A.    I can.

Q.    Okay.  Great.  And yesterday you testified that all these demands and requests that you made right after the loan was provided, that all these requests were not only for the loan, but they were for the bonus and the extra 5,000, right?  You remember that?

A.    Yes.

Q.    That's not true, is it?

A.    I believe that was true.

Q.    Okay.  Do you remember exactly what you were requesting, for example, in February of 2020?

A.    I believe it was an update on all of the payments that we've discussed: the loan, the interest, the bonus, the missing pay.

Q.    Well, do you want to turn in your binder and refresh your recollection?

A.    Which binder is it, please?

Q.    It's the plaintiff's binder, Plaintiff's Exhibit 17. And refresh your recollection as what you were

requesting.  And go to the very last email.

A.   Is it supposed to match what's on the screen?
Sorry.

Q.   The top email will.  But if you look at the email before, which is the one you wrote, refresh your recollection on that.  Again, it's the very last email.

A.   The very last email starts with a string from you.

Q.   No.  The very last -- the very last email.  It's page 0603, sir.

A.   Okay.  0603, yes?

Q.   Yes, sir.  That's your email, right?

A.   Yes, it is.

Q.   I don't want you to read it out loud, but refresh your recollection.  It's not true that you requested payment of the bonus or the additional 5,000.  It was only related to the loan, correct?

A.   That email is specifically about the loan, yes.

Q.   And I want you to go through all the others in this plaintiff's exhibit, and not once do you mention the bonus or the 5,000, contrary to what you testified yesterday, correct?

A.   Okay.  I can go through the emails.

Q.   If you want to, sir, or you can trust me.

A.   May I look at them briefly?

Q.   Please.  Please.

A.   (Reviews document) Without reading every word, yes, this email -- I mean, this subject is "updated loan payment list."  So this was specifically about the loan and the other loan portions, the interest, fees, et cetera.

Q.   So your testimony yesterday was not correct, was it?

A.   Which testimony, please?

Q.   Your testimony when you said these emails, that you are demanding not only the loan, but the bonus and the 5,000.  That was not correct, was it?

A.   I believe it's in some emails.  It's not in this email string that you're pointing at.

Q.   But that's what your testimony was, was on this email string that you were asking for all of them, correct?

A.   Okay.  I don't recall which email that testimony was on.

Q.   All right.  But I'm telling you it was, and that was not correct testimony, was it?

A.   If what you're --

       MR. SCHULZE:  Objection, Your Honor: asked and answered and argumentative.

       THE COURT:  Overruled.

A.   If what you're saying is correct, then it's correct.

Q.   Now let's talk about this bonus money that you're

saying you're owed. Let's look back at the contract, Plaintiff's Exhibit 3.

All right. And it says here: "Employee will also be entitled to a one-time 44,000 bonus to be paid after the eight truckloads of products are delivered to Roll Form Group." Do you see that?

A. I see that.

Q. Now, it doesn't say "after eight truckloads of products are delivered to Roll Form Group," does it?

A. No.

Q. It says "The eight truckloads of products are delivered to Roll Form Group," correct?

A. Yes.

Q. But you testified yesterday that if you put one bar -- one piece of steel on eight trucks and you delivered them to Roll Form Group, that would satisfy this bonus, right?

A. That would be ridiculous situation, but, yes, it would.

Q. But doesn't that take out the "the" in there? Doesn't the "the" signify that there are eight truckloads that have to be delivered? Those are the only truckloads that have to be delivered?

A. I don't see it that way, no.

Q. But that's what it reads, doesn't it?

A.    It says "the eight truckloads," and then there was another list that showed it was probably going to be 12 truckloads or however many truckloads needed to be fulfilled.

Q.    I'm not talking about other lists.  I'm talking about the contract.

A.    Okay.

Q.    It says "the eight truckloads," right?

A.    It says "the eight truckloads."

Q.    And you understand what that would signify, that if it says "the eight truckloads," there are eight truckloads that have to be delivered?

A.    After the eight truckloads to earn the bonus, sure.

Q.    Yeah.  The -- you knew that Roll Form Group had ordered 38,000 feet of product, right?

A.    Approximately, yes.

Q.    All right.  And this was about 354,000 pounds?

A.    That sounds in the right ballpark, yes.

Q.    Okay.  You understand that a truckload is between 44,000 and 48,000 pounds?

A.    No.

Q.    You understand that's what a standard truck can carry?

A.    Some of our trucks are sent by hotshot drivers that can only carry, 8-, 10-, 12-, 15-thousand pounds.

Q.   I'm not talking about those, sir.  I'm talking about the standard trucks for a truckload carry between 44,000 and 48,000 pounds, right?

         MR. SCHULZE:  Objection, Your Honor: calls for expert testimony.

         THE COURT:  Overruled.

A.   On this particular order we used hotshot drivers, which had a very wide range of carrying capacity.

Q.   Sir, you used some trucks that carried between 44,000 and 48,000 pounds, correct?

A.   Correct.

Q.   Okay.  So some trucks?

A.   Some, yes.  Not all.

Q.   Some trucks, a truckload would be 44,000 to 48,000, right?

A.   Correct.

Q.   And if you divide 354,000 by 44,000, do you know what you get?

A.   I'm sure you'll tell me.

Q.   I'm asking you, sir.  Do you know?  Can you do the math?

A.   I'm sure it's in the eight or nine range.

Q.   It's eight.

A.   Okay.

Q.   It's eight.  So 354,000 pounds divided by 44,000 is

actually eight.  So eight truckloads.  Does that make sense?

A.    It makes sense.

Q.    Because you knew that Roll Form Group ordered about eight truckloads of products on the trucks that carry between 44,000 and 48,000 pounds, right?

A.    No.  I knew they ordered 38,000 feet.  They didn't order by the truckload.

Q.    And I remember at one point your counsel asked you if there were eight shipments completed.  And I noticed that word that was used.  That's not what the contract says.  It's not eight shipments.  It's eight truckloads. "The eight truckloads," correct?

A.    Correct.

Q.    Let's look a Plaintiff's Exhibit 4 that's been entered into evidence already.  And this summary list you put together, correct?

A.    Yes.  That's correct.

Q.    And I'll blow up -- this is really hard to see, but I'll blow it up as we go.  Now, first off, when you were talking about, hey, we could just deliver one bar and do it eight times and that would satisfy the contract, you should get paid 44,000 after that, right?

A.    Well, I wouldn't do something like that, but it would satisfy "eight truckloads."

Q.   Well, let's look at this first order.  Total feet was 80.  The totaled funded was $1440, right?

A.   Correct.

Q.   So that's what Sheet Pile would have received from that one what you call a truckload, right?

A.   Roughly, yes.

Q.   Okay.  So let's just round that up to 1500.  Let's do that eight times.  How much is that to Sheet Pile?

A.   Not much.

Q.   How much, sir?

A.   Well, it would be about 12,000.

Q.   That's right, sir.  It's $12,000.  So you say, if they do that eight times and Sheet Pile gets $12,000, they owe you 44,000 under this agreement?

A.   As it's written, yes.

Q.   Okay.  Well, as you read it anyways, right?

A.   As it's written, yes.

Q.   And if we look at this, this is the total shipped and remaining to be shipped.  You see this green bar?

A.   Yes.

Q.   Okay.  So let's scroll over.  And after all the shipments, which by the way you said weren't all -- you're not sure if they were even delivered or paid or whatever else for all these shipments so far?

A.   You mean the ones so far, the first 10 here?

Q.   Right.

A.   I'm not sure if they were all paid, no.

Q.   Because you said it's 45 to 60 days later, right?

A.   Well, they get paid from the funding company 80 percent within a couple or three days of invoicing.

Q.   It could be a couple of weeks, too, right?

A.   Rarely.  It was a few business days after invoicing.

Q.   It's happened before.  It's been a few weeks right?

A.   It's possible, certainly.

Q.   So we're not even sure if Sheet Pile even received this money, correct?

A.   I don't know that, because I was gone after that date, yes.

Q.   Okay.  And this is the -- in the green box right here, this is the amount of feet shipped, right?

A.   Total feet shipped, yes.  The top number.

Q.   As you said it was about 38,000 feet that had to be shipped?

A.   Total, yes.

Q.   So you're saying, at this point, less than half of the amount that had to be shipped was shipped, correct?

A.   Correct.

Q.   But yet you were to get your bonus for less than half of the order being completed?

A.   I wanted it on the payment list, yes.

RAMSEY - DIRECT                                    48

Q.    When you say -- I'm not sure I understand, sir, when you say "on the payment list"?

A.    Okay.

Q.    Were you due that bonus or not for less than half of the order being completed?

A.    I was due that bonus, but I didn't need to receive it for a few weeks, you know, based on cash flow, as Mr. Wendt and I always discussed cash flow items.

Q.    Well, actually, sir, you made the demand December 18th, right after some of those last orders that you say went out.

A.    Many times I sent in my reimbursement requests, and they may not get paid for weeks or months.

Q.    But you demanded it right then?  You said I'm owed it right then.

A.    I am owed it, yes, but it doesn't need to be paid right away.

Q.    That's not what you said in the email, right?

A.    I don't believe I said it needed to be paid right away.

Q.    You didn't say, hey, this doesn't need to be paid right away, correct?  You said:  You owe me this bonus. I'm asking you to send it to me?

A.    It was due to me as of then, yes.

Q.    All right.  And so you understand, in any order, the

first part of an order, a large percentage of that, is to reimburse for manufacturing costs, shipping costs, those other kinds of expenses, right?

A.   I do.

Q.   And so really it's only the very last part where there's profits that can be distributed, correct?

A.   Well, there can be realized profits earlier on, but it's a matter of semantics.  Yes, I understand what you're saying.  There's more of a cash flow positivity late in a project, yes.

Q.   Right.  So it makes sense that the order would be completed and you'd have those profits at the end before you shared the bonus -- or shared those profits with others, right?

A.   That would be fair.

Q.   Okay.  So when an order is less than halfway completed, then there's usually no profits at this point, right?

A.   I'm not sure about no, but cash flow would most likely still be tight at that point, yes.

Q.   Okay.  And you don't know if this order was ever completed, right?

A.   I don't know.

Q.   And you'd agree that that, to your knowledge, 354,000 pounds or 38,000 feet was never delivered to Roll

Form Group related to this order?

A.   I don't know.

Q.   You're not aware that it happened, are you?

A.   I'm not aware if it did or if it didn't.

Q.   Okay.

A.   After I left.

Q.   If we take -- I've added up all these pounds under the weight, and I got about 158,000 pounds.  Does that look about right?

A.   That sounds in the right order, yes.

Q.   If we divide that by 44,000, I'll tell you we get 3.5.

A.   Okay.

Q.   That sound about right?

A.   It sounds in the right range, yes.

Q.   So that would be, if we're talking about a truck that carries 44,000 pounds, that that would give us 3 1/2 -- 3.5 trucks?

A.   If you're talking about a 44,000 pound capacity, yes.

Q.   Right.

A.   That would be truckloads.

Q.   Now, let's look at Plaintiff's Exhibit 5.

          And these are the bills of lading and other sorts of documents here.  Do you remember those?

A.   Yes, I do.

Q.   Okay.  Now, one thing I noticed in going through, for example, on the second one, it doesn't even have -- or strike that.

On the second one, you see where it says "received in apparent good order"?

A.   I do.

Q.   That's not signed, right?

A.   That's correct.

Q.   Roll Form hasn't signed that it received the product, correct?

A.   Not on this bill of lading.  Correct.

Q.   All right.  And on the next one it's not signed, right?

A.   Correct.  No.  I apologize.  I was incorrect on both of them.  Both of them have been signed as received.

Q.   Okay.  It says "see the received."  Okay.

A.   Yeah.  Further up.  That's right.

Q.   All right.  On this one, this third one, there's no received, correct?

A.   Correct.

Q.   And on this one -- next one, which is Ramsey 494, it's not received, right?  I'm sorry.  It is.  See it's received right there?

A.   Yes.

Q.   Okay.  On this next one, there's no received, correct?

A.   Correct.

Q.   On this next one there's no received, right?

A.   I don't believe so.  I'm not sure what the cutoff is at very top.  It says Dustin Fields, dispatcher.  I'm sorry. That was cut off on mine.  No, it's not signed.

Q.   Okay.  Next one, it's not received, right?

A.   Correct.

Q.   On the next one, it's not received?

A.   Correct.

Q.   Now on the next one, not received?

A.   Correct.

Q.   So you actually don't have any documentation showing, other than for a few orders, that it was actually even received by Roll Form Group, correct?

A.   Not on these bills of lading, correct.

Q.   And that's what we have here today, right?

A.   That's right.

Q.   Now, let's talk about this Roll Form Group order. You actually weren't doing anything different from this order than what you did with any other order with Sheet Pile, correct?

A.   I wouldn't say that, no.

Q.   Well, we talked about the very beginning, sir, you

were in charge of all the invoicing for all the orders, right?

A.   Yes.

Q.   You were in charge of assisting with in inventory for all orders?

A.   Correct.

Q.   And you were in charge of assisting with moving products across the country, right?

A.   Correct.

Q.   For all orders.  Same thing you did with this one, right?

A.   On one level, yes.  But the labor was much more intensive on this one.  We had new providers of materials.  We had a whole change in our process.  We had to orchestrate the trucks in, trucks out.  On one hand, yes, it was the same duties.  On the other hand, it was an abundance of work to make this work correctly.

Q.   And you've had orders before where that's happened, right?

A.   I don't recall one to this extent.  But, yes, we have had some in the past.

Q.   Yeah.  Some orders take a lot more work, and some don't, right?

A.   Of course.

Q.   You don't get a bonus for an order that takes a

little bit longer or is harder to do, do you?

A.   Didn't have one in writing, no.

Q.   Well, you didn't get one at all, right?

A.   Correct.

Q.   And when you asked for this bonus in December of 2018, you knew that Sheet Pile had another $250,000 payment it had to make related to those IP assets during that exact same period, correct?

A.   Just to correct, you said 2018.  I believe you meant 2019.

Q.   I'm sorry.  Did I say 2018?  I meant December 18, 2019.

A.   That's correct, yes.

Q.   Okay.  And you knew this because you were managing all the books, right?

A.   Correct.

Q.   And so you demanded 44,000 right after Sheet Pile had to borrow from you 100,000, when you knew it had a $250,000 payment right upcoming, correct?

A.   Yes.

Q.   It's not what a trusted employee would do, wouldn't you agree?

A.   I was following the lines of my employment agreement saying I was due a bonus, and I also knew that we were becoming cash flow positive with the more than the

million-dollar purchase order.

Q. That's not really my question. That's not what a trusted employee would do, would it?

A. To demand their bonus or put in a request for their bonus?

Q. To request $44,000 when Sheet Pile -- you knew Sheet Pile had all these financial obligations it had to meet, when there was less than 3 1/2 full truckloads that were delivered, or potentially delivered.

A. And so what was the question that went with that?

Q. That's not what a trusted employee would do. Wouldn't you agree?

A. I would disagree. That was my agreed-to bonus that I was requesting.

Q. Let's go back to your employment agreement. As part of the employment agreement, you were required, after termination, to return any property of employer or any companies controlled, managed, owned or affiliated with employer at the time of termination. Do you see that?

A. I see that.

Q. That includes documents, right?

A. Yes.

Q. Can we go back to Plaintiff's Exhibit 4, this summary. You'd agree this has a lot of confidential information on it, right?

A.   Yes.

Q.   Plaintiff's Exhibit 5, you'd agree this has a lot of confidential information on it?

A.   Yes.

Q.   Go to Plaintiff's Exhibit 10.  Let me pull that up real quick.  You'd agree Plaintiff's Exhibit 10 has a lot of confidential information on it?

A.   Yes.

Q.   And this was after your representation to Sheet Pile that you turned over all the documents, all the confidential information of Sheet Pile's, right?

A.   Correct.

Q.   Now, this same information, you testified we heard in the -- the deposition of the Lone Star Global corporate representative, the same information was so sensitive at SteelWall that you redacted all of it, correct?

A.   The vast majority of it, yes.

Q.   Yet you had these documents while you were working at SteelWall without even telling Sheet Pile that you were there, correct?

A.   Correct.

Q.   After making the representation that you had turned over all this confidential information to Sheet Pile and you didn't have it anymore, correct?

A.   Correct.

Q.   In fact --

MR. TERRAZAS:  I apologize.  Can we pull down the screen?

Q.   I'm going to show you, if you can turn to Defendant's Exhibit 58.  And, sir, can you see it on the screen?

A.   I cannot.

MR. TERRAZAS:  Ms. Thomson, can you put it up on his screen only?

A.   Yes.  I see it now.

Q.   And this is an invoice that you worked on from SteelWall, correct?

A.   Yes.

Q.   It's a true and correct copy of that?

A.   As far as I can tell, yes.

Q.   Okay.  It's a business record of -- and I'll show you the email.  This is an email from you with that invoice, correct?

A.   Just a moment.  Yes.  It appears to be.

Q.   Okay.  It's an email you wrote and attached this invoice, that kind of thing?

A.   Correct.

MR. HUDSON:  Your Honor, I move to admit Defendant's Exhibit 58.

MR. SCHULZE:  Hearsay, Your Honor.  Lacks proper foundation.

THE COURT:  What is the hearsay response?

MR. TERRAZAS:  Your Honor, it's a statement against the party's interest.  Mr. Ramsey wrote this email.  He's admitted it's a business record.  I can establish more foundation if needed for a business records, but I think it's a statement against the interest of a party opponent.

THE COURT:  Do you have a copy of it that I can look at?

MR. TERRAZAS:  Yes, Your Honor.  And, Your Honor, I'm just going to -- there's no markings on this.  I'm just going to let you have the binder because I'm going to go two more exhibits like this.

THE COURT:  Okay.  So this exhibit would include the emails and everything that's in here?

MR. TERRAZAS:  Yes, Your Honor.  The invoices and the emails.  And, again, if I need to lay more foundation on the invoices, I can.

THE COURT:  You have a copy of this, too, right?

MR. SCHULZE:  I do, Your Honor.

THE COURT:  Why don't you-all come up to the bench; we'll talk about it real quick.

(At the bench)

THE COURT:  So as for the -- business records exception, I think that applies to the invoices themselves.  As for the email, the first one from Doug Ramsey, the statement by a party opponent, the email from the two messages from Chang, though, what are those?

MR. TERRAZAS:  One second.  Just to be clear, Your Honor, the only thing I'm using this for is to show the redacted portions.  That's it.

THE COURT:  Okay.

MR. TERRAZAS:  It's not for the truth of anything.  It's just he's redacted the same information that he's got not redacted on the stuff he had.

MR. SCHULZE:  Based on that representation, I'll withdraw my objection.

MR. TERRAZAS:  And I also plan on using 61 and 63, if we can ...

THE COURT:  We might as well, right?

MR. TERRAZAS:  They're similar things.

MR. SCHULZE:  Just to show that they've been redacted?

MR. TERRAZAS:  Just to show they've been redacted.

MR. SCHULZE:  That's fine.

MR. TERRAZAS:  And when I say redacted, I'm

going to say this is similar information and customer information.  This was talked about in the depositions.

MR. SCHULZE:  I have no objections to those.

THE COURT:  Okay.  Go team.

(In open court)

MR. TERRAZAS:  So, Your Honor, at this time we move to Admit Defendant's Exhibit 58, 61, and 63.

MR. SCHULZE:  No objection.

THE COURT:  The court admits Defendant's 58, 61, and 63.

Q.   (BY MR. TERRAZAS) Now, Mr. Ramsey, we just saw Plaintiff's Exhibits 4, 5, and 10, and these are very similar documents.  And, again, this is coming from your current employer, SteelWall, where the information is, again, so confidential that you have to redact it, correct?

A.   Current client SteelWall.  But, yes, the rest of that is accurate.

Q.   So I think there's a dispute over whether you'd agree you're employed by SteelWall or not?

A.   Well, it's my client, so I would not say I'm employed by them.  But, I mean, that's pretty minor right here.

Q.   And you got paid bonuses by SteelWall as a contractor, right?

A.    Yes.

Q.    Yes.  Okay.  And you've redacted pricing information.  You've redacted the type of materials. you've redacted the customer.  You've redacted the -- the shipping.  All those kind of things, correct?

A.    Correct.

Q.    And you did that in Exhibit 58 as well as in Exhibit 61.  Do you see that?

A.    Yes.

Q.    Okay.  And as we go through, Defendant's Exhibit 63, same thing?

A.    Yes.  I see that.

Q.    And we heard from Mr. Chang when he was testifying about how, like, for example, the factoring company -- knowing who the factoring company is and who the representatives are, that's highly confidential, too, right?

A.    Correct.

Q.    So you'd agree you violated your employment agreement by keeping these documents of Sheet Pile's in your possession without telling them.  It violates this Provision D?

        MR. SCHULZE:  Objection, Your Honor: assumes facts not in evidence.

        THE COURT:  Overruled.

A.    No.  I don't believe I violated it.

Q.    You think you complied with returning all property of the employer?

A.    These were my personal records.  So, yes, all employer property, yes, was turned over.

Q.    Okay.  So your contention is that a summary of production versus orders is your personal document?

A.    Yes.  Because that was attached to my request for bonus that I sent to you and Mr. Wendt the night before my email was cut off.

Q.    And bills of lading?  Those are your personal documents?

A.    That was also attached to that same request for bonus.

            MR. TERRAZAS:  Object as nonresponsive.

            THE COURT:  Overruled.

Q.    (BY MR. TERRAZAS) Sir, I'm asking whether or not there you're personal documents?

A.    Personal documents as part of my personal request for my bonus, yes.

Q.    But, sir, I thought whenever we went through this and there was an objection as to hearsay, it was that these were business records of Sheet Pile.  So are they business records of Sheet Pile or not?

A.    They could be both.

Q.    So you're saying they can be business records of Sheet Pile but also your personal documents?

A.    They would be kept in the normal course of business for Sheet Pile, certainly, and they were also part of my personal request for my bonus, which is still waiting to be paid.

Q.    And this, sir, invoices of Sheet Pile, by Sheet Pile, those are your personal documents?

A.    Yes.  Attached to my bonus request as supporting documentation.

Q.    And, sir, you never told -- again, when you asked for your bonus, that was in December 18th, while you were still employed by Sheet Pile, right?

A.    Correct.

Q.    So it wasn't when you were -- after you were terminated from Sheet Pile, right?

A.    When I sent the email, no.  As far as I know.

Q.    And, in fact, afterwards is when you made the representation that you had turned over all your company documents, right?

A.    Correct.

Q.    But you still had these?

A.    As part of my personal records at that point, yes.

Q.    Okay.  So they changed to now your personal records?

A.    They are both.

Q.    Let's go back to the employment agreement.  So you knew that you had noncompetition and nondisclosure requirements from Sheet Pile, right?

A.    Yes.

Q.    And we heard you testify on the video that you believed that you had those even without a contract, correct?  At least for SteelWall?

A.    I believe I have a duty to not disclose proprietary information.  That portion of it, yes.  Correct.

Q.    But you testified on Monday that you didn't have to keep Sheet Pile's confidential information and trade secrets a secret, didn't you?

A.    I don't recall that testimony, no.

Q.    I thought that's what you testified.  It was different from the video if you testified like that, right?

A.    I don't recall that testimony, no.

Q.    You'd agree, as a CFO, a trusted individual at Sheet Pile, that you owed a duty to Sheet Pile to keep its confidential information and trade secrets a secret, right?

A.    Yes, I would.

Q.    It would be unethical to release Sheet Pile's trade secrets.  Wouldn't you agree?

A.    Correct.

Q.   And you agree that you wouldn't have had continued access at Sheet Pile to trade secrets unless you had sign -- unless you signed that employment agreement in 2019?

A.   That, I don't know, because I had gone six and a half years without an agreement.  And that was the situation, and I felt like it continued after that.

Q.   Well, that's what it says, right, sir?

A.   It is what it says.

Q.   I mean, that's what you signed after you read it, that said that you knew that if you didn't sign this, you wouldn't continue to get access to this highly confidential and trade secret information, correct?

A.   It could be read that way, yes.

Q.   Well, can you read it any other way?

A.   Sure.  Just as boilerplate information.  If you didn't get -- if you didn't sign this, then you didn't get the information.  But I already had proprietary information for six and half years.

Q.   So I apologize, sir.  Are you saying you read it differently?  I'm trying to understand.  Can you read this paragraph differently than what I'm saying, which is that, if you didn't sign this, you wouldn't continue to get access to confidential information.

MR. SCHULZE:  Objection: parol evidence rule.

The document speaks for itself.

THE COURT:  Overruled.

A.   I felt like that continued what we had already been doing of not sharing any proprietary information.  I didn't know if any access to proprietary information was going to change or not.

Q.   I'm sorry.  My question was simply:  Can you read this a different way than what I said?

A.   Then can you say it again, please?

Q.   Yeah.  Can you read it differently than, if you don't sign this, you won't continue to have access to confidential information?

A.   Sitting here now, you can read it that way.  But that's not how I read it.

Q.   Okay.  And you'd agree that you couldn't do your job without access to this confidential, trade secret, and proprietary information?

A.   I do agree with that, yes.

Q.   And you agreed when you signed this employment agreement that you wouldn't solicit business from Sheet Pile customers for two years after your separation, right?

A.   Correct.

Q.   And, as CFO, you know who Sheet Pile did business with, right?

A.   Yes.

Q.   You know who their vendors would be, right?

A.   Yes.

Q.   You know who their supply chain and their business operations and strategies and those kind of things when you left, correct?

A.   Yes.

Q.   So you had a lot of Sheet Pile knowledge?

A.   Yes.

Q.   And you promised here that you would notify Sheet Pile's counsel if anyone attempts to communicate with you about Mr. Wendt or Sheet Pile or these other entities, right?

A.   I did.

Q.   And you see in that paragraph it doesn't have a provision that says, "only while you're working at Sheet Pile," correct?

A.   It doesn't.  But it says "employee."

Q.   Okay.  But it also says in the next one, employee agrees that, while he is employed, he's not going to accept employment from another company in the same industry, right?

A.   Correct.

Q.   So that one does have the prohibition that says, "employee, while he's employed," right?

A.   It does.

Q.   And the reason why it says "employee," sir, is just a shorthand at the beginning to say that it's really when you see "employee," you can just put in "Doug Ramsey" in there, right?

A.   Okay.

Q.   Would you agree with that?

A.   If you say so, yes.

Q.   So it's not simply saying that "employee" means you have to be employed at the time, right?  It's just saying "employee" means "Doug Ramsey"?

A.   Okay.

Q.   But nearly immediately -- after having all this information, nearly immediately after you left Sheet Pile, you started with SteelWall, correct?

A.   Within five or six weeks, yes.

Q.   Now, I find it interesting Mr. Chang testified that it wasn't until the end of March that you started, right?

A.   I heard that testimony, yes.

Q.   And you actually testified that it wasn't until around then, too?

A.   I believe I testified I thought it was February or March.

Q.   And then we showed you documents, including those pay records, that showed that you started getting paid at

least the beginning of February?

A.    Early February, yes.

Q.    And you know that SteelWall was run by Humphrey Chang, who was a prior CFO of PilePro Steel, correct?

A.    Correct.

Q.    Just like you?

A.    I would think so, yes.

Q.    Sorry if I said something different.  You started -- you started getting paid in February of 2020, correct?

A.    2020.  If you said something different, I heard 2020.

Q.    I may have, and I apologize to everyone.  I don't mean to make a mistake there.

      At SteelWall you're managing freight operations, aren't you?

A.    Yes.

Q.    And you performed that function at Sheet Pile?

A.    I did.  In conjunction with the warehouse folks, who also coordinated freight.

Q.    And you do that in conjunction with the warehouse folks at SteelWall, right?

A.    I do most of the freight at SteelWall in conjunction with a different setup of warehouse, yes.

Q.    Right.  It might be contractors instead of

employees, but you're doing basically the same thing?

A.   It's similar for the freight.

Q.   Yeah.  And at SteelWall you work with receivables and send out invoicing packages directly to customers, correct?

A.   I do.

Q.   You performed that same function at Sheet Pile, right?

A.   I did.

Q.   At SteelWall you correspond directly with customers about receivables, right?

A.   Rarely.  I usually send those to Humphrey to deal with.

Q.   Well, you performed that same function at Sheet Pile?

A.   That function I did, yes.

Q.   At SteelWall you manage the funding to ensure the receivables are paid, correct?

A.   Correct.

Q.   And you performed that same function at Sheet Pile, right?

A.   I did.

Q.   Other than being more hands-on with freight at SteelWall, everything you're doing at SteelWall you're doing at Sheet Pile, right?

A.    Everything I'm doing at SteelWall I did at Sheet Pile?  Is that what you're saying?

Q.    Yes, sir.

A.    Yes.  That's correct.

Q.    And, at bottom, you're performing financial and operational services for SteelWall, correct?

A.    Could you repeat that?  I'm sorry.

Q.    Sure.  At bottom, you're performing financial and operational services at SteelWall, correct?

A.    Yes.  That's correct.

Q.    And you performed financial and operational services for Sheet Pile, didn't you?

A.    In addition to many others, yes.

Q.    And you understand that SteelWall is the primary competitor to Sheet Pile?

A.    It is one of at least two main competitors that I'm aware of.

Q.    You say at least two, because we heard Mr. Chang say there's three in the U.S. market, right?

A.    I believe at one point he said three, and at one point he said there may be more.  But I did hear three in the U.S., yes.

Q.    And you're really only aware of three in the U.S., correct?

A.    Correct.

Q.   So Sheet Pile, SteelWall, and this company Skyline, right?

A.   Correct.

Q.   All right.  At your deposition in this case, you testified that, within four months of leaving Sheet Pile, that's when you started with SteelWall, right?

A.   At the time I didn't remember the exact dates, until I went back and refreshed my memory with dates.  But, yes, I believed it was three or four months.  At the time of the deposition, I thought it was three or four months.

Q.   It was actually just a matter of weeks, wasn't it?

A.   Well, it was a little over a month.

Q.   And you'd been consulting with SteelWall for nearly two years?  Probably more than that now, actually. Nearly two and a half years, right?

A.   Almost, yes.

Q.   And you never told Sheet Pile about it, did you?

A.   No.  Until the deposition.

Q.   Until you were asked in a deposition specifically, right?

A.   More or less, yes.

Q.   And you knew that a reason Humphrey Chang wanted to hire you is because of the knowledge you gained working at Sheet Pile; isn't that right?

A.   I believe that was one of the reasons he wanted to

hire me, yes.

Q.    Another reason was that you had access to all of Sheet Pile's sensitive information, correct?

A.    No.

Q.    That's not what you testified in your deposition, is it?

A.    I don't believe I would have said otherwise.

MR. TERRAZAS:  Your Honor, if I may approach?

THE COURT:  You may.

MR. TERRAZAS:  (Tenders document to witness).

Q.    Mr. Ramsey, has your recollection been refreshed?

A.    It has.

Q.    So didn't you testify in your deposition that one of the reasons that Mr. Chang hired you, or that might have informed or encouraged him to contact you was because of the sensitive information you had at Sheet Pile?

A.    I said it was possible, yes.

Q.    Okay.  In fact, I asked you, you know, that would make sense, wouldn't it?  And what did you say?

A.    I believe I said yes or yes, possibly.

Q.    And you didn't have any knowledge of the sheet piling industry except what you knew because you worked at Sheet Pile at that point, correct?

A.    That's correct.

Q.    And you make money off that knowledge now, right?

A.    Off of which knowledge, sir?

Q.    The knowledge that you learned at Sheet Pile.

A.    It's the knowledge I learned there.  None of the proprietary knowledge do I use now.  But, yes, general market knowledge, general logistics knowledge, I do use now.

Q.    Well, as part of your job at SteelWall, you communicate with customers, right?

A.    Yes.

Q.    And you heard Mr. Chang say, no, you never communicated with customers, right?

A.    I heard him say that.

Q.    And you heard him say you never communicated with vendors, right?

A.    I heard him say that.

Q.    Never communicated with suppliers, right?

A.    I believe I heard him say that, yes.

Q.    And then you heard him change his testimony when he was presented with documents, correct?

A.    Somewhat change it, yes.

Q.    Because you do talk with customers, you do talk with vendors, you do talk with suppliers.  Right?

A.    I do not talk with suppliers.

Q.    And one of the customers that you have contacted before, that you told in your deposition, was Triad

Metals, right?

A.    I mentioned that in my deposition, and then I also filed a correction there --

Q.    And, sir --

A.    -- asked me to do.

Q.    Sir, you said in your deposition, multiple times, actually, that you talked with Triad Metals as a customer, right?

A.    Yes.  And then I corrected that.

Q.    While at SteelWall, right?

A.    While at SteelWall.  And then I corrected that, yes.

Q.    Okay.  And you know that Triad is one of the largest customers of Sheet Pile correct?

A.    I remember it being a good customer of Sheet Pile when I was there.

Q.    And I asked you at your deposition, you remember, that -- I asked you if there's any answer that you wanted to change when the deposition was done, correct?

A.    Correct.

Q.    And you said no, right?

A.    At that time, yes.

Q.    And I asked you if there's any answer -- anything you wanted to add to any of your answers at that time, right?

A.    Yes.

Q.   And asked you a -- and you said no, right?

A.   That's correct.

Q.   And I asked you, if you didn't understand a question, that you let me know, right?

A.   Yes.

Q.   And I also asked you that, if I asked you a question and you answered it, was it fair for us to assume that you understood the question that was asked, right?

A.   Yes.

Q.   And you told us that day at that deposition that you're going to give us your very best and most complete answers on the subjects we discussed, right?

A.   Yes.

Q.   And multiple times in there you said that you had contacted Triad Metals while you were at SteelWall.

A.   Yes.  And then I realized my error and filed the correction, as you requested me to do.

Q.   Weeks later, right?

A.   I don't recall the timing of it.  I notified my attorney very quickly.

Q.   And you testify at your deposition that you've been in communication with Triad Metals to answer questions they had, right?

A.   I don't recall the answering questions portion.

Q.   And you -- do you need me to refresh your

recollection?

A.    Please.

MR. TERRAZAS:  Your Honor, may I approach?

THE COURT:  You may.

MR. TERRAZAS:  (Tenders document to witness).

Q.    Mr. Ramsey, is your recollection refreshed?

A.    It is.

Q.    And you testified at your deposition that you answered questions from Triad, right, while at SteelWall?

MR. SCHULZE:  Your Honor, may we approach?

THE COURT:  You may.

(At the bench)

MR. SCHULZE:  Mr. Ramsey has already testified that he misspoke during his deposition and that he filed a notice of correction.  We timely filed a notice of correction of that testimony, amending the testimony, indicating that he didn't intend to say Triad Metals but he intended to say a different company.  And I forget what it is off the top of my head.

We timely filed that notice of correction, and there was no objection to that notice of correction or anything thereafter.  And so this is misleading the jury, and it's mischaracterizing the evidence that's on file because that was not the intended testimony.

THE COURT:  Well, does that correction

completely foreclose this kind of impeachment?

MR. TERRAZAS:  Not at all.

THE COURT:  Well, I would imagine that the correction is there to -- and that you can take that up on, you know, redirect.  But I think the fact that he said one thing and then said another one on correction, I can't imagine filing a correction completely prevents someone who is questioning them on cross from raising it to the jury, right?

MR. SCHULZE:  That's my understanding of Rule -- forgive me.  I don't -- I don't recall off the top of my head.  I want to say 30.

MR. TERRAZAS:  I believe it's 30(e).

MR. SCHULZE:  30(e).  Yes.  Federal Rule 30(e). I guess there's nothing in the rule that requires or eliminates the testimony.  You are correct.

THE COURT:  It seems appropriate, just at a gut level.  I mean, it's -- we can leave it up to the jury to decide.  I don't see anything that forecloses this line of questioning.

MR. SCHULZE:  Understood, Your Honor.

THE COURT:  Overrule the objection.

MR. SCHULZE:  Thank you.

(In open court)

Q.    (BY MR. TERRAZAS) Mr. Ramsey, you testified at your

deposition that you responded to and answered some questions from Triad, correct?

A.   Yes.

Q.   While you were at SteelWall?

A.   Yes.

Q.   And that you also -- those questions were related to processing orders for Triad, correct?

A.   Yes.

Q.   I'm going to show you what's already been admitted as Defendant's Exhibit 59.  This is a little small, so I'll blow it up.  And this is a report you ran at SteelWall, correct?

A.   Yes.

Q.   Remember Mr. Chang, that he got corrected.  This was the document he got corrected on when he said, Oh, he's never had any orders with Skyline Steel after you started?

A.   I remember him explaining that it was an old order that was getting rebilled or something along those lines.

Q.   That was the first one.

A.   Oh, okay.

Q.   This is the second where he said, "Oh, I stand corrected."  Do you remember that?

A.   I recall that, yes.

Q.   All right.  So Skyline Steel is actually a customer,

even though you all are claiming that it's a competitor.

A.    It's listed as a receivable here, yes.

Q.    Okay.  And you don't see Sheet Pile on there, right?

A.    No, I don't.

Q.    All right.  Because SteelWall and Sheet Pile don't buy from each other?

A.    No, they don't.

Q.    You also see here this Roll Form Group Canada.  Let me blow that up.  See that?

A.    I see that.

Q.    Now, you're unaware of any orders that SteelWall made with Roll Form prior to you joining, are you?

A.    I'm not aware of any before I joined?

Q.    Right.

A.    I -- I don't know the history of the customers.

Q.    Right.  So you're not aware of any?

A.    I'm not aware that they had them or didn't have them.

Q.    Okay.  And Roll Form Group is a large customer of Sheet Pile, correct?

A.    It was when I left, yes.

Q.    Right.  In fact, that order that you are saying you owed a bonus on was with Roll Form Group, correct?

A.    That's correct.

Q.    So we've got here -- we see Roll Form Group now

ordering from SteelWall, and you have no knowledge of it ever ordering from SteelWall prior to you joining, right?

A.    No knowledge, yes or no.

Q.    Now, sir, you've been -- you know who Norman Buitta is, correct?

A.    I do.

Q.    And you've been in -- Norman Buitta was the operations manager up at New Hampshire facility for Sheet Pile, correct?

A.    Correct.

Q.    And you were in contact with him immediately after you were terminated, right?

A.    I don't know about immediately, but sometime after, yes.

Q.    And you've been in contact with him since then, right?

A.    I have.  He's a friend.

Q.    And you know that Mr. Norman Buitta has left Sheet Pile under some pretty bad conditions, correct?

A.    I do know that, yes.

Q.    And you know he absconded with a lot of Sheet Pile's equipment and other sorts of things, correct?

A.    I don't know that.

Q.    You don't know that at all?

A.    I don't know that.

Q.   All right.  But you're in regular communication with him?

A.   I don't know about regular.  Phone calls, occasionally.

Q.   I could see that as pretty regular.

A.   Every few months.  If you call that regular, that's regular.

Q.   Okay.  Let's talk about how you booked company expenses at Sheet Pile.  You claimed that --

          MR. TERRAZAS:  Sorry, Ms. Thomson.  Can we take it down to allow the witness to see?

Q.   I'm going to show you Plaintiff's Exhibit 60.  Yeah. Plaintiff's.  Sir, can you see that?

A.   I can make it out, yes.

Q.   This is a document you created, correct?

A.   Yes.

Q.   This is document you created while you were at Sheet Pile, right.  Or is it after?

A.   I believe this may have been after.

Q.   Okay.  After.  But this is a true and correct copy of a document you created?

A.   It looks to be, yes.

          MR. TERRAZAS:  Your Honor, I move to admit Plaintiff's Exhibit 60.

          MR. SCHULZE:  No objection.

THE COURT:  The court admits Plaintiff's Exhibit 60.

Q.    (BY MR. TERRAZAS) And you claimed that you personally paid -- you, personally -- more than $175,000 for freight charges incurred by Sheet Pile between December 2017 and May 2019.  Do you agree with that?

A.    Do you mind scrolling to the bottom.  Is there a total on there?

Q.    There's not a total on this.

A.    Okay.

Q.    And I can get to other documents that show that, but we saw some of the Quickbook reports.  But would you say that's probably accurate?

A.    I'm not sure, honestly.

Q.    Okay.  Do you want to see some of those Quickbook reports?

A.    If you don't mind.

Q.    No problem, sir.  So here is Defendant's Exhibit 41. And we have a number of freight bills and other sorts of things that you claimed -- and, again, I could go line by line, but I think that would take us forever -- that you claim that you paid on behalf of Sheet Pile, right?

A.    Yes.  That's correct.

Q.    We've added them up, and it's about $175,000 over two and half years?

A.    It may be.  I'm not sure of the number sitting right here.

Q.    Do you have any reason to doubt that?

A.    Not right now.

Q.    But you don't have any documents to back that up, do you?

A.    Yes, I do.

Q.    Well, we don't have any here, do we, today?

A.    I don't know which you have in here.  The other sheet that you just had in there was kind of a table of contents of the documentation of those receipts that have been provided in discovery.

Q.    Okay.

A.    In discovery or filing.

Q.    Sir, I'm asking about here today.  We've got -- Defendant has exhibits; Plaintiff has exhibits.  Are you aware of documentation of all those?

A.    I'm not sure if they're in all the copious exhibits, because this was a table of contents that listed all of the receipts.  If you look to the very right side, it says "receipts."  It lists them 1B, 2B, 3B.  I remember there are PDFs of documentation for those reimbursements.

Q.    And you're claiming this is every payment you made to yourself for alleged expenses, right?

A.    I believe that is from Sheet Pile to myself for

expense reimbursements, correct.

Q. Let's look at, for example -- strike that.

You also heard from Ms. Minteer who said, hey, it's not good enough to just simply provide like a summary of Quickbooks. You've got to have actual receipts, right?

A. I did hear that, yes.

Q. Do you agree with that?

A. I do agree with that, yes.

Q. You'd agree it's not enough to just have credit card statements, right?

A. That is correct.

Q. You have to have the underlying documentation, correct?

A. Credit card statements are a step to basically have an index, and then you should also have documentation to support it.

Q. All right. I'm looking here. And I'll blow this up. We see on September 26th, 2019 -- and this is just slightly less than a month after you signed your new employment agreement, right?

A. Correct.

Q. And there's a $20,000 payment that you paid to yourself, correct?

A. Yes.

Q.   And you're claiming that's for medical expenses?

A.   That's correct.

Q.   That's not a corporate expense, is it?

A.   It is, because Rob Wendt authorized that.  He was offering to pay all back medical expenses for managers: Norman, myself, Mr. Wendt.  I'm sorry.  I should say Mr. Buitta, Mr. Wendt, myself.

Q.   Well, I think Mr. Wendt will contest that, and we'll hear from him.  But, either way, sir, it's not a corporate expense.  Personal medical expenses are not a corporate expense, are they?

A.   It certainly can be, if Mr. Wendt is authorizing it from his company to be paid to employees to cover what our health plan did not cover.

Q.   So you believe that the IRS would consider personal medical expenses to be a corporate expense?

A.   I do believe they would.

Q.   And you're claiming that these medical expenses go back years -- like eight years, correct?

A.   About seven years, I believe.

Q.   I'm sorry.  Seven years?

A.   Yes.

Q.   Seven years.

A.   Six and a half to seven, yes.

Q.   And so, again, right before you make this loan to

Sheet Pile, you're paying yourself $20,000 for medical expenses that you say go back seven years?

A.   Correct.

Q.   So going back to the Quickbooks, what you recorded, you did all these Quickbooks transactions, right?

A.   I'm not sure that I did.  I don't recognize some of the items that are on there.  But, for the most part, yes, I did.

Q.   Well, sir, who else would do it?  I mean, the only ones that had access to Quickbooks were you and Mr. Wendt, right?

A.   After I left, evidently there were interim accountants.  There was Ms. Minteer.  Like, for instance, "PilePro Old Master," that wasn't a term I ever used.  I don't know where some of those items came from.

Q.   Well, these are recorded in 2017, 2018, 2019.  To be clear, you were the only one that was doing the Quickbooks at that time, right?

A.   At that time, yes.

Q.   And so, as we see in here, let's just look as an example, 5-15 -- and, by the way, I'm sorry.  Just to orient you and everyone, it says "Doug Ramsey" here at the top.  That's because these are payments or transactions to and from you?

A.   Correct.  From Sheet Pile.

Q.    From Sheet Pile?

A.    Correct.

Q.    Right.  And so we have pages of transactions between you and Sheet Pile?

A.    Yes.

Q.    It's a little odd, don't you think?

A.    No.

Q.    Okay.  And so, for example, we look at 5-15-2018, and we see a $3,384.23 payment to you, right?

A.    I do.

Q.    And there's no description on it whatsoever.

A.    Okay.  It was a bill payment.  So it would -- if you go into Quickbooks, it will refer back to the original bill.

Q.    Okay.  And then we've got two more just soon after, a couple of weeks after, for a little over 10,000 and about 4500.  You see that?

A.    I see that.

Q.    No description on it whatsoever, right?

A.    They would refer back to an original bill if you pull those up in Quickbooks.

Q.    Sir, I'm just asking:  Is there any description on this?

A.    Not in this report.

Q.    And you understand that Ms. Minteer came up here and

said she's got access to all the Quickbooks, and she wasn't able to find any backup documentation, right?

A.    Not backup documentation, correct.

Q.    Or anything else to describe what these were for.

A.    I don't know about that.  Because, again, if you go into Quickbooks, you would see that these refer to a specific bill.  And that would refer back to an original -- you see, like, the bills have a reference number of an expense report on there.

Q.    Remember, you -- strike that.

Did you hear her testify that she did that, she looked at the Quickbooks to try to figure out where they were from, and she couldn't figure it out.  Do you remember that?

MR. SCHULZE:  Objection: misstates the evidence.  Misstates the testimony of Ms. Minteer.

THE COURT:  Overruled.

A.    I recall that -- I recall that Ms. Minteer said that she looked at Quickbooks, yes.

Q.    And she looked for -- trying to find the underlying what these transactions were for, right?

A.    I believe that she said something along those lines, yes.

Q.    And so 3,000 -- a little over 3,000 on May 15th.  A little over 15,000 between June 4th and June 6th.  We've

got another one here for about 10,000 -- I'm sorry -- just on June 13th.  So just in that time frame, in about a month, you got paid close to $30,000 from Sheet Pile in addition to your salary and in addition to, apparently, some Sempe payments?

A.    Reimbursements.

Q.    Sir, you got paid.

A.    I received payment on reimbursements, according to this list.

Q.    You got paid -- sir, just you got paid about $30,000, plus your salary, plus from Sempe, correct?

A.    Correct.

            THE COURT:  We're overdue a stretch break.  If we can take a sec here.

Q.    (BY MR. TERRAZAS) Mr. Ramsey, you said that your email was cut off on December 19th, 2019, correct?

A.    Either the evening of the 18th or morning of the 19th.  When I checked on the 19th, it was off, yes.

Q.    And you need your email to work, don't you?  To do work at Sheet Pile?

A.    It certainly helps, yes.

Q.    I mean, it not only helps.  It's pretty essential. Wouldn't you agree?

A.    It's essential, yes.

Q.    And you actually didn't do any work for Sheet Pile

after December 18th?

A.   I actually did.  I had a desktop version of Quickbooks.  I kept entering any physical bills that we had.  I kept following up that way, reaching out to yourself to see what the situation was.  Still working with Mr. Buitta in New Hampshire.

Q.   Reaching out to people to figure out what the situation was, that's not actually working.  Would you agree?

A.   I would say that's part of work.

Q.   And you didn't receive any bills from anyone after December 18th, did you?

A.   I don't recall what I received.  I may have.  There were -- there was a physical mailbox.  I may have checked it during that time.

Q.   You're not sure you did?

A.   I'm not sure that I did, no.

Q.   Okay.  So is there anything you could say that you absolutely did during -- after December 18th?

A.   Yes.  I kept entering some paper bills that I had into Quickbooks.  I can't remember if I issued a few checks during that time.  I don't believe I did.  I was trying to tidy up the end of the year stuff, getting ready for end of the year, as you normally do in December.

RAMSEY - DIRECT

92

Q.    Do you remember any specific bill that you entered after December 18th?

A.    I don't remember a specific bill from four years ago.

Q.    And despite being paid at least 165,000 in salary and in Sempe payments in 2019, and despite not having even email access and not remembering anything specifically that you did after December 18th, you're claiming that you're owed another $5,000?

A.    Yes, I am.

Q.    Didn't you tell Mr. Chang that you were fired once Mr. Wendt turned off your email access?

A.    I believe I said -- I don't even remember if I gave him a specific date or specifics of it.

Q.    Right.  But you told him that you were fired once he turned off your email access?

A.    I don't believe I ever said that.

Q.    Okay.  Sir, we're going to look at Plaintiff's Exhibit 2.  This is the security agreement, right?

A.    Yes.

Q.    And the security agreement went along with the promissory note, correct?

A.    That is correct.

Q.    And the security agreement was to provide collateral for this promissory note, right?

A.   That's correct.

Q.   And it was very specific about what collateral, correct?

A.   It was.

Q.   And that was on the last page.  See that?

A.   I do.

Q.   And it was specific to the receivables of the borrower as of the date of the agreement, correct?  So it's back in 2019 -- November of 2019, right?

A.   That's correct.

Q.   Specifically, the receivables on that Samuel Roll Form Group PO, right?

A.   That's correct.

Q.   And then the current inventory of Sheet Pile?

A.   That's correct.

Q.   Not future, but current?

A.   Correct.

Q.   And the equipment, tools, machinery, and other supplies, correct?

A.   That's correct.

Q.   Yet you filed suit, and you tried to attach much different collateral than what's listed here, didn't you?

A.   I don't believe so, no.

Q.   Well, didn't you approach Sheet Pile's factoring company, proprietary information of who they are, and

send them letters related to the lawsuit, trying to attach?

A.   I believe my attorney or legal team did, yes.

Q.   And that was for receivables that are not listed here, correct?

A.   I wouldn't know what receivables that the factoring company would have had by that point that were still open from then.

Q.   But you would know they would be different from the Roll Form Group ones, because working at Sheet Pile, you know there's a lot of receivables that come in every month.

A.   I would know that it would change often, yes.

Q.   Right.  So you knew that at least some of those receivables would not be the receivables in the collateral.  Wouldn't you agree?

A.   Potentially, yes.

Q.   And you sent it to the bank?  You sent these letters to the banks, too, right?

A.   I believe the legal team did, yes.

Q.   Well, the banks wouldn't have any open receivables, would they?

A.   I don't know that.

Q.   No.  They have money, sir.  They don't have receivables.

A.    I understand that.  But, much like the factoring company, I wouldn't know at that point what other transactions, loans, other notes had been signed with any banks.

Q.    But you knew, sir, that in the bank there would be funds which were not open receivables or receivables due, right?

A.    Not open receivables, right.

Q.    And not receivables due an open.  The second one, right?

A.    No.  But receivables that may have been collected.

Q.    But that's -- sir, it's not -- that would be -- strike that.

      You knew at least that some of the moneys that you were trying to attach in there were not part of this collateral for the banks?

A.    Some.  But I'm not sure if this exhibit got sent to the banks for their determination, their legal department.  I don't know all the specifics of that.

Q.    Well, if I told you it was, do you have any reason to doubt that?

A.    I don't.

Q.    So you were trying to use the security agreement and violate the security agreement by trying to attach things that you had no right to, correct?

A.    I was trying to get my either money back or collateral in value back.

Q.    And, sir, I apologize.  My question was:  You tried to attach things that were not part of the security agreement.  Yes or no?

A.    Not to my knowledge.  I only wanted to attach what was listed on this collateral.

Q.    Well, you didn't tell the -- the letters to the banks and to the factoring company didn't say that, did they?  They said everything.

A.    I don't know what the letters said.

Q.    You also sent it to the landlord, correct?

A.    I don't recall that.

Q.    And you directed your attorneys to send it to everyone they could, right?

A.    I shared potential contact information with my attorney and let them make the determination of what they needed to send to what party.

Q.    So you shared proprietary information concerning factoring, concerning banks, concerning potentially landlords, and others, correct?

A.    As allowed by law, yes.

Q.    Sir, how do you know it's allowed by law?

A.    I was advised.  But I don't want to get into client-attorney discussions here.

Q.   Sir, you're saying it's allowed by law.  I'm trying to understand.  Do you really know that it's allowed by law?

A.   That's my understanding, yes.

Q.   All right.  Let's discuss your accounting practices.

You would agree that CFOs have a duty to handle all financial books and records?

A.   Handle or manage the people that do, yes.

Q.   And in your case it's just you.  There's no one else, right?

A.   Meaning at Sheet Pile?

Q.   Right.

A.   That's correct.

Q.   And at SteelWall?

A.   I'm not a CFO at SteelWall.

Q.   You're handling the finances, right?

A.   Finance and operations.

Q.   Okay.  And that includes identifying and designating transactions, what CFOs have to handle?

A.   Yes.

Q.   That includes running payroll?

A.   Are we talking -- not to split hairs.  Are we talking specifically at Sheet Pile or in different companies?  Because the CFO level can vary from company to company.

Q.    Thank you.  That's fine.  Let's talk about Sheet Pile.

A.    Okay.  Thank you.

Q.    Running payroll, right?

A.    Yes.

Q.    Maintaining records of equipment?

A.    Yes.

Q.    Keeping adequate records of business transactions?

A.    Yes.

Q.    Properly identifying coding transactions for tax purposes?

A.    Yes.

Q.    You would agree that companies usually have accounting software that assist in this process, right?

A.    Correct.

Q.    And Sheet Pile used Quickbooks here?

A.    That's correct.

Q.    And the Quickbooks allowed you to upload receipts and other sort of backup documentation, didn't it?

A.    It allowed it, yes.

Q.    And you'd agree that you're the only person who had access to Sheet Pile's Quickbooks between November 2016 and December 2020 -- or 2019?

A.    2019, yes.

Q.    Okay.  Let's look at Defendant's Exhibit 4.  And,

Q.   sir, this is something that you put together, correct?

A.   It looks like it, yes.

Q.   And this has got a lot of confidential information on it, doesn't it?

A.   It does.

Q.   It's something you kept, though, in your records?

A.   It is.  This was a working copy.  Not a final copy, but a working copy, yes.

Q.   Even as a working copy, you'd agree it's very sensitive?

A.   Absolutely, yes.

Q.   And, sir, this was done before the end of December, right?

A.   Before the end of December, yes.

Q.   Okay.  Because we can see here it says "Contract Expected December," right?

A.   Correct.

Q.   So we know this happened either at the end of November or beginning of December, correct?

A.   That's correct.

Q.   And at that time you -- you put down that you received $120,000 already in salary, correct?

A.   No.

Q.   That's what it says here, isn't it?

A.   No.  The titles weren't clear because, again, this

was a working copy. I believe Mr. Wendt had asked me to come up with a list of what we were expecting to pay out in contract in December. And so the salary column -- it is a bit misleading, but the salary column, that was full salary for the year that was going to have been paid by the end of the year. And then we were trying to figure out how much contract money was going to need to be paid in December.

Q.    And if we come down -- this is the second page of it. We've got insurance. Now I'm going to represent to you, and we can go back and see, but this fourth line up, that's you. Would you agree with that?

A.    It looks to be, yes. That's right.

Q.    And so Sheet Pile was paying basically double for your medical insurance versus any other employee. Would you agree?

A.    That's correct.

Q.    And you still think that you deserve to get paid $20,000 in medical expenses on top of that?

A.    Yes. Because that's what Mr. Wendt offered me, and so that came out to about another $3,000 per year that I had been there.

Q.    And I noticed here in this -- this column, when you talk about salary and it's got "contractor" and those kind of things, you don't mention anything about the

$45,000 in payments that you received as a contractor in 2019, do you?

A.   You mean from Sempe?

Q.   Yes, sir.

A.   Not at all.  Because that was payment for 2018 back pay.

Q.   Yes, sir.  But this is what was received in 2019, right?

A.   This is payroll for Sheet Pile in 2019.

Q.   For what was received in 2019 by all the different contractors as well as salary, correct?

A.   From Sheet Pile.

Q.   And you don't list anything about the $45,000 in payments that you received, correct?

A.   Not to myself or the various payments that were made to Mr. Wendt in 2019 either.

Q.   And you would agree, if you showed this to Mr. Wendt, that this would suggest that the only thing you were receiving would be salary, correct?

A.   From Sheet Pile, yes.

Q.   Well, it doesn't say "Sheet Pile" on here.  It says "Payroll Expense Breakdown," correct?

A.   Right.  But this was just a simple working internal document.  I wasn't going to put all the titles or my name on the paper.

MR. TERRAZAS:  Your Honor, I object as nonresponsive.

Q.   Sir, I need you to just answer my question, and we can get out of here.

Sir, it doesn't say anything about it just being Sheet Pile, does it?

A.   No, it doesn't.

Q.   And on this medical insurance -- one last question. On this medical insurance payment, that was covering your entire family, wasn't it?

A.   That was medical coverage for my family, as offered by Mr. Wendt, yes.

MR. TERRAZAS:  Pass the witness, Your Honor.

THE COURT:  Any examination from you, Mr. Schulze?

MR. SCHULZE:  Your Honor, Mr. Ramsey is a defensive witness in this as well, and we will -- we'll hold our questions until then.

THE COURT:  Okay.  Then you can step down, Mr. Ramsey.

(End of requested transcription)

**UNITED STATES DISTRICT COURT        )**

**WESTERN DISTRICT OF TEXAS           )**

I, Arlinda Rodriguez, Official Court Reporter, United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

WITNESS MY OFFICIAL HAND this the 12th day of November 2023.

/S/ Arlinda Rodriguez
Arlinda Rodriguez, Texas CSR 7753
Expiration Date:  10/31/2025
Official Court Reporter
United States District Court
Austin Division
501 West 5th Street, Suite 4152
Austin, Texas 78701
(512) 391-8791